## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CLASS ACTION CASE NO. _____

STEVEN MICHAEL COX, individually and
on behalf of those similarly situated,

       Plaintiff,

vs.

PORSCHE FINANCIAL SERVICES, INC.,
PORSCHE LEASING LTD., and
PORSCHE CARS NORTH AMERICA, INC.,

       Defendants.

_____/

### CLASS ACTION COMPLAINT

Plaintiff STEVEN MICHAEL COX, on behalf of himself and all others similarly situated, brings this class action against Defendants PORSCHE FINANCIAL SERVICES, INC. and PORSCHE LEASING LTD. (referred to collectively as "Porsche Leasing/Financial"), as well as PORSCHE CARS NORTH AMERICA, INC. ( "Porsche NA"), for violating federal and Florida laws in connection with their predatory motor vehicle leasing practices.

### I.      INTRODUCTION

1.      This action concerns the unlawful, deceptive, and unfair motor vehicle leasing practices of Defendants and their affiliated entities, including the nationwide network of authorized Porsche dealers.   These unlawful leasing practices are designed to provide unwarranted and unlawful profits for Defendants and their affiliated entities at the expense of unwitting consumers.

2.      Plaintiff is a senior citizen who was victimized by a predatory motor vehicle leasing practice colloquially known as "swallowing a trade-in"—a practice whereby Defendants

and their authorized Porsche dealers accept a trade-in vehicle with positive monetary value from a consumer as part of a lease transaction, but then intentionally and willfully:

    a. fail to accurately disclose on the face of their standard form motor vehicle lease agreements *what value* the consumer has received in exchange for their trade-in vehicle, and *how that value* has been applied to the transaction;

    b. fail to apply the positive monetary value of the consumer's trade-in vehicle to reduce the overall cost of the lease, including the amount financed, the amount of interest, and the amount of sales tax; and

    c. fail to exclude the positive monetary value of the consumer's trade-in vehicle from the sales tax calculation under Florida law.

3. Through these unlawful practices, Defendants and their authorized Porsche dealers: (a) deprive consumers of the opportunity to make an informed decision based on a full and accurate disclosure of the terms of the lease transaction; (b) collect unlawful and unwarranted profits for themselves; and (c) impermissibly charge and collect from consumers more sales tax than is actually due under Florida law.

4. In Plaintiff's case alone, Defendants and the complicit authorized Porsche dealer in Florida obtained thousands of dollars in additional profit from Plaintiff through their willful violations of federal and Florida law.

5. Plaintiff brings this class action on behalf of himself and all other similarly situated victims of Defendants' unlawful practices (referred to collectively as the "Class" or "Class Members").

6. Plaintiff and the putative Class Members seek statutory damages, actual damages, punitive damages, restitution, civil penalties, attorneys' fees and costs, and declaratory and injunctive relief to end these unscrupulous practices.

## II.    NATURE OF THE CASE, JURISDICTION, AND VENUE

7.    This class action arises under the federal Consumer Leasing Act, 15 U.S.C. § 1667, *et seq.*; its implementing regulation, Regulation M, 12 C.F.R. § 213; the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201, *et seq.*; and Florida common law.

8.    This Court has federal question jurisdiction under 28 U.S.C. § 1331.  This Court also has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367, because they are so related to the federal claim that they form part of the same case or controversy under Article III of the United States Constitution.

9.    This Court also has subject matter jurisdiction over this action under the Class Action Fairness Act because there is minimal diversity and the matter in controversy exceeds the sum or value of $5,000,000.00 exclusive of interests and costs.  28 U.S.C § 1332(d)(2)(A).  None of the claims stated here have been assigned or otherwise given to any other court or tribunal.

10.    Venue lies in this District under 15 U.S.C. § 1667d(c), which provides that any action under the Consumer Leasing Act "may be brought in any United States district court or in any other court of competent jurisdiction."   Venue also lies in this District under 28 U.S.C. § 1391(b).

## III.    PARTIES

11.    Plaintiff is an adult resident of Collier County, Florida.  Plaintiff is, and was at all relevant times, 60 years of age or older and, therefore, a senior citizen under FDUTPA.  *See* Fla. Stat. § 501.2077(1)(e) (defining a "senior" as someone 60 years of age or older).

12.    Defendant Porsche NA is a Delaware corporation with its principal place of business at One Porsche Drive in Atlanta, Georgia 30354.  Its registered agent is CT Corporation System, 1200 South Pine Island Road, Plantation, FL 33324.  Established in 1984, Porsche NA is

the exclusive importer of Porsche vehicles for the United States and is a wholly owned subsidiary of Porsche AG, which is headquartered in Stuttgart, Germany.  Porsche NA conducts substantial business activities in Florida and in this District, and otherwise maintains requisite minimum contacts with Florida.

13.     Defendant Porsche Leasing, Ltd. is a Delaware corporation with its principal place of business at 4343 Commerce Court, Suite 300, Lisle, IL 60532.  Its registered agent is CT Corporation System, 1200 South Pine Island Road, Plantation, FL 33324.  It also conducts substantial business activities in Florida and in this District, and otherwise maintains requisite minimum contacts with Florida.

14.     Defendant Porsche Financial Services, Inc. is a Delaware corporation with its principal place of business at One Porsche Drive, Atlanta, GA 30354.  Its registered agent is CT Corporation System, 1200 South Pine Island Road, Plantation, FL 33324.  It also conducts substantial business activities in Florida and in this District, and otherwise maintains requisite minimum contacts with Florida.

## IV.     DEFENDANTS' NATIONWIDE NETWORK OF PORSCHE DEALERS

15.     Porsche of Fort Myers (the "Fort Myers Dealer") is a Porsche dealer located at 10064 Daniels Interstate Court, Fort Myers, FL 33913.  It is one of many Porsche dealers across Florida and the United States (collectively the "Porsche Dealers") that regularly leases or arranges for the lease of Porsche vehicles to consumers.

16.     Each Porsche Dealer has leased or arranged to lease motor vehicles to consumers more than five times in the preceding calendar year and more than five times in the current calendar year.  Each Porsche Dealer is thus a "lessor" under the Consumer Leasing Act, 15 U.S.C. § 1667(3), and Regulation M, 12 C.F.R. § 213.2(h).

17.     Porsche NA and Porsche Leasing/Financial are affiliated companies.   Porsche Leasing/Financial is the captive or in-house financing and leasing company (or companies), offering financing for leases and purchases of Porsche vehicles.

18.     At all relevant times, the Porsche Dealers and their subsidiaries, affiliates, and other related entities, as well as their respective employees, were the agents of Porsche NA and Porsche Leasing/Financial acting within the scope and purpose of that agency.

19.     At all relevant times, Porsche Leasing/Financial and its subsidiaries, affiliates, and other related entities, as well as its respective employees, were the agents of Porsche NA acting within the scope and purpose of that agency.

## V.     FACTUAL ALLEGATIONS

**A.**     <u>**The Mechanics of a Porsche Lease Transaction.**</u>

20.     Pursuant to Porsche NA's "Dealer Sales and Service Agreement," Porsche NA provides "sales . . . training programs to [each Porsche Dealer's] personnel, at such times and locations as are reasonable."   https://www.sec.gov/Archives/edgar/data/1019849/ 000095012403001005/k74179exv10w2w16.txt (last visited July 11, 2016).   Porsche NA also "agrees to make available field service personnel who, from time to time, will advise and counsel [each Porsche Dealer's] personnel on sales, service, and parts-related subjects[.]"   *Id.* Accordingly, Porsche NA trains all employees of the Porsche Dealers regarding the sales practices used in connection with a lease or sale of a Porsche vehicle.

21.     Porsche Leasing/Financial and the Porsche Dealers use a standard form contract known as a "Motor Vehicle Lease Agreement," designated "PLL 3300 (7/09)" ("Lease Agreement"), in all of their lease transactions with consumers.   Plaintiff's boilerplate Lease Agreement, attached as Exhibit "A," is representative of the type of standard form contract used by Porsche Leasing/Financial and the Porsche Dealers.

