**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

**Case No. 1:16-cv-23409-Gayles/Turnoff**

| | |
|---|---|
| STEVEN MICHAEL COX, individually and on behalf of those similarly situated, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| PORSCHE FINANCIAL SERVICES, INC., PORSCHE LEASING LTD., and PORSCHE CARS NORTH AMERICA, INC., | ) ) ) ) |
| Defendants. | ) ) |

**MEMORANDUM OF LAW IN SUPPORT OF
<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

Thomas M. Byrne (*pro hac vice*)
Valerie S. Sanders (*pro hac vice*)
Stacey M. Mohr (*pro hac vice*)
EVERSHEDS SUTHERLAND (US) LLP
999 Peachtree Street, NE, Ste. 2300
Atlanta, Georgia 30309-3996
404.853.8000 (t)
404.853.8806 (f)
tombyrne@eversheds-sutherland.com
valeriesanders@eversheds-sutherland.com
staceymorh@eversheds-sutherland.com

Jacqueline S. Miller (28900)
Tara S. Pellegrino (026775)
BROAD AND CASSEL LLP
One North Clematis Street, Ste. 500
West Palm Beach, Florida 33401
561.832.3300 (t)
561.655.1109 (f)
jmiller@broadandcassel.com
tpellegrino@broadandcassel.com

*Attorneys for Defendants*

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ................................................................................................. 1

II.    FACTUAL BACKGROUND............................................................................... 1

    A.    Mr. Cox's Vehicle Lease ......................................................................... 1

    B.    The Defendants: PLL, PFS, and PCNA.................................................. 4

    C.    Mr. Cox's Complaint .............................................................................. 5

III.   ARGUMENT AND CITATION OF AUTHORITY ........................................... 7

    A.    Overview of Consumer Leasing Act Claim (Count 1) .......................... 7

    B.    Plaintiff's "Inaccurate Disclosure" CLA Claim Fails............................ 9

         1.    The CLA Does Not Require Itemized Disclosure of Net Trade-in
            Allowance, and Reg M's Itemization Requirement Is Invalid or at
            Least Not Actionable. .................................................................10

         2.    Even If the Alleged Violation of the Regulation Otherwise Were
            Actionable, the Undisputed Facts Show at Most a "Bare Procedural
            Violation" That Is Not Justiciable................................................13

    C.    The "No Capitalized Cost Reduction and Sales Tax Overcharge" CLA
         Claim Fails. .......................................................................................... 15

    D.    Plaintiff Has No § 1667a(3) Claim. ..................................................... 17

    E.    In Any Event, No Defendant Is a CLA "Lessor" Under the Circumstances. ....... 17

    F.    Plaintiff's State-Law Claims (Counts 2–9) Fail Because Defendants Are
         Not Liable for Acts of the Dealer. ....................................................... 19

    G.    Plaintiff's State-Law Claims (Counts 2–9) Are Barred by the Voluntary-
         Payment Doctrine................................................................................. 21

    H.    Plaintiff's FDUTPA Claims (Counts 2, 3, and 4) Fail........................ 23

         1.    There is No Unfair or Deceptive Practice..................................24

         2.    Plaintiff Has Suffered No Loss Caused by an Alleged Violation.............26

         3.    Defendants Are Not Vicariously Liable for the Dealer's Acts. .................27

         4.    Plaintiff Has Not Established a *Per Se* FDUTPA Violation (Count 2). ....29

I.     Plaintiff's Claim for Overpayment of Florida Sales Tax Is Precluded by Statute (All Florida-law Counts)............................................................................ 30

     1.     Section 213.756, Florida Statutes, Bars Plaintiff's Sales-Tax Claims.......30

     2.     There Is No FDUTPA Claim Anyway for a Dealer's Incorrect Calculation of Taxes. ..............................................................................31

J.     Plaintiff's Breach-of-Contract Claim (Count 5) Fails. ......................................... 32

K.     Plaintiff's Claim for Breach of the Implied Covenant of Good Faith (Count 6) Fails. ...................................................................................................... 32

L.     Plaintiff's Negligent-Training-and-Supervision Claim (Count 7) Fails. .............. 34

M.     Plaintiff's Claim for Unjust Enrichment (Count 8) Fails...................................... 35

N.     Plaintiff's Negligent-Taxation Claim (Count 9) Is Precluded by Statute. ............ 36

IV.     CONCLUSION................................................................................................................ 37

## I.     INTRODUCTION

Plaintiff Steven M. Cox's 186-paragraph, 40-page, 9-count complaint boils down to two claimed flaws in the disclosures made in his single-payment lease of a new Porsche. No fraud is or could be alleged, because Plaintiff concededly got exactly the deal for which he bargained. Although the prolix complaint goes on at length about supposed "swallowing the trade" (an insupportable charge here since Plaintiff got the $25,000 trade-in credit he negotiated), the complaint specifically attacks two particular disclosures in the lease under federal and state law. The undisputed facts demonstrate that Plaintiff's technical claims about the two disclosures are meritless. What he claims, through this action, is entitlement to different disclosures that would accompany a reimagined, rewritten, *different deal*. Accordingly, and as detailed below, Defendants are entitled to summary judgment on all counts.

## II.     FACTUAL BACKGROUND

### A.     Mr. Cox's Vehicle Lease

On March 9, 2015, Mr. Cox went to the Porsche of Fort Myers dealership to look at a used 2012 Porsche he had seen on the dealership's website. (Cox Dep. at 48:12–14, 50:13–14.)[1] Although Mr. Cox had previously leased a Porsche (*id.* at 163:10–14, Ex. 9), at the time of his 2015 transaction with Porsche of Fort Myers, Mr. Cox was driving a 2015 Hyundai Genesis (*id.* at 46:4–10, 49:20). Mr. Cox had purchased the Hyundai shortly before visiting Porsche of Fort Myers in March of 2015 but didn't like it and wanted another Porsche. (*Id.* at 59:9–13.)

Mr. Cox was looking at used rather than new Porsches because he had a budget around $43,000 and did not want a monthly payment commitment. (*Id.* at 53:10–14, 61:14–17, 68:1–5.)

---

[1] Copies of all deposition excerpts, declarations, and deposition exhibits cited herein are being filed contemporaneously herewith as Exhibits A–H.

When he arrived at Porsche of Fort Myers on March 9, 2015, Mr. Cox talked with one of the dealership's salespeople, David Wilson. (*Id.* at 51:16–18.)

Mr. Cox told Mr. Wilson that he wanted to trade in his 2015 Hyundai Genesis. (*Id.* at 49:20–22.) Another dealership employee told Mr. Cox that the dealership could offer $25,000 for the Hyundai. (*Id.* at 56:9–11.) Mr. Cox tried unsuccessfully to negotiate a higher price for the Hyundai. (*Id.* at 58:18–24.) Ultimately, Mr. Cox decided against buying the 2012 Porsche because he didn't think it was worth what the dealership wanted for it. (*Id.* at 73:24–74:9.) Mr. Cox left the dealership on March 9 without buying or leasing anything. (*Id.* at 61:24–62:1.)

The next day, however, after looking at the dealership's website and seeing a used 2014 Porsche that he liked, Mr. Cox returned to the dealership. (*Id.* at 64:5–11.) He still was unable to get the dealership to offer more than $25,000 for the Hyundai. (*Id.* at 82:11–83:5.) And because the dealership was unwilling to reduce the price for the 2014 Porsche, he decided against buying it. (*Id.* at 73:21–23, 67:8–12.) But, "in the back of [his] mind," he had the idea of leasing a new Porsche instead. (*Id.* at 67:14–16.) He asked about leasing a new 2015 Porsche Cayman. (*Id.*)

Mr. Wilson, the salesperson at the dealership, told Mr. Cox that there was such a thing as a "single-payment" lease, which would not include a monthly payment obligation; the only payment was made up front. (*Id.* at 71:10–12.) Mr. Cox testified that he told Mr. Wilson that if he were to enter into the single-payment lease, for a new Porsche, he would expect to get the best rate available and that Mr. Wilson assured him that he would get the lowest rate. (*Id.* at 72:6–10.)

A single-payment lease is an uncommon lease product. (Trombley Dep. at 219:2.) Under its terms, the lessee pays all that he is required to pay for use of the vehicle and rental charges up front, in a single payment. No monthly or other periodic payments are required, in contrast to the more typical, monthly-payment lease. And the "buy rate" generally is discounted for a single-

payment lease. At the time of Mr. Cox's transaction, for example, PFS's minimum rate for a single-pay lease in which the vehicle would be returned after 36 months was 0.00160. (Supena Dec. ¶9, Ex. B.) For a 36-month, standard monthly-payment lease of the same vehicle, the minimum rate would have been higher: 0.00200. (*Id.*)

Mr. Wilson presented Mr. Cox with a proposed 36-month, single-payment lease for the 2015 Cayman and told him that the dealership would need a check for $11,539.30. (Cox Dep. at 77:18–20.) In Section 7.A, the lease disclosed the amount due at signing: $36,539.30. Section 8 itemized that amount, including "N/A" in the line for "Capitalized Cost Reduction":

**B. Capitalized Cost Reduction.** The amount of any Net Trade-in Allowance, rebate, noncash credit, or cash you pay that reduces the Gross Capitalized Cost ....... – _____ N/A

(Compl. Ex. A (Lease) (Doc. 1-3); Cox Dep. Ex. 6.)  The dealer would not have agreed to a capitalized cost reduction on Mr. Cox's single-payment lease. (Trombley Dep. at 148:11–12.)

Section 7.B of the lease disclosed the amount paid at lease signing—$36,539.30—corresponding to the amount due disclosed in Section 7.A:

**B. How the Amount Due at Lease Signing or Delivery will be Paid:**

| | | |
|---|---|---|
| (1) Net Trade-in Allowance | $ | N/A |
| (2) Rebates and Noncash Credits | | N/A |
| (3) Amount to be Paid in Cash | | 36539.30 |
| (4)  Total | $ | 36539.30 |

(Compl. Ex. A; Cox Dep. Ex. 6.)