22.     Porsche Leasing/Financial and the Porsche Dealers use either the same standard form Lease Agreement, or a substantially similar standard form Lease Agreement with the same material terms, in all of their lease transactions with consumers.

23.     As the captive leasing and finance company (or companies) for Porsche NA and the Porsche Dealers, Porsche Leasing/Financial controls how Porsche leases are calculated, processed, and handled.   Porsche Leasing/Financial calculates, processes, and handles all Porsche leases in the same, or substantially same, manner.

24.     When a customer executes a Lease Agreement, Porsche Leasing/Financial immediately receives an assignment of the lease and, therefore, ownership rights, including the right to the lease payments.  *See* Ex. A, § 1 ("You acknowledge that this Lease will be assigned to Porsche Leasing, Ltd. or an assignee designated by Porsche Leasing, Ltd. (collectively 'Assignee')."); *see also* Ex. B, Porsche Direct Pay Program Authorization Agreement ("By signing below, I (we) hereby authorize and request Porsche Financial Services, Inc. or Porsche Leasing Ltd., as applicable, (collectively 'PFS') to initiate electronic funds transfers or other withdrawals from my (our) designated account for amounts due to PFS under the terms of my (our) Motor Vehicle Lease Agreement and/or Retail Installment Contract ('Contract') with PFS."); Ex. C, Vehicle Information Check (showing Porsche Financial Services, Inc. holds a lien against Plaintiff's vehicle).

25.     According to the standard form Lease Agreement, an assignee, including Porsche Leasing/Financial, "may be deemed an additional lessor under the Consumer Leasing Act." Ex. A, § 24(E).

26.     In addition to a Lease Agreement, a customer also signs a standard form "Lease Order."  Plaintiff's boilerplate Lease Order, attached as Exhibit "D," is representative of the type of standard form Lease Order used by Porsche Leasing/Financial and the Porsche Dealers.

27.     Porsche Leasing/Financial and the Porsche Dealers use either the same standard form Lease Order, or a substantially similar standard form Lease Order, with the same material terms, in all of their lease transactions with consumers.

28.     Furthermore, in completing the standard form Lease Order, and as a matter of policy and practice, Porsche Leasing/Financial and the Porsche Dealers request, receive, and record their customers' dates of birth.  *See, e.g.*, Ex. D (showing Plaintiff's "DOB," which has been partially redacted).  They thus know when a customer is 60 years of age or older.

**B.      How the Price of a Consumer's Lease is Calculated.**

29.     According to the standard form Lease Agreement, Defendants and the Porsche Dealers use three primary calculations to determine a customer's lease payment: (1) a Depreciation Fee (i.e. the amount charged for the vehicle's decline in value over the lease term); (2) a Rent Charge (i.e. the finance fee); and (3) Sales Tax.  *See* Ex. A, §§ 8E, 8F, & 8K.

30.     The key figure in determining the amount of a consumer's lease is the "Adjusted Capitalized Cost," which is "[t]he amount used in calculating [a consumer's] Base Monthly Payment or Base Single Payment."  *Id.* § 8C.  The Adjusted Capitalized Cost is the price of the leased vehicle less any Capitalized Cost Reductions, such as a credit for a trade-in vehicle, that reduce the amount of financing associated with the lease.  *See id.* §§ 8A-C.

*[intentionally left blank]*

31.     The Adjusted Capitalized Cost is key because it is a component of each of the three primary calculations used to determine the customer's lease payment:

a.      <u>Depreciation Fee</u> = (Adj. Capitalized Cost − Residual Value[1]) ÷ Lease

        +

b.      <u>Rent Charge</u> = (Adj. Capitalized Cost + Residual Value) × Money Factor[2]

        =

c.      <u>Total of Base Monthly Payments or Single Payment (pre-tax).</u>

32.     Then, the sales tax is calculated based on the Base Monthly Payment or Base Single Payment to determine the Total Monthly Payment or Total Single Payment:

a.      <u>Sales Tax</u> = Base Monthly or Single Payment × Tax Rate

        +

b.      <u>Total of Base Monthly or Single Payment</u>

        =

c.      <u>Total Monthly Payment or Total Single Payment.</u>

33.     In other words, there is a direct correlation between the Adjusted Capitalized Cost of a leased vehicle and the amount of Defendants' profit.  The higher the amount of the Adjusted Capitalized Cost, the higher the Depreciation Fee, the higher the Rent Charge, the higher the Sales Tax, and the greater the profit for Defendants.  Defendants thus have a direct interest in manipulating the Adjusted Capitalized Cost of a leased vehicle to keep it as high as possible to maximize their profit at the expense of unwitting consumers.

---

[1] The "Residual Value" is "[t]he value of the Vehicle at the end of the Lease used in calculating your Base Monthly Payment or Base Single Payment."  Ex. A, § 8D.

[2] The "Money Factor" is an alternative method of presenting the amount of interest charged on a lease.  It is converted into the more common annual percentage rate (APR) by multiplying the money factor by 2,400.

34.     It is therefore critical to understand how Defendants calculate the Adjusted Capitalized Cost of a leased vehicle.   According to the standard form Lease Agreement, the Adjusted Capitalized Cost of a leased vehicle is calculated as follows:

   a.     <u>Gross Capitalized Cost</u> ("The agreed upon value of the Vehicle" plus "any items you pay over the Lease Term (such as service contracts, insurance, and any outstanding prior credit or lease balance."))

   _

   b.     <u>Capitalized Cost Reductions</u> ("The amount of any Net Trade-in Allowance, rebate, noncash credit, or cash [the consumer] pay[s] that reduces the Gross Capitalized Cost" of the leased vehicle.)

   =

   c.     <u>Adjusted Capitalized Cost</u>

*See* Ex. A, §§ 8A – 8B = 8C.

**C.     <u>Defendants Have an Established Practice of Deliberately Refusing to Apply Any Capitalized Cost Reductions in Their Consumer Lease Transactions.</u>**

35.     Defendants and the Porsche Dealers have an established uniform pattern and practice whereby they fail to apply any Capitalized Cost Reductions to their customers' leases— all in a deliberate effort to inflate the Adjusted Capitalized Cost of the leased vehicle and keep their corresponding profit as high as possible.

36.     Defendants and the Porsche Dealers employ this practice despite the fact that the plain language on the face of their standard form Lease Agreement misleads reasonable consumers to believe otherwise.

37.     For example, Section 2B of the Lease Agreement requires Defendants to disclose whether the consumer is trading in a vehicle as part of the lease transaction and, if so, to identify

the trade-in vehicle by its make, model, and year.  *See* Ex. A, § 2B.

38.     Section 7B(1), for its part, requires Defendants to disclose the amount of the consumer's Net Trade-in Allowance, which is the positive monetary value, if any, that the consumer is receiving in exchange for their trade-in vehicle.  *Id.* § 7B(1).

39.     Lastly, Section 8B(1) requires Defendants to disclose the consumer's Capitalized Cost Reduction, which is defined as "[t]he **amount of any Net Trade-in Allowance** . . . that reduces the Gross Capitalized Cost" of the leased vehicle."  *Id.* § 8B(1) (emphasis added).

40.     Reading this language together, a reasonable consumer is led to believe that if they trade in a vehicle with positive monetary value as part of a lease of a Porsche vehicle, that value (i.e. the Net Trade-in Allowance) will be applied as a Capitalized Cost Reduction to reduce the Gross Capitalized Cost of the leased vehicle, thereby reducing the amount financed, reducing the amount of the Rent Charge, reducing the amount of sales tax, and resulting in a lower total lease price.

41.     Yet instead of doing so, Defendants and the Porsche Dealers do not apply their customers' Net Trade-in Allowances as Capitalized Cost Reductions.  As a result, Defendants and the Porsche Dealers essentially force these customers to finance more money than is necessary, to pay a higher Rent Charge,[3] and to pay more sales tax than is lawfully due— resulting in a higher total lease price that pads Defendants' bottom line.  This practice, therefore, is not only deceptive, but also unfair to consumers.