While reviewing the lease, Mr. Cox noticed the "N/A" notation on line 7.B(1), "Net Trade-in Allowance," and asked where the $25,000 credit for his trade-in was. (Cox Dep. at 150:13–16.) The dealer showed him that the $25,000 was included in lines 7.B(3) and 7.B(4), in the total amount paid at signing of $36,539.30. (*Id.* at 149:12–150:18, 153:3–7.) That

$36,539.30, Mr. Cox understood, corresponded to the agreed-upon amount for his Hyundai—$25,000—plus the $11,539.30 he had paid by check. (*Id.*)

After reviewing the lease, Mr. Cox wrote a check to the dealership for $11,539.30, signed the lease, and left the Hyundai at the dealership. (*Id.* at 148:10–14, 86:2–3, Ex. 6.) He made no further payments to the dealership (*id.* at 86:14–18) and left the dealership with the 2015 Porsche Cayman, which he is still driving (*id.* at 86:4–5, 40:5–7).

The dealer assigned its interest in the lease to Porsche Leasing Ltd. ("PLL"), to be serviced by Porsche Financial Services, Inc. ("PFS"). (Supena Dec. ¶6.) The single-payment lease could not have been assigned to PLL if the adjusted capitalized cost of the lease had not been at least 110% of the vehicle's residual value—that is, at least 110% of the vehicle's calculated value at the end of the three-year lease term. (Supena Dec. ¶10, Ex. B.)

The dealer also transferred title to the car to PLL. Following assignment of the lease, the $2,052 in sales/use tax collected from Mr. Cox and remitted to PFS was paid to the Florida Department of Revenue. (Supena Dec. ¶11.)

### B.      The Defendants: PLL, PFS, and PCNA

PLL, the assignee of Mr. Cox's lease, is a Delaware statutory titling trust. (Supena Dec. ¶4.) PLL does not own any interest in or control Porsche of Fort Myers. (*Id*. ¶5; Harris Dec. ¶2.)

PFS serviced the lease after assignment to PLL. (Supena Dec. ¶6.) PFS does not own any interest in or control Porsche of Fort Myers. (*Id*. ¶2.) Porsche of Fort Myers is not required to assign leases to PFS or PLL. (*Id.* ¶8; Harris Dec. ¶4.) PFS's agreement with Porsche of Fort Myers expressly provides that the dealership "shall not represent itself as an agent or employee of PFS." (Supena Dec. ¶3.) Neither PLL nor PFS had any involvement with the negotiations between Mr. Cox and Porsche of Fort Myers that resulted in the lease. (*Id.* ¶5.)

4

Porsche Cars North America, Inc. ("PCNA") is a distributor that imports vehicles from Germany. (Derengowski Dec. ¶2.) PCNA's "Dealer Sales and Service Agreement" concerns dealers' sale of Porsche automobiles, conferring, for example, a limited right to use PCNA's trademarks in connection with their promotion and sale of Porsche vehicles. (*Id.* ¶3, Ex. A.) The Sales and Service Agreement expressly states that "Dealer must conduct all Dealer's Operations on its own behalf and for its own account. Dealer has no power or authority to act for the Manufacturer or PCNA. Dealer is not an agent of PCNA." (*Id.*) PCNA had no involvement whatsoever in the negotiation or servicing of Mr. Cox's lease. (*Id.* ¶5.)

No Porsche entity has the authority to hire, fire, or supervise employees of Porsche of Fort Myers, and no Porsche entity shares in the dealership's profits or losses. (*Id.* ¶4; Supena Dec. ¶¶2, 5; Harris Dec. ¶2.)

## C.    <u>Mr. Cox's Complaint</u>

On August 8, 2016, Mr. Cox filed his putative class action complaint (Doc. 1), which includes nine counts, all based on the manner in which the $25,000 agreed for the Hyundai Genesis was disclosed on his lease:

1.    In Count 1 (Compl. ¶¶102–12), Plaintiff asserts that the Defendants violated the federal Consumer Leasing Act, 15 U.S.C. §§ 1667 *et seq.*, and Regulation M promulgated thereunder, by "deliberately fail[ing] to accurately disclose what Net Trade-in Allowance, if any, that a customer received in exchange for their trade-in vehicle, and how that Net Trade-in Allowance was applied to the lease" (*id.* ¶110).

2.    In Count 2 (*id.* ¶¶113–24), Plaintiff asserts that the Defendants' alleged violation of the Consumer Leasing Act constitutes a *per* se violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), § 501.201 *et seq.*, Fla. Stat.

3.      In Count 3 (*id.* ¶¶125–38), Plaintiff asserts that the Defendants violated the FDUTPA by "utiliz[ing] a trade practice whereby they deliberately fail to accurately disclose what Net Trade-in Allowance, if any, that a consumer received in exchange for their trade-in vehicle, and how that Net Trade-in Allowance was applied to the lease" (*id.* ¶132).

4.      In Count 4 (*id.* ¶¶139–53), Plaintiff asserts that Defendants violated the FDUTPA by (i) "failing to apply the Net Trade-in Allowance as a Capitalized Cost Reduction in their customers' leases"; (ii) "[r]epresenting . . . in the standard form motor vehicle lease agreement that the Capitalized Cost Reduction included '[t]he amount of any Net Trade-in Allowance,' when it did not"; (iii) by "failing to exclude the positive monetary value of a consumer's trade-in vehicle, if any, from the calculation of the sales tax due on the lease under Florida law"; and (iv) by "[c]ollecting and retaining the improperly charged sales tax" (*id.* ¶146).

5.      In Counts 5 and 6 (*id.* ¶¶154–68), Plaintiff asserts that the Defendants breached his lease agreement, and the implied covenant of good faith and fair dealing, by "fail[ing] to apply the positive monetary value of Plaintiff's and the Class Members' trade-in vehicles (i.e. their Net Trade-in Allowances) as Capitalized Cost Reductions to reduce the Gross Capitalized Costs of their leased vehicles" (*id.* ¶¶160–61).

6.      In Count 7 (*id.* ¶¶169–75), Plaintiff asserts that Defendant PCNA was negligent "in training and supervising its employees and agents" (*id.* ¶175).

7.      In Count 8 (*id.* ¶¶176–82), Plaintiff asserts that the Defendants have been unjustly enriched by "benefit[ting] from the unlawful trade practices alleged" (*id.* ¶177).

8.      In Count 9 (*id.* ¶¶183–86), Plaintiff asserts that the Defendants were negligent in (i) "utilizing policies and practices whereby the positive monetary value of a consumer's trade-in vehicle (i.e. the Net Trade-in Allowance) is *not* excluded from the sales tax calculation"; (ii)

"[d]eliberately disregarding the legality of these policies and practices"; (iii) "[d]irecting or permitting its employees, agents, and affiliates to utilize these unlawful policies and practices"; and (iv) "[m]isrepresenting to consumers that sales tax was lawfully due on motor vehicle lease agreements involving trade-in vehicles with positive monetary value, even though the Net Trade-in Allowances had *not* been excluded from the sales tax calculation" (*id*. ¶185).

Plaintiff seeks to assert these claims on behalf of two putative classes: "The Inaccurate Disclosure Class," comprising Florida lessees who "traded in a vehicle with a positive monetary value that was not assigned a positive Net Trade-In Allowance"; and "The No Capitalized Cost Reduction and Sales Tax Overcharge Class," comprising Florida lessees who "traded in a vehicle with a positive monetary value that was not properly credited as a Capitalized Cost Reduction." (*Id*. ¶82.)

### III.   ARGUMENT AND CITATION OF AUTHORITY

#### A.   Overview of Consumer Leasing Act Claim (Count 1)

Consumer leasing is regulated under federal law by the Consumer Leasing Act (CLA), 15 U.S.C. §§ 1667 *et seq.*, and by Regulation M promulgated thereunder by the Federal Reserve Board and now administered by the Consumer Financial Protection Bureau, 12 C.F.R. § 213.1 *et seq.* The CLA requires accurate, clear, and conspicuous disclosure of several specific components of a consumer lease, including, as applicable, "[t]he amount of any payment by the lessee required at the inception of the lease." 15 U.S.C. § 1667a(2). Certain violations of the CLA are made actionable in private civil litigation. *Id.* § 1667d.

Count 1 of the complaint asserts two purported disclosure violations of alleged to be actionable. First, Plaintiff argues that the dealer, Porsche of Fort Myers, was required to itemize the disclosure of "How the Amount Due at Lease Signing or Delivery Will be Paid" in Section 7.B of the lease by indicating that $25,000 of the disclosed $36,539.30 was the net trade-in

7

allowance to which Plaintiff and the dealer agreed. Although it is undisputed that the $25,000 trade-in allowance was included in the $36,539.30 figure (Cox. Dep. at 149:12–150:18), Section 7.B of the lease, the line for a "Net Trade-in Allowance," shows an "N/A":

| B. How the Amount Due at Lease Signing or Delivery will be Paid: | | |
|---|---|---|
| (1) Net Trade-in Allowance | $ | N/A |
| (2) Rebates and Noncash Credits | | N/A |
| (3) Amount to be Paid in Cash | | 36539.30 |
| (4) Total | $ | 36539.30 |

(Compl. Ex. A (Lease) (Doc. 1-3)); Cox Dep Ex. 6.) Plaintiff seeks to assert this claim on behalf of the "Inaccurate Disclosure Class." (Compl. ¶82.)