---

[3] By refusing to apply their customers' Net Trade-in Allowances as Capitalized Cost Reductions, Defendants and the Porsche Dealers essentially force those customers to pay interest (i.e. a Rent Charge and/or finance fee) on money (i.e. the value of their trade-in vehicles) that they never borrowed from Porsche Leasing/Financial.

**D.      Defendants Have an Established Practice of Deliberately Failing to Accurately Disclose the Terms of Their Consumer Lease Transactions.**

42.     In 1976, Congress passed the Consumer Leasing Act as an amendment to the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*, in response to an emerging trend in auto leasing. *See* 15 U.S.C. § 1601(b).

43.     The purpose of this statutory scheme is, among other things:

> **to assure a meaningful disclosure of the terms of leases** of personal property for personal, family, or household purposes so as to enable the lessee to compare more readily the various lease terms available to him, limit balloon payments in consumer leasing, enable comparison of lease terms with credit terms where appropriate, and to assure meaningful and accurate disclosures of lease terms in advertisements.

*Id.* (emphasis added).

44.     According to the U.S. Supreme Court, this statutory scheme "reflects a transition in congressional policy from a philosophy of 'Let the buyer beware' to one of 'Let the seller disclose.'"  *Mourning v. Family Publ'n Serv., Inc.*, 411 U.S. 356, 377 (1973).  To that end, and because the Consumer Leasing Act is a consumer protection statute that is remedial in nature, it must be liberally construed in favor of consumers.  *See Carmichael v. Nissan Motor Acceptance Corp.*, 291 F.3d 1278, 1280 (11th Cir. 2002).

45.     The Consumer Leasing Act specifies the disclosures the lessor must provide to the lessee at the time of entering into a consumer lease.  *Id.*  As relevant here, Section 1667a of the Consumer Leasing Act requires a lessor to make certain disclosures to a consumer "in a clear and conspicuous manner."   15 U.S.C. § 1667a.   Specifically, the Consumer Leasing Act's implementing regulation, Regulation M, provides that a lessor "in motor-vehicle leases, shall itemize how the amount due will be paid, by type and amount, **including any net trade-in allowance** . . . ."  12 C.F.R. § 213.4(b) (emphasis added).

46.     Despite this statutory and regulatory framework, Defendants and the Porsche Dealers intentionally keep consumers in the dark.  Indeed, Defendants and the Porsche Dealers have established a practice of willfully concealing the true terms of their customers' lease transactions.  This illicit practice deprives consumers of the opportunity to make an informed leasing decision based on a full and accurate disclosure of the terms of their leases.

47.     Specifically, Defendants and the Porsche Dealers intentionally fail to disclose critical components of the lease transaction, withhold important information, and otherwise conceal the true structure of a consumer's lease transaction, including how they calculated the price of the lease—so as to unlawfully inflate their profits from these consumer transactions

48.     For instance, when a consumer trades in a vehicle with positive monetary value as part of a lease transaction, Defendants and the Porsche Dealers intentionally "swallow" the consumer's trade-in vehicle by deliberately failing to *disclose* to the consumer *what value* they are receiving in exchange for their trade-in vehicle, and *how that value* is being applied to the lease transaction.  To be clear, although Defendants and the Porsche Dealers will disclose *the fact* that a consumer has a trade-in vehicle, Defendants and the Porsche Dealers nonetheless deliberately fail to disclose the consumer's Net Trade-in Allowance.  *See, e.g.*, Ex. A §§ 2A, 7B(1).

49.     Defendants' failure to disclose the Net Trade-in Allowance is unlawful under the Consumer Leasing Act.  The only circumstances under which Defendants may fail to account for a consumer's Net Trade-in Allowance occur when the consumer does not have a trade-in vehicle, or if the trade-in vehicle has negative equity or value.  *See* 12 C.F.R. Pt. 213, Supp. I to Part 213, Official Staff Commentary to Regulation M.   Otherwise Defendants must clearly and conspicuously *disclose* to the consumer—in writing and on the face of the Lease Agreement— *what value* they are receiving in exchange for their trade-in vehicle, and *how that value* is being

applied to the lease transaction.  No consumer should ever have to ask for such transparency.
The law requires it.

50.     Defendants violate the Consumer Leasing Act, as a matter of law, whenever a
consumer trades in a vehicle with positive monetary value as part of a lease transaction, yet their
Lease Agreement fails to record the consumer's Net Trade-in Allowance.  *See, e.g.*, Ex. A, §
7B(1).

51.     Take Plaintiff's Lease Agreement as an example.   In Section 2B, the Lease
Agreement disclosed that Plaintiff was trading in a 2015 Hyundai Genesis Coup as part of his
lease transaction:

| 2. | VEHICLE DESCRIPTIONS. | | | | | | |
|---|---|---|---|---|---|---|---|
| | A.   LEASED VEHICLE. | ☐XNew | ☐ Used | | Primary Use: | ☑XPersonal | ☐ Business |

| Year | Make | Model | Body Style | Odometer Reading | Vehicle Identification No. |
|---|---|---|---|---|---|
| 2015 | PORSCHE | CAYMAN | CAYMAN | 9 | WP0AA2A83FK163238 |

| B.   TRADE-IN VEHICLE.   Year | 2015 | Make | HYUNDAI | Model | GENESIS COUP |
|---|---|---|---|---|---|

*See* Ex. A, § 2B.

52.     Yet in Section 7B(1), Defendants and their agent and assignor, the Fort Myers
Dealer, intentionally, willfully, and inaccurately disclosed that Plaintiff's Net Trade-in
Allowance was "N/A" (i.e. "not applicable") even though Plaintiff's trade-in vehicle had a
positive monetary value (i.e., no negative equity):

| 7. | *ITEMIZATION OF AMOUNT DUE AT LEASE SIGNING OR DELIVERY.* | | |
|---|---|---|---|
| **A.  Amount Due at Lease Signing or Delivery:** | | **B.  How the Amount Due at Lease Signing or Delivery will be Paid:** | |
| (1)  Capitalized Cost Reduction   $   N/A | | (1)  Net Trade-in Allowance   $   N/A | |
| (2)  First Monthly Payment   N/A | | | |
| (3)  Single Payment   36254.88 | | (2)  Rebates and Noncash Credits   N/A | |
| (4)  Title Fees   N/A | | | |
| (5)  Registration Fees   N/A | | (3)  Amount to be Paid in Cash   36539.30 | |
| (6)  License Fees   272.69 | | | |
| (7)  Sales or Use Tax   11.73 | | | |
| (8)  N/A   N/A | | | |
| (9)  N/A   N/A | | | |
| (10)  Total   $   36539.30 | | (4)  Total   $   36539.30 | |

*Id.* § 7B(1).

53.     In  fact,  by  writing  on  the  face  of  the  Lease  Agreement  that  Plaintiff's  Net

Trade-in Allowance was "N/A," Defendants and the Fort Myers Dealer made it impossible to discern what *value*, if any, Plaintiff received in exchange for trading in his 2015 Hyundai Genesis Coup.

54.     By the same token, Defendants and the Fort Myers Dealer were also able to avoid applying Plaintiff's Net Trade-in Allowance as a Capitalized Cost Reduction to reduce the Gross Capitalized Cost of the leased vehicle.  This deception allowed Defendants and the Fort Myers Dealer to keep the Adjusted Capitalized Cost of the leased vehicle and their corresponding profit as high as possible—all at Plaintiff's expense.

55.     Further, although Defendants and the Fort Myers Dealer did not disclose Plaintiff's Net Trade-In Allowance on the face of his Lease Agreement, they do maintain business records that show the actual monetary value (i.e. the "Actual Cash Value") they assigned to Plaintiff's trade-in vehicle.

56.     Federal law requires Defendants to retain such records:

> *Manner of retaining evidence.* A lessor must retain evidence of having performed required actions and of having made required disclosures. Such records may be retained in paper form, on microfilm, microfiche, or computer, or by any other method designed to reproduce records accurately. The lessor need retain only enough information to reconstruct the required disclosures or other records.