The second purported violation concerns the "capitalized cost" of the lease, which is the agreed value of the leased vehicle plus any other products or services purchased by the customer from the dealer. Reg M § 213.4(f)(1). Plaintiff argues that he was entitled to a "capitalized cost reduction" in the amount of his $25,000 trade-in allowance, even though he and the dealer specifically and indisputably agreed that his trade-in allowance would be used toward his single, up-front payment required by the lease—and not as a capitalized cost reduction. (Cox Dep. at 165:8–18.) Section 7.A of the lease showed how his payment (by cash and by trade-in allowance) would be allocated, with the bulk of it going toward the single, advance payment— not to a capitalized cost reduction:

| A. Amount Due at Lease Signing or Delivery: | | |
|---|---|---|
| (1) Capitalized Cost Reduction | $ | N/A |
| (2) First Monthly Payment | | N/A |
| (3) Single Payment | | 36254.88 |
| (4) Title Fees | | N/A |
| (5) Registration Fees | | N/A |
| (6) License Fees | | 272.69 |
| (7) Sales or Use Tax | | 11.73 |
| (8) N/A | | N/A |
| (9) N/A | | N/A |
| (10) Total | $ | 36539.30 |

(Compl. Ex. A; Cox Dep Ex. 6.)

8

This disclosure was carried through to the next section of the lease, Section 8, which listed an "N/A" in the blank corresponding to "Capitalized Cost Reduction":



A. **Gross Capitalized Cost.** The agreed upon value of the Vehicle ($ 63390.00) and any items you pay over the Lease Term (such as service contracts, insurance, and any outstanding prior credit or lease balance) ............ $ 64935.00 If you want an itemization of this amount, please check this box. ☐

B. **Capitalized Cost Reduction.** The amount of any Net Trade-in Allowance, rebate, noncash credit, or cash you pay that reduces the Gross Capitalized Cost ....... – N/A

C. **Adjusted Capitalized Cost.** The amount used in calculating your Base Monthly Payment or Base Single Payment .... = 64935.00

D. **Residual Value.** The value of the Vehicle at the end of the Lease used in calculating your Base Monthly Payment or Base Single Payment ........ – 40569.60

(*Id.*)

Plaintiff seeks to assert this claim on behalf of the "No Capitalized Cost Reduction and Sales Tax Overcharge Class." (Compl. ¶82.) (The gist of the sales-tax claim is that, if the $25,000 had been deducted from capitalized cost rather than used for the single payment, the sales tax would have been lower. (*Id.* ¶75.))

## B.    Plaintiff's "Inaccurate Disclosure" CLA Claim Fails.

The CLA claims for the "Inaccurate Disclosure Class" are that Regulation M requires that Section 7.B of Mr. Cox's lease, showing the $36,539.30 total paid at signing, should have included the figure "$25,000" rather than "N/A" for "Net Trade-in Allowance," and $11,539.30, rather than $36,539.30, for "Amount to be Paid in Cash." The disclosed total, in Plaintiff's alternative, would remain the same as it appears in the lease, $36,539.60. In prior briefing, Plaintiff has conceded that this claim "may appear insignificant." (Doc. 63 at 4.)

This claim fails, first, because the CLA itself does not require itemized disclosure of the amount due at lease signing or an itemized description of how the amount due will be paid. To the extent Regulation M purports to do so, the regulation impermissibly overreaches and is not entitled to *Chevron* deference, and in any event does not provide the basis for a private right of

9

action. Moreover, even if a private plaintiff could otherwise sue for a violation of the regulation, the insignificant omission here would be, at most, a "bare procedural violation" insufficient to state a justiciable claim. These points are developed below.

1.    **The CLA Does Not Require Itemized Disclosure of Net Trade-in Allowance, and Reg M's Itemization Requirement Is Invalid or at Least Not Actionable.**

The statutory text does not require that the amount due at lease inception be further itemized, and it does not require separate disclosure or itemization of the amount received or credited for any trade-in. 15 U.S.C. §1667a. The undisputed facts are that Mr. Cox received the disclosures required: Section 7.A of the lease discloses that $36,539.30 was due at lease signing. (Compl. Ex. A.) Mr. Cox does not claim that number is inaccurate, and he does not claim that he paid anything more than the $36,539.30 disclosed. Section 1667a requires nothing more.

a.    *The Regulation Impermissibly Expands the Statute.* Mr. Cox's claim of "inaccurate disclosure" is not based on the CLA, but rather on Reg M, which includes the non-statutory requirements that a lessor "itemize each component by type and amount, including any . . . capitalized cost reduction; and in motor-vehicle leases, shall itemize how the amount due will be paid, by type and amount, including any net trade-in allowance, rebates, noncash credits, and cash payments." 12 C.F.R. § 213.4(b). These requirements go beyond the Congressional authorization to the agency and are invalid.

"When a court reviews an agency's construction of the statute which it administers. . . . First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984); *see also Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1979 (2016) ("[W]e do not defer to the agency when the

10

statute is unambiguous."). "Where the statutory language is clear, agency regulations have no effect." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1320 (11th Cir. 2011); *see also Bd. of Governors of Fed. Reserve Sys. v. Dimension Fin. Corp.*, 474 U.S. 361, 374 (1986) ("The statute may be imperfect, but the [Federal Reserve] Board has no power to correct flaws that it perceives in the statute it is empowered to administer."); *Michigan v. EPA*, 135 S. Ct. 2699, 2712 (2015) (Thomas, J., concurring) (noting "serious questions about the constitutionality of our broader practice of deferring to agency interpretations of federal statutes"). The CLA itself unambiguously sets forth the written disclosures a lessor must provide, including "[t]he amount of any payment by the lessee required at the inception of the lease." § 1667a(2). There is no ambiguity in the requirement and no occasion for *Chevron* deference.

       *b.*    *Violation of the Regulation is Not Actionable.* Even if the additional requirements of § 213.4(b) were a valid exercise of regulatory power, there remains the additional, different question whether a violation of those regulations would be actionable by a private plaintiff like Mr. Cox. *See Alexander v. Sandoval*, 532 U.S. 275, 284 (2001) (even assuming regulations prohibiting disparate impact are valid, it does not "follow straightaway . . . that Congress must have intended a private right of action to enforce disparate-impact regulations"); *see also Malivuk v. Ameripark, LLC*, 694 F. App'x 705, 708 (11th Cir. 2017) (whether or not the regulation at issue might be entitled to *Chevron* deference if applied by the regulator, a violation of the regulation did not give rise to a private right of action).

       The most Mr. Cox might claim, on the undisputed facts, is that the disclosures made to him by the dealer complied with 15 U.S.C. § 1667a but did not comply with the additional requirements of 12 C.F.R. § 213.4(b). *Cf. Malivuk*, 694 F. App'x at 707 ("to gain any traction . . . in this case, Plaintiff must rely on § 531.52, which is only a regulation, not a statute"). For Mr.

Cox to state a claim, then, there must exist a private right of action for violations of the regulation which are not also violations of the statute. *Alexander*, 532 U.S. at 286 (considering whether "a failure to comply with regulations promulgated under § 602 [of Title VII] that is not also a failure to comply with § 601 [of Title VII]" is actionable).

"[P]rivate rights of action to enforce federal law must be created by Congress." *Id.* Nothing in the CLA confers upon private plaintiffs a right to sue for violations of the regulation which are not also violations of the statute. Section 1667d, "Civil liability of lessors," makes no reference to potential civil liability for violations of regulations—it refers only to "[a]ny lessor who fails to comply with any requirement imposed under section 1667a or 1667b of this title with respect to any person." 15 U.S.C. § 1667d. This extends to violations of regulations only to the extent those regulations "appl[y]—but do not expand—the statute." *Abrahams v. MTA Long Island Bus*, 644 F.3d 110, 118 (2d Cir. 2011). But Mr. Cox does not complain of non-compliance with the statute—not even non-compliance with an ambiguous statute clarified by regulations. His claim is, at most, that the dealer disclosed what was required by 15 U.S.C. § 1667a but did not meet the additional requirements of 12 C.F.R. § 213.4(b). Section 1667d, establishing a cause of action for non-compliance with the statute, does not extend so far.

Nor does the section of the CLA concerning regulations, § 1667f, confer any rights on private plaintiffs; it simply allows the CFPB to prescribe regulations as necessary to carry out, prevent circumvention of, or facilitate compliance with the CLA itself. The statute does not "display an intent to create a freestanding private right of action to enforce regulations promulgated under" the statute, *Alexander*, 532 U.S. at 293, and Mr. Cox cannot pursue a claim for an alleged violation of the regulation which is not also a violation of the statute.

2.      **Even If the Alleged Violation of the Regulation Otherwise Were Actionable, the Undisputed Facts Show at Most a "Bare Procedural Violation" That Is Not Justiciable.**

Even if there were a private cause of action to challenge disclosures satisfying the requirements of 15 U.S.C. § 1667a but not the additional requirements of 12 C.F.R. § 213.4(b), Mr. Cox's concededly apparently insignificant grievance would have to be dismissed because he alleges, at most, a "bare procedural violation" of the regulation that caused him no injury.

Injury in fact is the "[f]irst and foremost" of the three elements required for Article III standing. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 103 (1998)). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id*. at 1548 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). A plaintiff cannot satisfy the injury-in-fact requirement by alleging a "bare procedural violation, divorced from any concrete harm." *Id*. at 1549. Here, even assuming that a violation of Reg M but not the CLA could count as an otherwise actionable "violation," Mr. Cox has suffered no concrete harm as a result of the alleged violation, and his CLA claim must be dismissed. *Id*.; *see also Strubel v. Comenity Bank*, 842 F.3d 181, 190 (2d Cir. 2016) ("even where Congress has accorded procedural rights to protect a concrete interest, a plaintiff may fail to demonstrate concrete injury where violation of the procedure at issue presents no material risk of harm"); *Stacy v. Dollar Tree Stores, Inc.*, --- F. Supp. 3d ---, 2017 WL 3531513, at *4 (S.D. Fla. Aug. 11, 2017) (Zloch, J.) ("the question is whether non-compliance . . . caused harm (or a material risk of harm)").