12 C.F.R. Pt. 1013, Supp. I to Part 1013, at § 1013.8.

57.     In sum, liberally construing the Consumer Leasing Act in favor of consumers, as required, Defendants must disclose to their customers *what value* they are receiving in exchange for their trade-in vehicles, if any, and *how* that value is being applied to their lease transaction. Neither Plaintiff nor the putative Class Members should have to demand such transparency in deciding whether to spend thousands of dollars to lease a vehicle.  Rather, the law requires such information to be clearly, conspicuously, and accurately disclosed on the face of every Lease

Agreement to ensure that the consumer receives "a meaningful disclosure of the terms of [their] lease[ ] . . . ." 15. U.S.C. § 1601(b).

58.     Despite this law, Defendants have an established uniform pattern and practice whereby they intentionally inaccurately disclose the terms of their customers' Lease Agreements. Because of this unlawful practice, two significant things happen.  First, Defendants willfully deprive their customers of the opportunity to make an informed decision based on a full and accurate disclosure of the terms of their lease transactions.  Second, Defendants are able to manipulate the Adjusted Capitalized Cost of their customers' leased vehicles to keep them as high as possible—all at the expense of unwitting consumers, including senior citizens and other vulnerable members of society.

**E.    Defendants Have an Established Practice of Overcharging Sales Tax Due on Their Customers' Leases.**

59.     Compounding the injury, Defendants also have an established uniform pattern and practice whereby they systematically charge and collect more sales tax than is actually due under Florida law with respect to motor vehicle lease transactions involving trade-in vehicles with positive monetary value.

60.     According to the Florida Department of Revenue, "[s]ix percent (6%) sales tax must be paid on all new or used motor vehicles sold, leased, and/or delivered in Florida, unless exempted by law, or qualify for the partial exemption for a resident of another state . . . ." http://dor.myflorida.com/Forms_library/current/gt800030.pdf (last visited July 11, 2016).

61.     Furthermore, § 212.09(1), Florida Statutes, provides that:

> Where used articles, accepted and intended for resale, are taken in trade, or a series of trades, as a credit or part payment on the sale of new articles, the tax levied by this chapter shall be paid on the sales price of the new article, less the credit for the used article taken in trade.

62.     In addition, Rule 12A-1.007(1)(b)1 of the Florida Administrative Code provides in pertinent part that:

> **Any trade-in allowance** for tangible personal property, if the sale and trade-in are one transaction, accepted by any person registered with the Department of Revenue as a dealer to engage in the business of selling aircraft, boats, mobile homes, motor vehicles, or other vehicles of a class or type required to be registered, licensed, titled, or documented in this state or by the United States Government and intended for resale by such dealer **shall be excluded (deducted) from the gross sales price, and only the net sales price shall be subject to tax**.

(emphases added).

63.     Simply put, Florida law requires Defendants to exclude a customer's Net Trade-In Allowance (i.e. the positive monetary value of the trade-in vehicle) from the calculation of the sales tax due on the lease.  One purpose of this law is to avoid a sort of "double taxation," since the consumer presumably already paid sales tax on the value of the trade-in vehicle at the time that the consumer acquired the vehicle.

64.     Despite this law, Defendants have an established pattern and practice whereby they systematically and deliberately refuse to exclude their customers' Net Trade-In Allowances from the calculation of the sales tax due under Florida law.  Because of this unlawful practice, Defendants impermissibly charge and collect from their customers more sales tax than is actually due under Florida law.

## F.     Defendants Victimize Plaintiff.

65.     On March 10, 2015, Plaintiff—who was 63 years old at that time—went to the Fort Myers Dealer looking for a new car.

66.     Plaintiff signed a series of complex legal documents.  One of those documents was a Lease Order, in which the Fort Myers Dealer recorded Plaintiff's date of birth and other personal information, as it does with all of its customers.  *See* Ex. D.

67.     Plaintiff also signed a standard form Lease Agreement for a 36-month lease. *See* Ex. A.  Plaintiff's Lease Agreement was immediately assigned to Porsche Leasing/Financial, which received ownership rights and the rights to the monthly lease payments.  *See* Exs. A & C.

68.     According to the terms on the face of Plaintiff's Lease Agreement, Plaintiff leased a new 2015 Porsche Cayman with a Gross Capitalized Cost of $64,935.00 for 36 months for a total one-time payment of $36,539.30.  *Id.* §§ 2A, 7B(4), 8A.

69.     As part of that transaction, Plaintiff traded in a vehicle he owned—a 2015 Hyundai Genesis Coup—and gave the Fort Myers Dealer a check for $11,539.30.

70.     Accordingly, the Fort Myers Dealer assigned Plaintiff's trade-in vehicle an *undisclosed* $25,000 Net Trade-in Allowance (i.e. the total one-time payment of $36,539.30, *see* Ex. A, § 7B(4), less the check for $11,539.30).

71.     However, nowhere on the face of the Lease Agreement did the Fort Myers Dealer disclose *what* Net Trade-in Allowance Plaintiff received in exchange for his trade-in vehicle, or *how* that Net Trade-in Allowance was applied to his lease transaction.

72.     For instance, on the line in the Lease Agreement where the Fort Myers Dealer should have disclosed Plaintiff's Net Trade-in Allowance of $25,000, the Fort Myers Dealer instead disclosed that Plaintiff's Net Trade-in Allowance was "N/A":



7.

| A. Amount Due at Lease Signing or Delivery: | | | B. How the Amount Due at Lease Signing or Delivery will be Paid: | |
|---|---|---|---|---|
| (1) Capitalized Cost Reduction | $ | N/A | | |
| (2) First Monthly Payment | | N/A | | |
| (3) Single Payment | | 36254.88 | (1) Net Trade-in Allowance | $ _____ N/A |
| (4) Title Fees | | N/A | | |
| (5) Registration Fees | | N/A | (2) Rebates and Noncash Credits | N/A |
| (6) License Fees | | 272.69 | | |
| (7) Sales or Use Tax | | 11.73 | (3) Amount to be Paid in Cash | 36539.30 |
| (8) N/A | | N/A | | |
| (9) N/A | | N/A | | |
| (10) Total | $ | 36539.30 | (4) Total | $ 36539.30 |

*Id.* § 7B(1).

73.     Likewise, on the line where the Fort Myers Dealer should have disclosed and

applied Plaintiff's Net Trade-in Allowance as a Capitalized Cost Reduction to reduce the total

cost of the lease, the Fort Myers Dealer once again wrote "N/A":

**8.**                    **YOUR MONTHLY PAYMENT OR SINGLE PAYMENT IS DETERMINED AS SHOWN BELOW:**

A. **Gross Capitalized Cost**. The agreed upon value of the Vehicle
($   63390.00) and any items you pay over the Lease
Term (such as service contracts, insurance, and any
outstanding prior credit or lease balance) ............ $   64935.00
If you want an itemization of this amount,
please check this box. ☐

B. **Capitalized Cost Reduction**.  The amount of any
Net Trade-in Allowance, rebate, noncash credit, or cash
you pay that reduces the Gross Capitalized Cost ........ –   N/A

C. **Adjusted Capitalized Cost**.  The amount used in  calculating
your Base Monthly Payment or Base Single Payment .... =   64935.00

D. **Residual Value**.  The value of the Vehicle at the
end of the Lease used in calculating your
Base Monthly Payment or Base Single Payment ........ –   40569.60

E. **Depreciation and any Amortized Amounts**. The amount
charged for the Vehicle's decline in value through normal
use and for other items paid over the Lease Term ...... =   24365.40

F. **Rent Charge**. The amount charged in addition to the
Depreciation and any Amortized Amounts ............. +   9837.48

G. **Total of Base Monthly Payments or Single Payment**. The
Depreciation and any Amortized Amounts plus the Rent
Charge ........................................ =   34202.88

H. **Lease Payments**. The number of payments in your Lease ÷   1

I. **Base Monthly Payment or Base Single Payment** ...... =   34202.88

J. **Administrative Charge** .......................... +   N/A

K. **Monthly or Total Sales/Use Tax** ................... +   2052.00

L.   N/A   .... –   N/A

M. **Total Monthly Payment ("Monthly Payment") or**
**Total Single Payment ("Single Payment")** .......... = $   36254.88

*Id.* § 8B; *see also* § 7A(1) (again disclosing the Capitalized Cost Reduction as "N/A").