Mr. Cox's claim is that the $36,539.30 disclosed as both "Paid in Cash" and the total amount paid should have been itemized to reflect $11,539.30 in cash and $25,000 in trade value. But the undisputed facts show that Mr. Cox knew, at the time of the transaction, that the

13

$36,539.30 represented $11,539.30 in cash and $25,000 for the Hyundai, not only because he

wrote a check for only $11,539.30, but also because he specifically asked the dealer about it:

> Q: [L]et's look at the middle of the lease, page 1, with number 7. You see the total in box 7 which says $36,539.30?
> A: Yes, I do.
> Q: Do you know the origin of that number?
> A: Yes.
> Q: What is it?
> A: That's the combination of my trade-in and the check for 11,539, probably.
> . . . .
> Q: You told me earlier that you had asked a question about – just one question that you could recall about the lease. Would you tell me that again. Just refer to me on the lease what your question was.
> A: I asked Ed concerning line 7, B(1), where is my trade-in. I said Ed, didn't you know I was going to trade my car in, and he snippetly said it's right there in number 3, 7 B(3).
> Q: Which is the $36,539?
> A: Yeah.
> . . . .
> Q: [T]he value of your trade-in is reflected on your lease?
> A: Yes.
> Q: And you knew that on March 10th [the day he signed the lease]?
> A: Yes.

(*id*. at 149:19–150:2, 150:9–18, 153:3–7).

Mr. Cox knew that he received a $25,000 credit for the Hyundai and paid $11,539.30 by

check, resulting in $36,539.30 paid at signing. He therefore suffered no "actual" and "concrete"

harm by any error in the disclosure. *Spokeo*, 136 S. Ct. at 1550 ("A violation of one of the

FCRA's procedural requirements may result in no harm."); *Gubala v. Time Warner Cable, Inc.*,

846 F.3d 909, 911 (7th Cir. 2017) ("[The plaintiff]'s problem is that while he might well be able

to prove a violation of section 551, he has not alleged any plausible (even if attenuated) risk of

harm to himself from such a violation—any risk substantial enough to be deemed 'concrete.'");

*Hancock v. Urban Outfitters, Inc.*, 830 F.3d 511, 514 (D.C. Cir. 2016) (no standing where

plaintiffs "assert only a bare violation of the requirements of D.C. law"); *Dreher v. Experian*

14

*Info. Sols., Inc.*, 856 F.3d 337, 346 (4th Cir. 2017) ("a statutory violation divorced from any real world effect" insufficient to confer standing); *Stacy*, 2017 WL 3531513, at *6 (no "informational injury," even if FCRA disclosures not presented in required format, where plaintiff "testified that she understood the disclosure presented to her"); *Yeager v. Ocwen Loan Servicing, LLC*, 237 F. Supp. 3d 1211, 1216–17 (M.D. Ala. 2017).

**C.      The "No Capitalized Cost Reduction and Sales Tax Overcharge" CLA Claim Fails.**

Plaintiff's "No Capitalized Cost Reduction and Sales Tax Overcharge" claim also fails, again for multiple reasons. Plaintiff claims that the dealer was required by law to deduct the $25,000 for his Hyundai from the gross capitalized cost of the Porsche ($64,395). Subtracting $25,000 from the $64,395 as a "Capital Cost Reduction," he says, would have "result[ed] in a lower lease payment, a lower Rent Charge, and less sales tax." (Compl. ¶75.) Indeed, it might have, if the lease were rewritten—but that was not the deal he negotiated. Plaintiff's payments were applied entirely to the amounts due at lease signing, as disclosed and agreed. That is perfectly lawful. Nothing in the CLA or Reg M requires that a lessee receive a capitalized cost reduction. And the dealer never would have entered into the hypothetical alternative deal Plaintiff now proposes, anyway. (Trombley Dep. at 148:7–14, 216:21–218:18.)

The section of the CLA governing lease disclosures says nothing at all about "capitalized cost," reductions to capitalized cost, or trade-ins. 15 U.S.C. § 1667a; *see also* Final Rule, 61 Fed. Reg. 52246-01, 52251 (Oct. 7, 1996) ("The CLA does not call for a payment calculation . . . ."). As with the "inaccurate disclosure" claim discussed above, the sole basis for the claim is Reg M. The regulation says that, for a motor-vehicle lease, the lessor shall disclose

> a mathematical progression of how the scheduled periodic payment is derived, in a format substantially similar to the applicable model form in appendix A of this part, which shall contain . . . (2) [t]he capitalized cost reduction, with a description such as "the amount of any net trade-in allowance, rebate, noncash credit, or cash you pay that reduces the gross capitalized cost.

15

12 C.F.R. § 213.4(f). Notably, the regulation does not require that net trade-in allowance be applied as a reduction to capitalized cost; it simply requires that *if* a trade-in allowance is so applied, it must be disclosed. 12 C.F.R. § 213.4(f)(2) ("*any* net trade-in allowance . . . you pay *that reduces the gross capitalized cost*" (emphasis added)). Plaintiff agreed that his payment (in cash and trade-in) would not be applied to reduce his gross capitalized cost. (Cox Dep. at 165:8–18.) The lease accurately disclosed the deal in full compliance with the CLA and Reg M.

The alternative deal hypothesized by Mr. Cox is totally fanciful and would not have been entered into by the dealer or acquired by PLL. The dealer would not have agreed to a capitalized cost reduction on Plaintiff's single-payment lease. (Trombley Dep. at 148:11–12 ("The way our system is set up, there is no cap cost reduction on one-pay leases.").) And PLL would not have taken assignment of the lease with a $25,000 capitalized cost reduction, because that reduction (gross capitalized cost of $64,935 – $25,000) would have resulted in an adjusted capitalized cost ($39,935) smaller than the calculated residual value of the Porsche at the end of the three-year lease ($40,569.60). In other words, the deal Plaintiff suggests entails negative depreciation—that is, *appreciation* in value—of the vehicle over the three years Plaintiff drove it. Not only would that be in violation of PFS's requirement that the adjusted capitalized cost of single-pay leases be at least 110% of the vehicle's residual value (Supena Dec. ¶10), but it also would be at odds with the economic realities of the transaction—not even a Porsche is going to *appreciate* in value (or "negatively depreciate") during the 3 years Mr. Cox drives it.

Moreover, § 213.4(f) of Reg M, quoted above, does not apply to single-payment leases in the first place. Even if Mr. Cox could otherwise bring a claim for a violation of the regulation, he would have no such claim on the undisputed facts here, because he entered into a single-pay

16

lease, not one with a "scheduled *periodic* payment." By its own terms, the regulation does not apply to Mr. Cox's single-payment, up-front lease.

Finally, Plaintiff's claim for violation of the regulation (but not the statute) also fails for the reasons discussed in Part III.B.1, above, which are, in the interest of relative brevity, incorporated here by reference: Reg M impermissibly expands the statute with respect to required disclosures and no private cause of action is authorized anyway for a violation of the regulation alone.

### D.   Plaintiff Has No § 1667a(3) Claim.

In his motion for class certification (Doc. 104 at 13), Plaintiff suggests that his "Inaccurate Disclosure" CLA claim also includes a claim under another subsection of the CLA, 15 U.S.C. § 1667a(3), for alleged failure to disclose "the amount paid or payable by the lessee for official fees, registration, certificate of title, or license fees or taxes," *id*. But this claim is nowhere pleaded in the complaint and therefore is not before the Court. And even if pleaded, it would be meritless because, as explained above, there was no capitalized cost reduction in the lease—and none was required by the CLA or Reg M. The lease accurately disclosed the taxes collected and remitted to the state.

### E.   In Any Event, No Defendant Is a CLA "Lessor" Under the Circumstances.

Additionally, even if Mr. Cox's CLA claims could be asserted against the dealership, his claims against Defendants would still fail because no Defendant is a "lessor" to whom the lease was initially payable, 15 U.S.C. § 1641(e)(1)(A), and the alleged CLA violation is not apparent from the face of Mr. Cox's lease.

This is so because a claim under the CLA may be maintained only against a "lessor." 15 U.S.C. § 1667d. This section of the CLA, entitled "Civil liability of lessors," provides that "[f]or

the purposes of this section, the term 'creditor' as used in sections 1640 and 1641 of this title

shall include a lessor as defined in this part." Section 1641, in turn, provides that:

> [e]xcept as otherwise specifically provided in this subchapter, any civil action for
> a violation of this subchapter [*i.e.*, Title 15, Chapter 41, Subchapter 1, including
> both the TILA and the CLA] which may be brought against a creditor may be
> maintained against any assignee of such creditor only if the violation for which
> such action or proceeding is brought is apparent on the face of the disclosure
> statement, except where the assignment was involuntary.

15 U.S.C. § 1641(a); *see also Kennedy v. BMW Fin. Servs., N.A.*, 363 F. Supp. 2d 110 (D. Conn.

2005) (applying § 1641(a)'s limitation of assignee's liability to a CLA claim). To the extent the

Official Staff Commentary to Reg M would impose broader liability on assignees, the

commentary is "obvious[ly] repugnan[t] to the statute," *Anderson Bros. Ford v. Valencia*, 452

U.S. 205, 219 (1981), and entitled to no deference.

It is undisputed that Mr. Cox's lease was initially payable to Porsche of Fort Myers, not

to any Defendant. (Compl. Ex. A; Cox Dep. Ex. 6.) It is further undisputed that the dealership

was not required to assign the lease to PLL. (Harris Dec. ¶4; Supena Dec. ¶8.) At most, PLL is

an "assignee" of the lease and can be liable only for violations "apparent on the face of the

disclosure statement." 15 U.S.C. § 1641(a).