74.     In other words, instead of applying Plaintiff's Net Trade-in Allowance as a

Capitalized Cost Reduction to reduce the Gross Capitalized Cost of the leased vehicle, the Fort

Myers Dealer manipulated the Adjusted Capitalized Cost of the leased vehicle to keep it as high

as possible using the following calculation:

     a.     <u>Gross Capitalized Cost:</u>     $64,935

               –

     b.     <u>Capitalized Cost Reduction:</u>  N/A

               =

     c.     <u>Adjusted Capitalized Cost:</u>   $64,935

75.     However, if the Fort Myers Dealer had properly disclosed Plaintiff's Net Trade-in

Allowance and applied it as a Capitalized Cost Reduction to reduce the Gross Capitalized Cost

of the leased vehicle, the Adjusted Capitalized Cost of the leased vehicle would have been

substantially lower, resulting in a lower lease payment, a lower Rent Charge, and less sales tax.

76.     It also would have resulted in less profit for Defendants.  Accordingly, to keep

their profit as high as possible, Defendants and the Fort Myers Dealer failed to disclose and properly apply Plaintiff's Net Trade-in Allowance to the lease transaction.  To illustrate, rather than using Plaintiff's Net Trade-in Allowance to reduce the Gross Capitalized Cost of the leased vehicle, the Fort Myers Dealer instead applied Plaintiff's Net Trade-in Allowance as a purported and undisclosed "cash" payment towards the total cost of the lease.  And it did so without disclosing to Plaintiff *what value* he was receiving in exchange for his trade-in vehicle anywhere on the face of his Lease Agreement, as required by law.  As a result, not only was Plaintiff forced to pay a higher lease payment, a higher Rent Charge, and more sales tax than he would have paid if his Lease Agreement had been lawfully prepared, but Plaintiff was also forced to incur interest charges (i.e. Rent Charges and/or finance fees) on a principal sum unreduced by the value of his trade-in vehicle.

77.     On or about September 1, 2015, Plaintiff sent a letter to the Fort Myers Dealer, demanding a refund.  During a subsequent meeting, an employee of the Fort Myers Dealer told Plaintiff that Defendants and the Porsche Dealers have an established practice of calculating leases the same way in which Plaintiff's lease was calculated.  The Fort Myers Dealer also claimed that Plaintiff's Lease Agreement was lawful, and that the terms of Plaintiff's Lease Agreement had been lawfully disclosed.  According to the Fort Myers Dealer, there was nothing wrong, inaccurate, or unlawful about Plaintiff's Lease Agreement.  The Fort Myers Dealer thus refused to give Plaintiff any refund or otherwise resolve the issue.

78.     On or about September 14, 2015, Plaintiff filed a complaint with the Florida Office of the Attorney General.

79.     On or about October 21, 2015, Plaintiff filed a complaint with the Better Business Bureau.

80.     Despite being presented with numerous opportunities to rectify their wrongdoing,

on or about October 30, 2015, Becky Smith, the Controller for the Fort Myers Dealer, sent a

letter to the Better Business Bureau in response to Plaintiff's complaint, rejecting the notion that

the Dealer had done anything wrong and doubling down on its unlawful practices:

> The deal was processed as a 1 pay lease [Plaintiff] had a trade in
> and paid the balance of the lease with a check.  We executed
> [Plaintiff's] lease paperwork in accordance with Florida law.
> [Plaintiff] has a complaint that he should have received a Cap Cost
> reduction, which does not apply to 1 pay leases. . . .

Ex. E, Letter from the Fort Myers Dealer to the Better Business Bureau.

## VI.  CLASS ACTION ALLEGATIONS

81.     Plaintiff brings this lawsuit on behalf of himself and all those persons similarly

situated that leased a Porsche vehicle through the standard form Motor Vehicle Lease Agreement

from Defendants.  Excluded from the Classes are Defendants' affiliates, subsidiaries, agents,

board members, directors, officers, and/or employees.  Plaintiff seeks certification pursuant to

Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and/or (b)(3).  This action satisfies the

numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of

those provisions.

82.     The Classes are defined as follows:

a.   **The Inaccurate Disclosure Class:**

Persons who leased a Porsche vehicle in Florida through the standard form

Motor Vehicle Lease Agreement from Defendants and, as part of the

transaction, traded in a vehicle with a positive monetary value that was not

assigned a positive Net Trade-in Allowance.  This Class only covers individuals

whose leases either are outstanding or were terminated within four years before

the filing of this action.

b. **The No Capitalized Cost Reduction and Sales Tax Overcharge Class:**

Persons who leased a Porsche vehicle in Florida through the standard form Motor Vehicle Lease Agreement from Defendants and, as part of the transaction, traded in a vehicle with a positive monetary value that was not properly credited as a Capitalized Cost Reduction. This Class only covers individuals whose leases either are outstanding or were terminated within four years before the filing of this action.

A. **Numerosity.**

83.     Defendants, their agents, employees, and assignors have entered into motor vehicle lease agreements with thousands, if not hundreds of thousands, of consumers during the applicable limitations periods, many of whom have been victimized by Defendants' unlawful, unfair, and deceptive leasing practices.

84.     Although the exact number of Class Members is uncertain, the individual Class Members are so numerous that joinder of all members in a single action is impracticable.

85.     Furthermore, the exact number of Class Members, as well as the Class Members' names and addresses, are identifiable through the standard form Motor Vehicle Lease Agreements and other records Defendants are required to maintain under federal law.

B. **Commonality/Predominance.**

86.     Common questions of law and fact exist as to Plaintiff's and the Class Members' claims. These common questions predominate over any questions solely affecting individual Class Members, including but not limited to the following:

a. Whether Defendants' practice of deliberately refusing to apply any Capitalized Cost Reductions to their customers' leases is unlawful.

b. Whether Defendants' practice of deliberately failing to accurately disclose *what*

*value* (i.e. what Net Trade-in Allowance) the consumer has received in exchange for trading in a vehicle with positive monetary value as part of a lease transaction is unlawful.

c.   Whether Defendants' practice of deliberately failing to accurately disclose *how* a consumer's trade-in value was credited as part of the lease transaction is unlawful.

d.   Whether Defendants' practice of deliberately failing to exclude a consumer's positive trade-in value from the sales tax calculation is unlawful.

e.   Whether Plaintiff and the Class Members are entitled to injunctive relief and/or a declaratory judgment.

f.   Whether Plaintiff and the Class Members are entitled to equitable relief, including but not limited to a preliminary and/or permanent injunction.

g.   Whether Plaintiff and the Class Members are entitled to restitution and disgorgement.

h.   Whether Plaintiff and the Class Members are entitled to statutory damages.

i.   Whether Plaintiff and the Class Members are entitled to actual damages.

j.   Whether Defendants are liable for any civil penalties.

**C.      Typicality.**

87.     Plaintiff's claims are typical of the putative Class Members' claims because of the similarity, uniformity, and common purpose of Defendants' unlawful conduct.  Plaintiff's interest is aligned with the interests of absent Class Members.  Plaintiff, like all Class Members, has been damaged by Defendants' unlawful practices.

88.     Each Class Member has sustained, and will continue to sustain, damages in the same manner as Plaintiff due to Defendants' wrongful conduct, willful nondisclosures, and unlawful practices.

D.    **Adequacy.**

89.    Plaintiff will fairly and adequately protect and represent the interest of each Class Member, because he has suffered the same wrongs as the Class Members.

90.    Plaintiff is fully cognizant of his responsibilities as Class Representative and has retained Weil Quaranta, P.A. and Cory Watson, P.C. to prosecute this case.  Both firms are experienced in complex class action litigation, including litigation related to violations of federal and Florida consumer protection laws, and have the financial and legal resources to meet the costs of and understand the legal issues associated with this type of litigation.