So even if there were a violation of the CLA with respect to Mr. Cox's lease—and, as

discussed above, there is not—the violation still would not be apparent from the face of the lease

contract. The lease identifies a trade-in vehicle—the 2015 Hyundai—but does not disclose

whether Mr. Cox had any positive equity in the Hyundai.[2] (Compl. Ex. A.) The face of the lease

is consistent with a scenario in which Mr. Cox had some amount of positive equity, and that

---

[2] As explained in Plaintiff's class-certification motion, "Trade-in 'equity' means the agreed-upon
value of the consumer's trade-in vehicle, less the amount of any lien on the trade-in (which
results in the 'net' trade-in allowance). Like a homeowner, a consumer may have 'positive' or
'negative' equity in their trade-in." (Doc. 104 at 1 n.2.)

amount was included in the $36,539.30 paid at signing, but it is equally consistent with a situation in which Mr. Cox had no or negative equity in the Hyundai and paid $36,539.30 in cash. (*Id.*) PFS would not know from the face of the lease which was true. (Supena Dec. ¶7.) In the latter case, even under Mr. Cox's theory, there would be no violation of the CLA or Reg M. Thus none of the alleged CLA violations would have been apparent from the face of Mr. Cox's lease, and no Defendant would be deemed a statutory "lessor" under the circumstances.

For all of the foregoing reasons, Mr. Cox's CLA claims must be dismissed.

### F.    Plaintiff's State-Law Claims (Counts 2–9) Fail Because Defendants Are Not Liable for Acts of the Dealer.

Plaintiff's other claims depend on the allegation that the dealer, PFS, and PLL each "were the agents of Porsche NA acting within the scope and purpose of that agency" (Compl. ¶¶117, 129, 143), such that Defendants can be liable for the dealer's alleged actions. But the undisputed facts belie that allegation.

Under Florida law, an agency relationship requires "(1) the principal to acknowledge that the agent will act for it; (2) the agent to manifest an acceptance of the undertaking; and (3) control by the principal over the actions of the agent." *Whetstone Candy Co. v. Kraft Foods, Inc.*, 351 F.3d 1067, 1077 (11th Cir. 2003). For an agency relationship to exist, the principal must control "the means to be used" and not "merely . . . the result to be procured." *Chase Manhattan Mortg. Corp. v. Scott, Royce, Harris, Bryan, Barra & Jorgensen, P.A.*, 694 So. 2d 827, 832 (Fla. 4th DCA 1997) (quoting *Ortega v. Gen. Motors Corp.*, 392 So. 2d 40, 42 (Fla. 4th DCA 1980)). Additionally, in order for a principal to be liable for the actions of its agent, the agent must be acting within the scope of the agency. *See Parker v. Domino's Pizza, Inc.*, 629 So. 2d 1026, 1027 (Fla. 4th DCA 1993). The existence (or non-existence) of an agency relationship can be decided on summary judgment "where the evidence is capable of but one determination." *Robbins v.*

19

*Hess*, 659 So. 2d 424, 427 (Fla. 1st DCA 1995). Moreover, if the agency "is to be proven exclusively by analysis of the contract between the [alleged] principal and agent," then the question must be decided as a matter of law. *Banco Espirito Santo Int'l v. BDO Int'l*, 979 So. 2d 1030, 1032 (Fla. 3d DCA 2008) (citing *Villazon v. Prudential Health Care Plan, Inc.*, 843 So. 2d 842, 853–54 (Fla. 2003)). The party alleging the agency relationship has the burden of proving it. *Font v. Stanley Steemer Int'l*, 849 So. 2d 1214, 1216 (Fla. 5th DCA 2003).

Porsche of Fort Myers is not a PCNA agent. PCNA had no involvement in the negotiating or servicing of Mr. Cox's lease. (Derengowski Dec. ¶5.) PCNA imports vehicles from Germany, and Porsche of Fort Myers sells some of those vehicles at retail pursuant to a Dealer Sales and Service Agreement. (*Id.* ¶¶2, 3, Ex A.) Florida courts have consistently concluded that such automobile-dealership-franchise agreements do not create an agency relationship, because they lack "the tell-tale signs of a principal-agent relationship, such as the ability of the principal to hire, fire, or supervise dealership employees or dealer ownership." *Ocana v. Ford Motor Co.*, 992 So. 2d 319, 326 (Fla. 3d DCA 2008); *see also Ortega*, 392 So. 2d at 43 (noting that a conclusion of no agency relationship "has been reached by other courts throughout the country which have construed similar dealer franchise agreements" and citing cases). Porsche of Fort Myers is not PCNA's agent, as a matter of law.

Plaintiff's complaint does not assert an agency relationship between Porsche of Fort Myers and PFS or PLL, but, even if it did, there would be no basis for such an allegation. Neither PFS nor PLL owns or controls the dealership. PLL is a titling trust which holds title to leases and vehicles. (Supena Dec. ¶4.) As for PFS, its agreement with the dealership expressly provides that the dealer is not an agent of PFS. (*Id*. ¶3.) Instead, the dealership negotiates sales and leases with its customers, and then, if the customer wants to finance the sale or fund the lease through PFS,

20

the dealership submits an application to PFS, which PFS may then choose to accept or reject. (*Id.* ¶¶2, 6, 8; Harris Dec. ¶3.) Neither PFS nor PLL had any involvement in the negotiations between Plaintiff and his dealer that led to his lease. (Supena Dec. ¶5.)

## G.   Plaintiff's State-Law Claims (Counts 2–9) Are Barred by the Voluntary-Payment Doctrine.

All of Plaintiff's state-law claims are based on the allegation that he paid more money—specifically in rent charges and sales tax—than he would have if his trade-in had been used to reduce the capitalized cost rather than to make the single lease payment. But Plaintiff admits that he paid these amounts with a full understanding of the facts surrounding his lease, and his claims are therefore barred by the voluntary-payment doctrine.

Under Florida law, "money voluntarily paid under a claim of right to the payment, and with knowledge of the facts by the person making the payment, cannot be recovered back, and this is true even though the claim thus paid was illegal." *Sanchez v. Time Warner, Inc.*, 1998 WL 834345, at *2 (M.D. Fla. Nov. 4, 1998) (quoting *McMullen v. Inland Realty Corp.*, 152 So. 740, 742 (Fla. 1933)). "It does not matter that the payment may have been made upon a mistaken belief as to the enforceability of the demand, or liability under the law, as long as payment is made with knowledge of the factual circumstances." *Hassen v. Mediaone of Greater Fla., Inc.*, 751 So. 2d 1289, 1290 (Fla. 1st DCA 2000); *see also Hall v. Humana Hosp. Daytona Beach*, 686 So. 2d 653, 657 (Fla. 5th DCA 1996) ("Every man is supposed to know the law, and if he voluntarily makes a payment which the law would not compel him to make, he cannot afterwards assign his ignorance of the law as a reason why the state should furnish him with legal remedies to recover it." (quoting *N. Miami v. Seaway Corp.*, 9 So. 2d 705, 707 (Fla. 1942))).

Although the voluntary-payment doctrine has been limited somewhat by statute, that limitation applies "only to those situations in which the contract on its face does not call for

21

payment, or the contract on its face excuses the payment." *Hall*, 686 So. 2d at 658 (discussing § 725.04, Fla. Stat.). The doctrine therefore has been applied in numerous cases to bar claims by consumers that they were overcharged taxes and other charges by a vendor or dealer. *See, e.g.*, *id*. (affirming grant of summary judgment to defendant hospital on former patients' claims for "recovery of alleged overcharges for pharmaceuticals, medical supplies, and laboratory services" that plaintiffs asserted were "disproportionate to the market price of the items"); *Hassen*, 751 So. 2d at 1290 (affirming dismissal of claims for recovery of money paid as late charges on cable bills that customers asserted were "excessive and disproportionate to the actual costs which the appellee cable provider incurred with the late payments"); *Sanchez*, 1998 WL 834345, at *3 (affirming dismissal of claims of "excessive late fees" alleged to be "grossly disproportionate to any damage that might be sustained by late payment of any cable bill").

Here, Plaintiff claims that he paid too much in rent charge and in sales tax on the lease, but he paid those amounts voluntarily and with full knowledge of the facts. The rent charge of $9,837.48 and the sales tax of $2,052.00 were stated plainly on the face of the lease as being included in the single payment that Plaintiff chose to pay (with a combination of his trade-in vehicle and a check) to lease the new Porsche Cayman. Although Plaintiff now asserts, erroneously, that these amounts were higher than they should have been because "the law specifies that the trade-in allowance should be used to reduce the capitalization," he does not claim that he was under any misconception about the facts surrounding his lease transaction. (Cox Dep. at 165:20–22; *see also id*. at 150:19–21.)

Specifically, Plaintiff knew that the value of his trade-in vehicle would be used to reduce his lease payment, not the capitalized cost of his new vehicle:

> Q. Did anyone ever tell you we are going to use your trade-in to reduce the capitalized costs?

> A.  No.
> Q.  And, actually, when you asked what about this trade-in line, you were told it's over here in this $36,000 number; correct?
> A.  Correct.
> Q.  And that was a true statement; the $25,000 was in that number?
> A.  It was.

(*Id.* at 165:8–18.) And he knew that, after the single payment of $36,254.88 was calculated and license fees ($272.69) and taxes ($11.73) were added, the $25,000 agreed value of his Hyundai Genesis was applied to reduce the total payment so that he would pay only the remaining $11,539.30. (*See, e.g.*, *id.* at 82:11–13 ("Q. Did you ask him how much credit you had been given for it? A. I did not. I knew it was 25,000."), 83:12–16  ("[He pointed to the lower number, which was 35, 6 something thousand dollars. So I was satisfied that they somehow combined my down payment and my trade-in allowance into that number."), 153:3–7 ("Q. [T]he value of your trade-in is reflected on your lease? A. Yes. Q. And you knew that on March 10th? A. Yes.").)