E.    **Superiority.**

91.    Plaintiff and all of the Class Members have suffered, and will continue to suffer, harm and damages due to Defendants' uniformly unlawful and wrongful conduct and practices. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

92.    Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would have no effective remedy at law. Because of the relatively small size of the individual Class Members' claims, it is likely that few, if any, Class Members could afford to seek legal redress for Defendants' misconduct.  Absent a class action, Class Members' damages will go uncompensated, and Defendants' misconduct will continue without remedy.

93.    Class action treatment is superior to the alternatives, if any, for the fair and efficient adjudication of the controversy alleged herein, because such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.

94.     Class action treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

**F.      The Prerequisites of Rule 23(b)(1) Are Satisfied.**

95.     The prerequisites to maintaining a class action under Rule 23(b)(1)(A) are satisfied, because prosecuting separate actions by individual members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for the party opposing the class.

96.     In addition, the prerequisites to maintaining a class action under Rule 23(b)(1)(B) are satisfied, because prosecuting separate actions by individual members would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

**G.      The Prerequisites of Rule 23(b)(2) Are Satisfied.**

97.     The prerequisites to maintaining a class action for injunctive and equitable relief under Rule 23(b)(2) are satisfied, because Defendants have acted or refused to act on grounds generally applicable to all Class Members, thereby making final injunctive relief or declaratory relief concerning the class appropriate.

98.     Defendants' actions are generally applicable to the Class Members as a whole, and Plaintiff seeks, among other things, equitable remedies with respect to all of the Class Members.

**H.      The Prerequisites of Rule 23(b)(3) Are Satisfied.**

99.     The prerequisites to maintaining a class action under Rule 23(b)(3) are satisfied,

because the questions of law or fact common to Plaintiff's claim and the putative Class Members' claims predominate over any question of law or fact affecting only individual Class Members, and a class action is the superior method for fair and efficient adjudication of the controversy.

100.    The likelihood that individual Class Members will prosecute separate actions, and their interest in doing so, is small due to the extensive time and considerable expense necessary to conduct such litigation.

101.    This action will be prosecuted in a fashion to ensure the Court's able management of this case as a class action on behalf of the Class Members.  Plaintiff knows of no difficulty likely to be encountered in the management of this action that would preclude maintenance as a class action.

## VII.    CAUSES OF ACTION

### Count 1: Violation of the Consumer Leasing Act and Regulation M
**(Defendants)**

102.    Plaintiff repeats and re-alleges the allegations in paragraphs 1 through 101 as if fully set forth herein.

103.    Plaintiff and the Class Members bring this Count pursuant to the Consumer Leasing Act, 15 U.S.C. §1667, *et seq.*  The Act is part of a statutory scheme designed to combat the trend of offering automobile and other consumer leases "without adequate cost disclosures." 15 U.S.C. § 1601(b).

104.    Plaintiff and the Class Members, respectively, entered into consumer leases for a period of time exceeding four months and for a total contractual monetary obligation not exceeding:

      a.  $50,000 for leases executed between July 21, 2011, and December 31, 2011;

b.  $51,800 for leases executed between January 1, 2012, and December 31, 2012;

c.  $53,000 for leases executed between January 1, 2013, and December 31, 2013;

d.  $53,500 for leases executed between January 1, 2014 and December 31, 2014; and

e.  $54,600 for leases executed on or after January 1, 2015.

*See* 12 C.F.R. Pt. 213, Supp. I to Part 213, Official Staff Commentary to Regulation M.

105.   Plaintiff and Class Members are each a "lessee" as defined by 15 U.S.C. §1667(2) whose leases either are currently outstanding or were terminated within one year before the date of this action.

106.   Plaintiff and Class Members have entered into standard form motor vehicle lease agreements either pre-printed or provided by Defendants or an affiliated entity, such as a parent, subsidiary, or sister company.  Accordingly, or in the alternative, Plaintiff and Class Members entered into identical or materially similar lease agreements with Defendants.

107.   Porsche Leasing/Financial is a "lessor" as defined by 15 U.S.C. §1667(3) and 12 C.F.R. § 213.2(h), because it regularly engages in leasing, offering to lease, and/or arranging to lease motor vehicles under a consumer lease.  Alternatively, Porsche Leasing/Financial is the assignee of a "lessor," because the standard form motor vehicle lease agreements provide that Porsche Leasing/Financial "may be deemed an additional lessor under the Consumer Leasing Act." Ex. A, § 24(E).

108.   At all relevant times, Porsche Leasing/Financial and its assignors, the Porsche Dealers, as well as their employees, subsidiaries, affiliates, and other related entities, were the agents of Porsche NA acting within the scope and purpose of that agency.

109.   The Consumer Leasing Act requires a lessor to make certain disclosures in a consumer's lease "in a clear and conspicuous manner."   15 U.S.C. § 1667a.  Regulation M

provides that a lessor "in motor-vehicle leases, shall itemize how the amount due will be paid, by type and amount, including any net trade-in allowance . . . ."  12 C.F.R. § 213.4(b)

110.    However, Porsche Leasing/Financial and its assignors have utilized a practice whereby they deliberately failed to accurately disclose what Net Trade-in Allowance, if any, that a consumer received in exchange for their trade-in vehicle, and how that Net Trade-in Allowance was applied to the lease.

111.    In doing so, Porsche Leasing/Financial and its assignors have intentionally and unlawfully deprived Plaintiff and Class Members of the opportunity to make an informed decision based on the full and accurate disclosure of the terms of the lease transaction.

112.    As a result of this unlawful practice, Plaintiff and Class Members have been damaged, including but not limited to incurring a higher lease payment, a higher Rent Charge, and a higher sales tax, in an amount to be proved at trial.  Defendants are thus liable to Plaintiff and Class Members for actual damages, statutory damages, and the attorney's fees and costs incurred in bringing this action.  *See* 15 U.S.C. § 1640(a).

## Count 2: *Per Se* Violation of FDUTPA
### (Defendants)

113.    Plaintiff repeats and re-alleges the allegations in paragraphs 1 through 101 as if fully set forth herein.

114.    Plaintiff and Class Members brings this Count under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*.

115.    Plaintiff and each Class Member is a "consumer" under FDUTPA.  Fla. Stat. § 501.203(7).

116.    Porsche Leasing/Financial has engaged and continues to engage in "trade or commerce" within the meaning of FDUTPA.  Fla. Stat. § 501.203(8).

117.     At all relevant times, Porsche Leasing/Financial and its assignors, the Porsche Dealers, as well as their employees, subsidiaries, affiliates, and other related entities, were the agents of Porsche NA acting within the scope and purpose of that agency.

118.     FDUTPA outlaws "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." Fla. Stat. § 501.204(1).

119.     FDUTPA "shall be construed liberally" to "make state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection." Fla. Stat. § 501.202(3).

120.     Under Florida law, a violation of the federal Consumer Leasing Act and Regulation M, such as that alleged in Count I, is a *per se* violation of FDUTPA.  Fla. Stat. § 501.203(3)(c).

121.     As alleged in Count I of this Complaint, Defendants have violated the Consumer Leasing Act and Regulation M by utilizing a trade practice whereby they deliberately failed to accurately disclose what Net Trade-in Allowance, if any, that a consumer received in exchange for their trade-in vehicle, and how that Net Trade-in Allowance was applied to the lease.  By violating the Consumer Leasing Act and Regulation M, Defendants have committed *per se* violations of FDUTPA.

122.     As a direct and proximate result of these unfair, unconscionable, and deceptive acts and practices, Plaintiff and Class Members have been damaged, including but not limited to incurring a higher lease payment, a higher Rent Charge, and a higher sales tax, in an amount to be proved at trial.

123.     Defendants are thus liable to Plaintiff and Class Members for declaratory and injunctive relief, actual damages, attorney's fees and costs, and all other remedies available

under FDUTPA.

124.    By willfully employing a leasing practice that victimizes or attempts to victimize senior citizens, disabled persons, military servicemembers, and the spouses and dependent children of military servicemembers, Defendants are also liable for a civil penalty of not more than $15,000 for each such violation.  *See* Fla. Stat. § 501.2077(3)-(4).