Plaintiff chose to lease a new Porsche and, in exchange, pay the amount required on his lease agreement with full information about the facts. That he later decided he was not legally required to pay those amounts does not affect the voluntariness of his payment. Plaintiff is not entitled to a refund of any allegedly unwarranted amounts, no matter how framed.

### H.      Plaintiff's FDUTPA Claims (Counts 2, 3, and 4) Fail.

Counts 2, 3, and 4 of the complaint seek damages as well as declaratory and injunctive relief for alleged violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), §§ 501.201–501.213, Fla. Stat. The undisputed facts preclude these claims. The FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." § 501.204(1), Fla. Stat. To establish a claim for damages under the FDUTPA, a plaintiff must show "1.) a deceptive act or unfair practice; 2.) causation; and 3.) actual damages." *CareerFairs.com v. United Bus.*

23

*Media*, 838 F. Supp. 2d 1316, 1324 (S.D. Fla. 2011). For a defendant to be held directly liable

under the FDUTPA, that defendant must have had "direct" involvement in the offending act or

practice. *Aboujaoude v. Poinciana Dev. Co. II*, 509 F. Supp. 2d 1266, 1277 (S.D. Fla. 2007).

Like his CLA claim, Plaintiff's claims under the FDUTPA are based on (1) the fact that

the $25,000 he negotiated for his trade-in vehicle was not included on the lease agreement as

"Net Trade-in Allowance" (Compl. ¶¶121, 132), and (2) the fact that the $25,000 credit for the

trade-in vehicle was applied to reduce his $36,539.30 single payment rather than to reduce the

capitalized cost of the new Porsche (*id*. ¶146). Plaintiff claims these acts were "deceptive and

misleading" and caused him to pay a higher rent charge and more sales tax than he would have

had the trade-in been used as a capitalized cost reduction. (*Id*. ¶¶133–34, 148–49).

But neither of these grievances is sufficient to establish the requirements for an FDUTPA

claim, as explained below. First, there has been no deceptive trade practice—Plaintiff concedes

that he knew exactly how much he was getting for his trade-in vehicle and exactly how it was

being applied. Second, Plaintiff has not been damaged or aggrieved by any supposedly deceptive

practice: his $36,539.30 single payment was reduced by the $25,000 value of his trade-in

vehicle; he wrote a check for $11,539.30; and he drove off the lot in a new Porsche Cayman

worth $63,390. Third, there is no causal connection between the Defendants and the transaction

that occurred between Plaintiff and the Fort Myers dealership. Finally, as to Count 2 specifically,

Plaintiff has not alleged a *per se* FDUTPA violation, because there has been no CLA violation

and, again, he has not been aggrieved or damaged by the alleged practices.

### 1.      There is No Unfair or Deceptive Practice.

First, an FDUTPA plaintiff must establish that there has been a "deceptive act or unfair

practice." *Lombardo v. Johnson & Johnson Consumer Cos.*, 124 F. Supp. 3d 1283, 1287 (S.D.

Fla. 2015). "An unfair practice is 'one that offends established public policy and one that is

24

immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" *Id*. (quoting *Samuels v. King Motor Co. of Fort Lauderdale*, 782 So.2d 489, 499 (Fla. 4th DCA 2001)). And a deceptive act "occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *Id*. (quoting *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003)); *accord Hucke v. Kubra Data Transfer Ltd.*, 160 F. Supp. 3d 1320, 1328 (S.D. Fla. 2015).

Plaintiff's claims all are based on the allegation that his lease transaction with Porsche of Fort Myers was "deceptive and misleading" (*see* Compl. ¶¶133–34, 148–49), but this allegation is directly contradicted by Plaintiff's own testimony. First, as to the value given for his trade-in vehicle, Plaintiff admitted that he was not deceived—or even confused—in the least: "Q. Did you ask him how much credit your had been given for it? A. I did not. I knew it was 25,000." (Cox Dep. at 82:11–13.) And the absence of this number on his lease agreement did not mislead him in any way. When he asked about it, the dealer "pointed to the lower number, which was 35, 6 something thousand dollars," and Mr. Cox "was satisfied that they somehow combined my down payment and my trade-in allowance into that number. (*Id*. at 83:9–16; *see also id*. at 153:3–7 ("Q. [T]he value of your trade-in is reflected on your lease? A. Yes. Q. And you knew that on March 10th? A. Yes.").)

Similarly, Plaintiff admits that he was not deceived or misled about the fact that the value of his trade-in vehicle was being applied to the single lease payment rather than as a capitalized cost reduction. The dealership was clear with him about how the $25,000 was being applied:

> Q. Did anyone ever tell you we are going to use your trade-in to reduce the capitalized costs?
> A. No.
> Q. And, actually, when you asked what about this trade-in line, you were told it's over here in this $36,000 number; correct?
> A. Correct.

25

> Q.  And that was a true statement; the $25,000 was in that number?
> A.  It was.

(*Id*. at 165:8–18.) As Plaintiff explains it, the supposed "deceit was that the law specifies that the trade-in allowance should be used to reduce the capitalization, and there was an N/A on the line for capitalized cost reduction." (*Id*. at 165:20–23.) But that "N/A" was truthful. It accurately reflected the fact that the trade-in was not used as a capitalized cost reduction. Plaintiff concedes that "the 25,000 was credited," it just wasn't credited "the way [he] later decided it should have been." (*Id*. at 150:19–20.) The FDUTPA does not provide a cause of action for consumers who subsequently realize that they would like a better deal than what they actually negotiated.

## 2.   Plaintiff Has Suffered No Loss Caused by an Alleged Violation.

Second, even if the treatment of Plaintiff's trade-in vehicle had been a deceptive trade practice, he has not established that he was damaged by any such practice. "[W]hen a plaintiff in her complaint fails to allege a recoverable loss under FDUTPA, the complaint fails to state a cause of action under FDUTPA." *Rodriguez v. Recovery Performance & Marine, LLC*, 38 So. 3d 178, 180 (Fla. 3d DCA 2010). The FDUTPA "is intended to protect a consumer from unfair or deceptive acts or practices which diminish the value or worth of the goods or services purchased by the consumer." *Urling v. Helms Exterminators, Inc.*, 468 So. 2d 451, 454 (Fla. 1st DCA 1985). The Act therefore provides for recovery only of "actual damages," defined as "'the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered *according to the contract of the parties*.'" *Rodriguez*, 38 So. 3d at 178 (emphasis added; citations omitted). But a consumer is not entitled to damages based on "comparison with the deal he *might have made* . . . had he been a more astute negotiator." *Gen. Motors Acceptance Corp. v. Laesser*, 718 So. 2d 276, 278 n.5 (Fla. 4th DCA 1998).

26

Here, Plaintiff got exactly what he bargained for, as reflected on his lease agreement. He wanted a new Porsche vehicle but could not afford to purchase one outright, so he opted for a lease. (Cox. Dep. at 53:8–12.) He also did not want to have ongoing monthly payments, so he opted for a single-payment lease, where he would make the entire payment up front rather than over time. (*Id*. at 68:1–5.) Finally, he agreed that he would trade in his Hyundai for a $25,000 credit off his $36,539.30 single payment. (*Id*. at 149:12–150:18, 153:3–7.) As Plaintiff concedes, that is exactly what happened. (*Id*. at 86:4–18; *see also id*. at 151:19–21 ("Q. [Y]ou got a dollar-for-dollar credit for $25,000? A. Yes.").)

Plaintiff now asserts that he was damaged because he could have paid less money in rent charges and sales tax *if* the $25,000 trade-in allowance had been applied to reduce the capitalized cost rather than the lease payment. But that was not the deal. That Plaintiff has now thought of an alternative deal that may have cost him less—a deal to which the dealer never would have agreed—does not mean he was damaged under the FDUTPA. *See Laesser*, 718 So. 2d at 278 n.5.

### 3.     Defendants Are Not Vicariously Liable for the Dealer's Acts.

Moreover, even if Plaintiff could show any damage, he cannot establish that Defendants caused that damage. The FDUTPA requires damage caused by an unfair or deceptive act *of the defendant*. *See id*. at 277. In *Laesser*, the court concluded that the plaintiff had not established an FDUTPA claim against an automobile-finance company based on conduct of the dealership in a lease transaction. The plaintiff claimed that he had intended to purchase a vehicle but was convinced at the last moment to switch to a lease based on false representations by the dealer. *Id*. He sued both the dealership and the finance company (GMAC) on the "theory that GMAC was liable because it and [the dealership] were both participants in a scheme to unfairly enhance their profits by switching prospective vehicle purchasers from a purchase agreement to a lease under the false and deceptive claim that it is cheaper to lease a vehicle than to buy it." *Id*. The plaintiff

27

offered evidence at trial "that GMAC conducted training seminars" for dealership employees on "the 'bait and switch' procedure used on" the plaintiff and "using a lease agreement [to] omit certain disclosures required in a finance contract and thereby deceive customers about the overall price of the vehicle, thus enhancing profits." *Id*. Reversing the denial of GMAC's motion for directed verdict, the court of appeals concluded that, even if the dealership's conduct were wrongful, GMAC could not be held liable to the plaintiff under the FDUTPA:

> However, to be actionable an unfair or deceptive trade practice must be the cause of loss or damage to a consumer. The problem in this case is there was not presented to the jury any competent evidence that the wrongful deceptive conduct of the [dealership] employees in switching appellee from a sale to a lease was in any-wise connected with or caused by the deceptive technique taught in the GMAC seminar, nor any evidence from which the jury could reasonably infer that GMAC and [the dealership] had schemed to produce such a result.

*Id*. at 277–78.