### Count 3: Violation of FDUTPA
**(Defendants)**

125.    Plaintiff repeats and re-alleges the allegations in paragraphs 1 through 101 as if fully set forth herein.

126.    Plaintiff and Class Members brings this Count under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*.

127.    Plaintiff and each Class Member is a "consumer" under FDUTPA.  Fla. Stat. § 501.203(7).

128.    Porsche Leasing/Financial has engaged and continues to engage in "trade or commerce" within the meaning of FDUTPA.  Fla. Stat. § 501.203(8).

129.    At all relevant times, Porsche Leasing/Financial and its assignors, the Porsche Dealers, as well as their employees, subsidiaries, affiliates, and other related entities, were the agents of Porsche NA acting within the scope and purpose of that agency.

130.    FDUTPA outlaws "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." Fla. Stat. § 501.204(1).

131.    FDUTPA "shall be construed liberally" to "make state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection." Fla. Stat. § 501.202(3).

132.     Defendants have utilized, and continue to utilize, a trade practice whereby they deliberately fail to accurately disclose what Net Trade-in Allowance, if any, that a consumer received in exchange for their trade-in vehicle, and how that Net Trade-in Allowance was applied to the lease.

133.     These trade practices are deceptive and misleading in a material way, because they were and are likely to mislead a reasonable consumer acting reasonably under the circumstances. Specifically, Defendants were in a position to know, and did know, that the conduct alleged herein violated federal and Florida law, but nonetheless willfully engaged in such unlawful conduct.

134.     Defendants' actions constitute deceptive and unfair practices that violate FDUTPA, because the acts and practices are materially deceptive and misleading and deceived Plaintiff and Class Members.

135.     Defendants have acted and continue to act in an identical or substantially similar manner with respect to Plaintiff and Class Members.

136.     As a direct and proximate result of Defendants' unfair, unconscionable, and deceptive acts and practices, Plaintiff and Class Members have been damaged, including but not limited to incurring a higher lease payment, a higher Rent Charge, and a higher sales tax, in an amount to be proved at trial.

137.     Defendants are thus liable to Plaintiff and Class Members for declaratory and injunctive relief, actual damages, attorney's fees and costs, and all other remedies available under FDUTPA.

138.     By willfully employing a leasing practice that victimizes or attempts to victimize senior citizens, disabled persons, military servicemembers, and the spouses and dependent children of military servicemembers, Defendants are also liable for a civil penalty of not more

than $15,000 for each such violation.  *See* Fla. Stat. § 501.2077(3)-(4).

**Count 4: Violation of FDUTPA**
**(Defendants)**

139.    Plaintiff repeats and re-alleges the allegations in paragraphs 1 through 101 as if fully set forth herein.

140.    Plaintiff and Class Members brings this Count under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*.

141.    Plaintiff and each Class Member is a "consumer" under FDUTPA.  Fla. Stat. § 501.203(7).

142.    Porsche Leasing/Financial has engaged and continues to engage in "trade or commerce" within the meaning of FDUTPA.  Fla. Stat. § 501.203(8).

143.    At all relevant times, Porsche Leasing/Financial and its assignors, the Porsche Dealers, as well as their employees, subsidiaries, affiliates, and other related entities, were the agents of Porsche NA acting within the scope and purpose of that agency.

144.    FDUTPA outlaws "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." Fla. Stat. § 501.204(1).

145.    FDUTPA "shall be construed liberally" to "make state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection." Fla. Stat. § 501.202(3).

146.    Defendants have violated FDUTPA by:

a.    Establishing a uniform pattern, policy, and practice of failing to apply the Net Trade-in Allowance as a Capitalized Cost Reduction in their customers' leases;

b.    Representing to Plaintiff and Class Members in the standard form motor vehicle

lease agreement that the Capitalized Cost Reduction included "[t]he amount of any Net Trade-in Allowance," when it did not;

c. Establishing a uniform pattern, policy, and practice of failing to exclude the positive monetary value of a consumer's trade-in vehicle, if any, from the calculation of the sales tax due on the lease under Florida law; and

d. Collecting and retaining the improperly charged sales tax from Plaintiff and Class Members on amounts that are not properly taxable, and profiting from the collection of such improper taxes from Plaintiff and Class Members through the imposition of such taxes into their revenue stream.

147. Through these deceptive and unfair trade practices, Defendants have unlawfully charged and received inflated and unwarranted lease payments, inflated and excessive Rent Charges, and collected sales tax in excess of that lawfully due under Florida law.  Moreover, Defendants have forced Plaintiff and the Class Members to incur interest charges (i.e. Rent Charges and/or finance fees) on money (i.e. the value of their trade-in vehicles) that they never borrowed.

148. Defendants' actions are deceptive and misleading in a material way, because they were and are likely to mislead a reasonable consumer acting reasonably under the circumstances. Specifically, Defendants were in a position to know, and did know, that the conduct alleged herein violated federal and Florida law, but nonetheless willfully engaged in such unlawful conduct.

149. Defendants' actions constitute deceptive and unfair practices that violate FDUTPA, because the acts and practices are materially deceptive and misleading and deceived Plaintiff and the Class Members.

150. Defendants have acted and continue to act in an identical or substantially similar

manner with respect to Plaintiff and the Class Members.

151.    As a direct and proximate result of Defendants' unfair, unconscionable, and deceptive acts and practices, Plaintiff and the Class Members have been damaged, including but not limited to incurring a higher lease payment, a higher Rent Charge, and a higher sales tax, in an amount to be proved at trial.

152.    Defendants are thus liable to Plaintiff and the Class Members for declaratory and injunctive relief, actual damages, attorney's fees and costs incurred in bringing this action, and all other remedies available under FDUTPA.

153.    By willfully employing a leasing practice that victimizes or attempts to victimize senior citizens, disabled persons, military servicemembers, and the spouses and dependent children of military servicemembers, Defendants are also liable for a civil penalty of not more than $15,000 for each such violation.  *See* Fla. Stat. § 501.2077(3)-(4).

## Count 5: Breach of Contract
### (Defendants)

154.    Plaintiff repeats and re-alleges the allegations in paragraphs 1 through 101 as if fully set forth herein.

155.    Plaintiff and Class Members entered into standard form motor vehicle leasing agreements with Porsche Leasing/Financial and its assignors.

156.    At all relevant times, Porsche Leasing/Financial and its assignors, the Porsche Dealers, as well as their employees, subsidiaries, affiliates, and other related entities, were the agents of Porsche NA acting within the scope and purpose of that agency.

157.    According to the standard form leasing agreements, a consumer's Capitalized Cost Reduction includes "[t]he amount of any Net Trade-in Allowance" and "reduces the Gross Capitalized Cost[.]"  Ex. A, § 8B.

158.    Defendants, however, have failed to apply the positive monetary value of Plaintiff's and the Class Members' trade-in vehicles (i.e. their Net Trade-in Allowances) as Capitalized Cost Reductions to reduce the Gross Capitalized Costs of their leased vehicles.

159.    Consequently, Defendants have breached Plaintiff's and the Class Members' leasing agreements by not applying the positive monetary value of their trade-in vehicles (i.e. their Net Trade-in Allowances) as Capitalized Cost Reductions to reduce the Gross Capitalized Costs of their leased vehicles, thereby charging Plaintiff and the Class Members higher lease payments than provided for by the terms of their lease agreements.

160.    As a direct and proximate result of these breaches, Plaintiff and the Class Members have been damaged, including but not limited to incurring a higher lease payment, a higher Rent Charge, and a higher sales tax, in an amount to be proved at trial.

### Count 6: Breach of Covenant of Good Faith and Fair Dealing
**(Defendants)**

161.    Plaintiff repeats and re-alleges the allegations in paragraphs 1 through 101 as if fully set forth herein.

162.    Plaintiff and Class Members have entered into valid and enforceable standard form motor vehicle lease agreements with Porsche Leasing/Financial and its assignors.

163.    At all relevant times, Porsche Leasing/Financial and its assignors, the Porsche Dealers, as well as their employees, subsidiaries, affiliates, and other related entities, were the agents of Porsche NA acting within the scope and purpose of that agency.