Here, there is even less evidence connecting Defendants to the acts complained of by Plaintiff. The complaint includes vague allegations that Defendants train dealership employees and "control[] how Porsche leases are calculated" (Compl. ¶¶20, 23), but there is no such evidence in the record. The dealership's sales manager, Ed Trombley, and its managing partner, John Harris, both denied any training from Defendants on completing leases or applying trade-in values. (Trombley Dep. at 151:2–7, 151:12–13 ("Porsche Financial doesn't train me."); Harris Dep. at 50:3–51:18.) Mr. Trombley testified the dealership completes lease agreements by entering information in their Reynolds & Reynolds software, which then calculates, fills in, and prints out the lease. (Trombley Dep. at 148:7–14, 216:21–218:18.) He also testified the dealership does not use a trade-in as capitalized cost reduction on a single-pay lease because the dealership's Reynolds & Reynolds system does not do it that way. (*Id*.) He testified that this was not at the direction of any of the Defendants and further that none of the Defendants had any

28

involvement in the way he completed Plaintiff's lease agreement. (*E.g.*, *id*. at 149:4–5.) And the fact that PLL provides dealerships with the lease form (Compl. ¶21) is irrelevant. Plaintiff has no issue with the blank lease form itself; his concern is the way the Fort Myers dealership filled out the form, a practice not "connected with or caused by" Defendants. *Laesser*, 718 So. 2d at 278.

### 4.    Plaintiff Has Not Established a *Per Se* FDUTPA Violation (Count 2).

Count 2 of the complaint alleges a *per se* FDUTPA violation based on the alleged CLA violation. (Compl. ¶121.) Although section 501.203(3)(c), Florida Statutes, does provide that violation of a federal consumer-protection statute may establish the first element of an FDUTPA claim—a deceptive act or unfair practice—the other elements of the claim still must be established. *See, e.g.*, *Lombardo v. Johnson & Johnson Consumer Cos.*, 124 F. Supp. 3d 1283, 1290 (S.D. Fla. 2015) (holding that plaintiff did not adequately allege that manufacturer's deceptive advertising caused her to pay a higher price in violation of FDUTPA because the retailer, not the manufacturer, set the sales price); *see also Cross v. Point & Pay, LLC*, --- F. Supp. 3d ---, 2017 WL 1196676, at *6 (M.D. Fla. Mar. 31, 2017).

Plaintiff's *per se* claim fails, in the first instance, because he cannot make out a claim for violation of the CLA (discussed above). Even if there were a CLA violation, Plaintiff cannot establish that he suffered any damage caused by Defendants (also discussed above).[3]

_____

[3] Plaintiff also asserts that the alleged FDUTPA violations entitle him to a civil penalty of $15,000 under section 501.2077, Florida Statutes. (Compl. ¶¶124, 138.) But FDUTPA civil penalties are allowed only in actions brought by the "enforcing authority," not private litigants. *See Teggerdine v. Speedway LLC*, 2017 WL 2105224, at *4 (M.D. Fla. May 12, 2017); *Zendejas v. Redman*, 2016 WL 1242349, at *8 (S.D. Fla. Mar. 30, 2016) ("With respect to the imposition of a civil penalty, FDUTPA provides that civil penalties may be recovered in actions brought by the 'enforcing authority,' which is either the office of the state attorney or the department of legal affairs. §§ 501.203(2), 501.2075, Fla. Stat. Since this action is brought by a private individual and not the 'enforcing authority,' a civil penalty cannot be recovered in this case.").

## I. Plaintiff's Claim for Overpayment of Florida Sales Tax Is Precluded by Statute (All Florida-law Counts).

In his FDUTPA claim and his other Florida-law counts, Plaintiff claims that he paid more taxes than he should have because the value of his trade-in was not deducted from the sales price of the car on which the sales tax was calculated. (Compl. ¶146.) But Florida law strictly limits the circumstances in which an action can be brought against a dealer for overpayment of taxes, precluding it entirely where the tax was remitted to the Department of Revenue, as it was here.

### 1. Section 213.756, Florida Statutes, Bars Plaintiff's Sales-Tax Claims.

Plaintiff's tax-overpayment claims are subject to the limitations imposed by section 213.756, Florida Statutes, which applies "[i]n any action by a purchaser against a retailer, dealer, or vendor to obtain a refund of or to otherwise recover taxes, fees, or surcharges collected by the retailer, dealer, or vendor from the purchaser." § 213.756(2)(a), Fla. Stat. This statute not only provides a heightened standard of proof for purchasers, but it also limits the remedy available and provides an affirmative defense when the taxes have been remitted to the taxing authority:

2. The *sole remedy* in the action is damages measured by *the difference between* what the retailer, dealer, or vendor *collected as a tax*, fee, or surcharge and what the retailer, dealer, or vendor *paid to the taxing authority* . . . ; and

3. It is an *affirmative defense* to the action when the retailer, dealer, or vendor *remitted the amount collected* from the purchaser to the appropriate taxing authority . . . .

*Id.* (emphasis added).

Here, Plaintiff's claims are based on an alleged overpayment of sales tax to Porsche of Fort Myers, which he alleges is an agent of Defendants. Specifically, Plaintiff claims that he was charged too much sales tax on his lease payment because the base single payment, on which the 6% sales tax was calculated, had not been reduced by the value of his trade-in vehicle. (Compl. ¶75.) But the amount of that tax charged—$2,052 (*id.* Ex. A § 8.K)—was collected by Porsche of Fort Myers as part of Plaintiff's lease payment and then submitted to PFS when the lease was

funded (Supena Dec. ¶11). His claims therefore fall squarely within section 213.756, and he would be entitled to nothing more than "the difference between what" the dealership "collected as a tax" and what was "paid to the taxing authority." § 213.756(2)(a)2. But the undisputed evidence is that everything collected as tax was indeed paid to the taxing authority, so Plaintiff is not entitled to any damages. (Harris Dep. at 114:17–115:4; Supena Dec. ¶11.) That the taxes were remitted is a complete defense to Plaintiff's tax-overpayment claims. § 213.756(2)(a)3.

### 2. There Is No FDUTPA Claim Anyway for a Dealer's Incorrect Calculation of Taxes.

Even if there were not an outright statutory prohibition of such claims, courts have held that there can be no violation of the FDUTPA based on a claim that a retailer may not have properly calculated the taxes due, particularly where those taxes indeed were remitted to the Department of Revenue as represented. In *Berry v. Budget Rent A Car Systems, Inc.*, 497 F. Supp. 2d 1361, 1367 (S.D. Fla. 2007), the plaintiffs argued that a rental-car company violated the FDUTPA by charging a "cost recovery fee" that allegedly far exceeded the actual costs to be recovered. The court discussed an earlier Florida DCA decision, *Latman v. Costa Cruise Lines, N.V.*, in which the court stated that there would be an unfair and deceptive trade practice when there is "an intentional overcharge of sales tax, *which is kept by the company itself*." 758 So. 2d 699, 703 (Fla. 3d DCA 2000) (emphasis added); *accord id*. ("The hypothetical company pays the state the sales tax that it owes, *and then keeps the overcharge for itself*." (emphasis added)). As the *Berry* court explained, "in *Latman*, it was not the excess amount of the fee that was deceptive, but rather the fact that the company charged what appeared to be a pass-through fee for a third-party but retained a portion for itself." 497 F. Supp. 2d at 1367. Here, again, because the taxes were indeed remitted as taxes, there is no deceptive or unfair act.

31

**J.      Plaintiff's Breach-of-Contract Claim (Count 5) Fails.**

In addition to the grounds stated above, Plaintiff's claim for breach of contract also fails on the undisputed facts. A breach of contract requires: "(1) a valid contract; (2) a material breach; and (3) damages." *Abbott Labs., Inc. v. Gen. Elec. Capital*, 765 So. 2d 737, 740 (Fla. 5th DCA 2000). The plaintiff has the burden of proving each element. *Carpenter Contractors of Am., Inc. v. Fastener Corp. of Am., Inc.*, 611 So. 2d 564, 565 (Fla. 4th DCA 1992).

The undisputed facts demonstrate no breach of contract. The alleged breach is the purported failure to "apply[] the positive monetary value of [Plaintiff's] . . . trade-in vehicle[] (i.e. the[] Net Trade-in Allowance[]) as Capitalized Cost Reductions." (Compl. ¶159.) But the provision of the lease claimed to have been breached is this one: "**Capitalized Cost Reduction.** The amount of any Net Trade-in Allowance . . . you pay *that reduces the Gross Capitalized Cost*." (Compl. Ex. A § 8.B (emphasis added).) This Section 8.B shows "N/A" in the field for "Capitalized Cost Reduction." As discussed above, that disclosure was accurate, as Mr. Cox has acknowledged. (Cox Dep. at 166:7–9, 165:8–11 ("Did anyone ever tell you we are going to use your trade-in to reduce the capitalized costs?" "No.").) There was no "Net Trade-in Allowance . . . that reduces the Gross Capitalized Cost" identified in the contract, and no breach of contract, on the undisputed facts. The written contract explicitly did not provide for a capitalized cost reduction, and so there could be no breach in not providing one.

**K.      Plaintiff's Claim for Breach of the Implied Covenant of Good Faith (Count 6) Fails.**

In Count 6, Plaintiff alleges that the same purported failure to provide for a capitalized cost reduction is a breach of the implied duty of good faith and fair dealing. Under Florida law, the implied covenant of good faith and fair dealing protects "the reasonable expectations of the contracting parties in light of their express agreement." *QBE Ins. Corp. v. Chalfonte Condo. Apartment Ass'n*, 94 So. 3d 541, 548 (Fla. 2012) (citation omitted). Such a claim fails, however,

"where application of the covenant would contravene the express terms of the agreement" or "where there is no accompanying action for breach of an express term of the agreement." *Id*. The implied covenant of good faith is a "gap-filling default rule," which is "usually raised when a question is not resolved by the terms of the contract or when one party has the power to make a discretionary decision without defined standards." *Publix Super Mkts., Inc. v. Wilder Corp. of Del.*, 876 So. 2d 652, 654 (Fla. 2d DCA 2004). It is not enough to show "an honest mistake, bad judgment, or negligence"; a plaintiff must demonstrate harm "by a conscious and deliberate act, which unfairly frustrates the agreed common purpose and disappoints the reasonable expectations of the other party." *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1329 (11th Cir. 2012) (applying Florida law; citation omitted).