164.    The standard form motor vehicle lease agreements contained the implied covenant of good faith and fair dealing.

165.    According to the standard form leasing agreements, a consumer's Capitalized Cost Reduction includes "[t]he amount of any Net Trade-in Allowance" and "reduces the Gross

Capitalized Cost[.]" Ex. A, § 8B.

166. Defendants, however, have failed to apply the positive monetary value of Plaintiff's and the Class Members' trade-in vehicles (i.e. their Net Trade-in Allowances) as Capitalized Cost Reductions to reduce the Gross Capitalized Costs of their leased vehicles.

167. Consequently, Defendants have breached the covenant of good faith and fair dealing by not applying the positive monetary value of Plaintiff's and the Class Members' trade-in vehicles (i.e. their Net Trade-in Allowances) as Capitalized Cost Reductions to reduce the Gross Capitalized Costs of their leased vehicles, thereby charging Plaintiff and the Class Members higher lease payments than provided for by the terms of their lease agreements.

168. As a direct and proximate result of these breaches, Plaintiff and the Class Members have been damaged, including but not limited to incurring a higher lease payment, a higher Rent Charge, and a higher sales tax, in an amount to be proved at trial.

### Count 7: Negligent Training and Supervision
#### (Porsche NA)

169. Plaintiff repeats and re-alleges the allegations in paragraphs 1 through 101 as if fully set forth herein.

170. Porsche NA, its employees, and its agents, including Porsche Leasing/Financial and the Porsche Dealers, owed Plaintiff and the Class Members a duty of care and professionalism in the rendition of services and products sold to Plaintiff and the Class Members.

171. Porsche NA also owed Plaintiff and the Class Members a duty of care in training and supervising its employees and agents, including Porsche Leasing/Financial and the Porsche Dealers, to perform those services in full compliance with federal and Florida law, and to not allow its agents and employees to engage in the wrongful practices alleged in this Complaint.

172. Porsche NA breached the duties owed to Plaintiffs and the Class Members, and

such breaches arise out of the negligent, wanton, and reckless conduct alleged in this Complaint.

173.    Porsche NA knew, or should have known, of the unlawful practices engaged in by its agents and employees, and knew or should have known that its own training and supervision was inadequate to fulfill its obligation to protect Plaintiff and the Class Members.

174.    Porsche NA knew, or should have known, that its policies and practices in training and supervising its agents and employees were inadequate to prevent or detect the misconduct alleged in this Complaint, and such inadequate training and supervision was the direct and proximate cause of Plaintiff's injuries, as well as the injuries of the Class Members.

175.    Plaintiff and Class Members have incurred damages proximately caused by Porsche NA's negligence in training and supervising its employees and agents.  As a direct and proximate result of Porsche NA's negligent training and supervision, Plaintiff and Class Members suffered damages, including monetary loss, and incidental and consequential damages, in an amount to be determined by a jury.

### Count 8: Unjust Enrichment
#### (Defendants)

176.    Plaintiff repeats and re-alleges the allegations in paragraphs 1 through 101 as if fully set forth herein.

177.    Defendants have received a benefit at the expense of Plaintiff and the Class Members.  By using the unlawful trade practices alleged in this Complaint, Defendants unlawfully received inflated profits on the leases entered into by Plaintiff and the Class Members.  Defendants intended to and did benefit from the unlawful trade practices alleged in this Complaint by, among other things, receiving from Plaintiff and each Class Member a higher lease payment, a higher Rent Charge, and more sales tax than was lawfully due.

178.    Defendants thereafter placed such monies into its revenue streams and

subsequently retained all or some of such monies and/or passed through some or all such monies to the Florida government and/or other entities.

179.    Irrespective of Defendants' actions after such monies were placed into its revenue streams, Defendants benefitted in the form of increased profits resulting from the monies retained, interest it obtained from such monies, and the additional capital it acquired from the monies given to it by Plaintiff and the Class Members.  Such additional capital and interest monies (i.e. Rent Charges) translated into increased revenues for Defendants that ultimately resulted in an increase in Defendants' yearly income.

180.    Such common fund benefit obtained by Defendants is thereby the amount equal to profits it obtained as a result of the increase in its revenue streams from the imposition of a higher lease payment, a higher Rent Charge, and more sales tax than was lawfully due. Defendants demanded these monies be paid by Plaintiff and the Class Members and knowingly and voluntarily accepted these monies to obtain the benefits alleged above.

181.    It is unjust and inequitable to permit Defendants to retain the benefits it obtained through the unlawful practices alleged in this Complaint.  The financial benefits obtained by Defendants should not, in fairness, be retained by them but rather should be paid and returned to Plaintiff and the Class Members.

182.    As a direct and proximate result of Defendants' inequitable conduct, Plaintiff and the Class Members have suffered damages, including monetary loss, and incidental and consequential damages, in an amount to be determined by a jury.


*[intentionally left blank]*

## Count 9: Negligence
### (Defendants)

183.    Plaintiff repeats and re-alleges the allegations in paragraphs 1 through 101 as if fully set forth herein.

184.    Defendants owed Plaintiff and the Class Members a duty to exercise reasonable care to establish lawful policies and practices and to train its employees, agents, and affiliates, to determine, represent, charge, and collect the proper amount of sales tax due on consumers' motor vehicle lease agreements under Florida law.

185.    Defendants were negligent and breached their duty of reasonable care by:

    a.    Establishing, facilitating, and utilizing policies and practices whereby the positive monetary value of a consumer's trade-in vehicle (i.e. the Net Trade-in Allowance) is *not* excluded from the sales tax calculation, as required by Florida law, resulting in an overcharge and collection of excess sales tax from the consumer;

    b.    Deliberately disregarding the legality of these policies and practices or, alternatively, concluding that these policies and practices are lawful;

    c.    Directing or permitting its employees, agents, and affiliates to utilize these unlawful policies and practices; and

    d.    Misrepresenting to consumers that sales tax was lawfully due on motor vehicle lease agreements involving trade-in vehicles with positive monetary value, even though the Net Trade-in Allowances for those vehicles had *not* been excluded from the sales tax calculation.

186.    As a direct and proximate result of Defendants' negligence, Plaintiff and the Class Members paid more sales tax than was lawfully due under their motor vehicle lease agreements. Plaintiff and the Class Members have suffered damages, including monetary loss, and incidental

and consequential damages, in an amount to be determined by a jury.

## VIII.   DEMAND FOR JURY TRIAL

Plaintiff respectfully requests a jury trial on all issues triable by jury.

## IX.     PRAYER FOR RELIEF

Plaintiff and Class Members request the following relief:

1.      The Court certify the Classes as alleged and permit the present causes of action to proceed and be prosecuted as a class action with Plaintiff as the designated class representative;

2.      Actual damages;

3.      Incidental and consequential damages;

4.      Statutory damages;

5.      Punitive damages;

6.      Civil penalties;

7.      Declaratory and injunctive relief enjoining Defendants from continuing to violate federal and Florida law relative to the unlawful treatment of a consumer's Net Trade-in Allowance and the imposition and collection of sales taxes;

8.      Pre-judgment and post-judgment interest at the maximum rate permitted by applicable law;

9.      Reasonable attorney's fees, court costs, and class notice costs; and

10.     Any other relief that the Court deems just and proper.

Respectfully submitted,

By:  _/s/ Mark A. Schweikert_____
Ronald P. Weil (FBN 169966)
rweil@weilquaranta.net
Mark A. Schweikert (FBN 70555)
mschweikert@weilquaranta.net
**WEIL QUARANTA, P.A.**
200 South Biscayne Boulevard

Southeast Financial Center, Suite 900
Miami, Florida  33131
T:  (305) 372-5352
F:  (305) 372-5355

F. Jerome Tapley (FBN 22066)
jtapley@corywatson.com
**CORY WATSON, P.C.**
2131 Magnolia Avenue
Birmingham, Alabama 35205
T: (205) 328-2200
F: (205) 324-7896

*Attorneys for Plaintiff*