Even putting aside the voluntary-payment doctrine and the absence of any basis for a finding of vicarious liability of Defendants, Plaintiff's good-faith claim fails for at least three reasons. First, courts will not use the duty of good faith to contravene the express terms of the contract. *QBE*, 94 So. 3d at 548. Plaintiff's lease was clear that his trade-in was not being applied to reduce his gross capitalized cost. Even if the dealer had acted in bad faith (and there is no evidence to that effect), the plain terms of the contract would preclude recovery on this claim. Second, the claim cannot stand absent an accompanying claim for the breach of an express contract provision. *QBE*, 94 So. 3d at 548. Because Plaintiff's breach-of-contract claim fails, so does his duty-of-good-faith claim.

Finally, the undisputed evidence precludes any claim that the dealer acted in bad faith. Plaintiff testified in his deposition that no one told him that the $25,000 would be applied to reduce capitalized cost (Cox Dep. at 165:8–11), and when he asked the dealer where the $25,000 had been applied, the dealer responded, accurately, that it was applied to the $36,539.30 due at

33

signing (*id.* at 149:12–150:18; 153:3–7). There is no evidence that the dealer "consciously and deliberately" failed to do anything it was supposed to do. *Resnick*, 693 F.3d at 1329 (allegations that defendant "fail[ed] to fully comply" with the law did not state a claim; plaintiffs did not allege "conscious and deliberate" acts "to frustrate the common purpose of the agreement").

## L.   Plaintiff's Negligent-Training-and-Supervision Claim (Count 7) Fails.

Count 7 asserts that PCNA and its purported agents, "Porsche Leasing/Financial and the Porsche Dealers, owed Plaintiff . . . a duty of care and professionalism in the rendition of services and products sold to Plaintiff." (Compl. ¶170.) Count 7 further asserts that PCNA owed Plaintiff "a duty of care in training and supervising its employees and agents . . . to perform those services in full compliance with federal and Florida law, and to not allow its agents and employees to engage in the wrongful practices alleged in this Complaint." (*Id.* ¶171.)

Negligent training or supervision is a theory of vicarious liability that is predicated on the existence of an underlying breach of legal duty. The underlying wrong in a negligent training claim "must be based on an injury resulting from a tort which is recognized under common law." *Footstar Corp. v. Doe*, 932 So. 2d 1272, 1278 (Fla. 2d DCA 2006) (Casanueva, J., specially concurring for a majority of the court) (quoting *Scelta v. Delicatessen Support Servs., Inc.*, 57 F. Supp. 2d 1327, 1348 (M.D. Fla. 1999)).

In addition to Plaintiff's voluntary payment of the now-controverted amount, the most obvious fatal flaw in Count 7 is that the purported underlying "duty of care and professionalism in the rendition of services and products sold to Plaintiff" simply does not exist under Florida law. Porsche of Fort Myers was under no duty to look out for Plaintiff's economic interests in a concededly arm's length transaction. *See Watkins v. NCNB Nat'l Bank of Fla., N.A.*, 622 So. 2d 1063, 1065 (Fla. 3d DCA 1993) ("In an arms-length transaction . . . there is no duty imposed on either party to act for the benefit or protection of the other party, or to disclose facts that the other

34

party could, by its own diligence have discovered."). Moreover, to the extent that Count 7 relies on the viability of other claims of "wrongful practices alleged in this Complaint," it is entirely derivative and fails for the same reasons those claims do.

Finally, as demonstrated above, Defendants had no dealings with Plaintiff prior to obtaining his lease and no involvement in negotiating the lease. And there is no evidentiary basis for a claim that the dealer was an agent of Defendants; the undisputed facts show otherwise.

## M.  Plaintiff's Claim for Unjust Enrichment (Count 8) Fails.

In Count 8, Plaintiff alleges that Defendants "received a benefit at the expense of Plaintiff" by "using the unlawful trade practices alleged in this Complaint" and thereby receiving "inflated profits" on Plaintiff's lease. (Compl. ¶177.) This claim fails for multiple reasons. First, Plaintiff cannot establish any "unlawful trade practice." Count 8 is derivative of Counts 1–4 and fails for the same reasons. Second, a plaintiff cannot bring a claim for unjust enrichment "if an express contract exists concerning the same subject matter." *Diamond "S" Dev. Corp. v. Mercantile Bank*, 989 So. 2d 696, 697 (Fla. 1st DCA 2008). Here, Plaintiff's and the dealer's respective rights and obligations are set forth in the lease, which was assigned to PLL. Because the relationship was governed by an express written contract, the existence of which is undisputed, there can be no claim for unjust enrichment addressing the same subject matter. *Id.*

Third, the evidence is insufficient to establish any claim of a benefit conferred on Defendants by Plaintiff. A claim for unjust enrichment has three elements: "(1) plaintiff conferred a benefit on the defendant, who has knowledge of that benefit; (2) defendant accepts and retains the conferred benefit; and (3) under the circumstances, it would be inequitable for the defendant to retain the benefit without paying for it." *Fito v. Attorneys' Title Ins. Fund*, 83 So. 3d 755, 758 (Fla. 3d DCA 2011). Moreover, "the plaintiff must directly confer a benefit to the defendant." *Kopel v. Kopel*, --- So. 3d ---, 2017 WL 372074, at *5 (Fla. Jan. 26, 2017).

35

There is no evidence here of a direct benefit conferred on Defendants by Plaintiff. As to the taxes that the dealer allegedly overcharged, the undisputed facts are that the entire amount of tax collected was paid to the State of Florida's Department of Revenue; none of it was retained by the dealer or by any Defendant. (Supena Dec. ¶11.) Taxes aside, Plaintiff also has failed to raise a material question of fact as to whether he conferred any other *direct* benefit upon Defendants. *See Kopel*, 2017 WL 372074, at *5; *Peoples Nat'l Bank of Commerce v. First Union Nat'l Bank of Fla., N.A.*, 667 So. 2d 876, 877–79 (Fla. 3d DCA 1996) (plaintiff bank alleged that insolvent entity had distributed loan proceeds due to plaintiff and four defendants in inequitable manner; affirming dismissal as to the four other recipients of loan proceeds, court ruled there was no allegation that the plaintiff had "directly conferred a benefit on the defendants"; rather, "if any benefit was conferred . . . , it could only have been conferred . . . by [the insolvent entity], not [the plaintiff]."); *Virgilio v. Ryland Group, Inc.*, 680 F.3d 1329, 1331 (11th Cir. 2012) (affirming dismissal for lack of direct benefit allegation). The absence of a direct benefit here parallels *Peoples National Bank* and *Virgilio*. Assuming, counterfactually, that there was a benefit unjustly conferred upon Defendants, then it was conferred by the dealer, not directly by Plaintiff. The dealer was not required to assign the lease to PLL; that it did does not give rise to liability.

Finally, nothing even arguably "unjust" occurred here. As discussed above, Plaintiff signed a contract that disclosed on its face that his trade-in would not be credited to his gross capitalized cost. Plaintiff cannot complain that Defendants were unfairly enriched because he now regrets the contract that he freely negotiated with the dealer for his new Porsche.

**N.    Plaintiff's Negligent-Taxation Claim (Count 9) Is Precluded by Statute.**

In Count 9, Plaintiff claims that Defendants are vicariously liable for Porsche of Fort Myers's purportedly collecting the wrong amount of sales tax from Plaintiff. This count fails as a matter of law under the undisputed facts. As explained above, section 213.756(2)(a), Florida

36

Statutes, precludes such a claim where the tax has been remitted to the Department of Revenue,

and Defendants cannot be vicariously liable anyway for the actions of Porsche of Fort Myers.

**IV.**   **CONCLUSION**

For the foregoing reasons, summary judgment should be entered in favor of Defendants

on all of Plaintiff's claims.

Respectfully submitted,

| | |
|---|---|
| */s/ Thomas M. Byrne* | */s/ Tara S. Pellegrino* |
| Thomas M. Byrne (*pro hac vice*) | Jacqueline S. Miller (28900) |
| Valerie S. Sanders (*pro hac vice*) | Tara S. Pellegrino (026775) |
| Stacey M. Mohr (*pro hac vice*) | BROAD AND CASSEL LLP |
| EVERSHEDS SUTHERLAND (US) LLP | One North Clematis Street, Ste. 500 |
| 999 Peachtree Street, NE, Ste. 2300 | West Palm Beach, Florida 33401 |
| Atlanta, Georgia 30309-3996 | 561.832.3300 (t) |
| 404.853.8000 (t) | 561.655.1109 (f) |
| 404.853.8806 (f) | jmiller@broadandcassel.com |
| tombyrne@eversheds-sutheralnd,com | tpellegrino@broadandcassel.com |
| valeriesanders@eversheds-sutherland.com | |
| staceymohr@eversheds-sutherland.com | |

*Attorneys for Defendants*

37

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on November 28, 2017, I electronically filed the foregoing

**Memorandum of Law in Support of Defendants' Motion for Summary Judgment** with the

Clerk of Court using the CM/ECF filing system. I further certify that the foregoing document

was served on all counsel of record via transmission of the Notice of Electronic Filing generated

by the Court's CM/ECF system.

*/s/Tara S. Pellegrino*
Tara S. Pellegrino (026775)