**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CLASS ACTION CASE NO. 16-CV-23409-GAYLES/LOUIS**

STEVEN MICHAEL COX, individually and
on behalf of those similarly situated,

       Plaintiff,

vs.

PORSCHE FINANCIAL SERVICES, INC.,
PORSCHE LEASING LTD., and
PORSCHE CARS NORTH AMERICA, INC.,

       Defendants.

_____/

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

Mark A. Schweikert (FBN 70555)
Ronald P. Weil (FBN 169966)
**WEIL SNYDER SCHWEIKERT & RAVINDRAN, P.A.**
201 South Biscayne Boulevard, Suite 720
Miami, Florida 33131
T: (305) 372-5352
F: (305) 372-5355
mschweikert@weilquaranta.net
rweil@weilquaranta.net

Hirlye R. Lutz, III (*Pro Hac Vice*)
F. Jerome Tapley (FBN 22066)
Adam W. Pittman (*Pro Hac Vice*)
**CORY WATSON, P.C.**
2131 Magnolia Avenue
Birmingham, Alabama 35205
T: (205) 328-2200
F: (205) 324-7896
rultz@corywatson.com
jtapley@corywatson.com
apittman@corywatson.com

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 3

I.  Porsche Financial is the "lessor" of Mr. Cox's PORSCHE® Lease under the CLA ...... 3

    A.  The Lease was contingent on Porsche Financial's approval of credit and financing .... 3

        1.  On March 10, Porsche Financial approved Mr. Cox's form PORSCHE® Credit Application before he signed the form PORSCHE® Lease ................................... 3

        2.  On March 12, Porsche Financial reviewed, approved, and agreed to finance Mr. Cox's PORSCHE® Lease as written ............................................................ 4

    B.  Porsche Financial offers leases to consumers ...................................................... 5

    C.  As the lessor, Porsche Financial controls the scheme .................................................. 5

    D.  Porsche Financial's revised form lease agreement further demonstrates its control of the scheme ......................................................................................................... 7

II.  Porsche's scheme caused Mr. Cox to pay inflated rent charges and sales tax ............ 8

    A.  Mr. Cox's trade-in allowance was $25,000—*not* "N/A"—as disclosed on the face of the form PORSCHE® Lease ............................................................................... 8

    B.  Porsche Financial's failure to reduce the Lease's capitalized cost by Mr. Cox's $25,000 trade-in allowance inflated his rent charges and sales tax; it also increased Porsche Financial's profit. ........................................................................................... 9

    C.  Mr. Cox discovered the scheme, but only after a fortuitous encounter with his neighbor, months of research, and a consultation with his former attorney ............... 11

ARGUMENT ................................................................................................................. 12

I.  Summary judgment should be denied because Porsche Financial is liable to Plaintiff under the Consumer Leasing Act ................................................................................ 12

    A.  Porsche Financial is a "lessor" that must comply with the CLA ................................. 13

        1.  Porsche Financial concedes it is a "lessor" under the CLA ................................. 14

        2.  Porsche Financial is likewise liable *as a lessor* because it is an assignee who had "substantial involvement" in the lease transaction ....................................... 14

i

3.      Porsche Financial is liable to Plaintiff as a "lessor" under Section 1640—not as an "assignee" under Section 1641 ....................................................................17

4.      Porsche Financial cannot rely on the non-binding *Kennedy* opinion to narrow its liability as a "lessor" under Section 1640....................................................18

B.    Porsche Financial failed to accurately disclose the financial terms of Plaintiff's PORSCHE® Lease as required by the CLA ............................................................19

C.    Plaintiff was harmed "in fact" by Porsche Financial's inaccurate disclosures. .........23

**II.    Summary judgment should be denied because Porsche Financial is liable to Plaintiff under the Florida Deceptive and Unfair Trade Practices Act**....................................24

A.    Porsche Financial is liable for its *own* acts under FDUTPA, not "vicariously liable" for the acts of its franchised dealers. ..........................................................................27

B.    Porsche Financial's CLA disclosure violations are *per se* violations of FDUTPA ...28

C.    Porsche Financial violated FDUTPA by overcharging Plaintiff for his Lease .........30

1.      Porsche Financial overcharged Plaintiff for his "rent charge"..........................31

2.      Porsche Financial overcharged Plaintiff for Florida sales taxes .......................32

D.    Porsche Financial cannot blame Plaintiff for being defrauded by injecting irrelevant issues of his subjective reliance...............................................................................34

E.    Porsche Financial's "voluntary payment" defense does not apply to FDUTPA claims, but fails regardless .......................................................................................36

F.    Porsche Financial owes Plaintiff actual damages under FDUTPA ...........................37

**III.    Summary judgment should be denied because Porsche Cars is liable to Plaintiff for its negligent collection of Florida sales tax** ...................................................................38

A.    Porsche Cars is liable to Plaintiff under FDUTPA...................................................39

B.    Porsche Cars is liable to Plaintiff for common law negligence. ...............................39

**IV.    Plaintiff will amend his Complaint to narrow the claims at issue**............................40

**CONCLUSION** ............................................................................................................41

ii

## INTRODUCTION

This putative class action seeks to remedy Defendants'[1] leasing practices that have already been rendered deceptive, unfair, and unlawful in other courts. *See, e.g.*, *Taylor v. United Mgmt., Inc*., 51 F. Supp. 2d 1212, 1214-17 (D.N.M. 1999) (granting summary judgment for plaintiff under the CLA and state's unfair and deceptive trade practices act, where her $4,000 trade-in allowance was disclosed as "N/A" to "reduce the principle owed by the least amount possible" and "ke[ep] the monthly payment as high as possible"); *Myers v. Hexagon Co*., 54 F. Supp. 2d 742, 749-57 (E.D. Tenn. 1998) (rendering judgment for plaintiffs under the CLA and state's unfair and deceptive trade practices act, where their $7,000 trade-in allowance was disclosed as "N/A" and was not applied as a capitalized cost reduction); *Gross v. Spitzer Buick Co.*, 1998 WL 2027611, *3-6 (Ohio C.P. Dec. 22, 1998) (enjoining Buick's practice of "[f]ailing to list the value of a consumer's trade-in vehicle in a contract, and/or failing to credit the consumer with the value of the trade-in vehicle" and awarding damages).

According to the Florida Attorney General, automobile leasing is one of the "most significant and complex financial transactions in a typical consumer's life." (Ex. L.) "[T]he technical and complex language can cause car leasing to be an option that is fraught with pitfalls for the average consumer." (*Id.*) In an advisory entitled *How to Protect Yourself Leasing: Car Leasing*, the Florida Attorney General has warned about "numerous complaints from consumers, many of whom . . . have not been **credited for their trade-in vehicle** or have complained of being defrauded in other ways." (*Id.*)

Plaintiff is a victim of those pitfalls—he is not a victim of poor negotiation, but of

---

[1] Defendant Porsche Financial Services, Inc. ("PFS") is referred to as "Porsche Financial." Porsche Cars North America, Inc. ("PCNA") is referred to as "Porsche Cars." Defendant Porsche Leasing Limited ("PLL") is referred to as "Porsche Leasing." All Defendants are collectively referred to as "Porsche."

Porsche's fraudulent, unlawful, and unfair leasing practices already prohibited by federal and state law. Porsche first harmed Plaintiff by failing to accurately disclose his trade-in allowance and the payment terms of his PORSCHE® Motor Vehicle Lease Agreement ("Lease"), violating the federal Consumer Leasing Act and depriving him of the opportunity to understand his lease terms. Porsche then cost Plaintiff money by failing to use his undisclosed trade-in allowance like a down payment to reduce the Lease's "capitalized cost,"[2] violating the Florida Deceptive and Unfair Trade Practices Act. The Florida Attorney General has explained that, in a proper lease, "[t]he cap cost is reduced by the amount of cash or *vehicle trade-in equity* that you put into the deal[.]" (Ex. L.) (emphasis added).

Porsche's failure to apply Plaintiff's undisclosed $25,000 trade-in allowance like a downpayment on his Lease (cap cost reduction) caused Plaintiff to unfairly pay *inflated*: (1) rent charges of $2,331.23, and (2) sales tax charges of $1,639.70. (*See* Yerkes Dec., ECF No. 105-10.) Essentially, Plaintiff paid interest and sales tax on his trade-in. Through his own diligence, Plaintiff later discovered that Porsche's undisclosed, unfair, and unlawful formulation of the financial terms of his Lease cost him almost $4,000.

Porsche cannot escape its own liability by using its franchised dealer as a scapegoat— particularly where its dealer was following Porsche's direction to get paid. Porsche is liable for its own and deceptive, unfair, and unlawful acts. Summary judgment should be denied.

---

[2] "A capitalized cost reduction is a payment in the nature of a downpayment on the leased property that reduces the amount to be capitalized over the term of the lease." Regulation M, 12 C.F.R. § 213, Supp. I (Official Staff Commentary).

### STATEMENT OF FACTS

I.   **Porsche Financial is the "lessor" of Plaintiff's PORSCHE® Lease under the CLA.**

   A.   **The Lease was contingent on Porsche Financial's approval of credit and financing.**

On March 10, 2015, Mr. Cox signed a *conditional* form PORSCHE® Lease for a 36-month lease of a 2015 Porsche Cayman (6.22% APR) in exchange for 36 *monthly* payments of $1,007.08,[3] paid upfront, totaling $36,254.88. (Facts ¶ 1.) A franchised Porsche dealer, Porsche of Fort Myers, *arranged* the contingent lease transaction. (*Id.*) The Porsche dealer used Porsche-approved software[4] to print the financial terms on a standard form PORSCHE® Lease provided by the Porsche dealer's captive finance company, Porsche Financial. (*Id.*)

Porsche Financial's corporate representative has admitted that "there's no lease agreement at time of contract application." (*Id.*) This is so because the Lease is "contingent upon [Porsche Financial's] approval of credit **and** approval of financing." (*Id.*) The parties agreed that "the financing for . . . [the] lease [was] contingent upon third party lender or lease company approval," and that "if such financing is denied for any reason DEALER shall not under any circumstances be required to finance the purchase or lease." (*Id.*)

   1.   **On March 10, Porsche Financial approved Mr. Cox's form PORSCHE® Credit Application before he signed the form Lease.**

Before signing the contingent Lease on March 10, Porsche Financial required the dealer to have Mr. Cox complete a form PORSCHE® Credit Application, which the dealer then provided to Porsche Financial. (*Id.*) The credit application notified Porsche Financial that Mr. Cox had a

---

[3] Mr. Cox's total "Periodic" monthly payment of $1,007.08 consisted of $676.82 (Depreciation) plus $273.26 (Rent Charge), plus $57.00 (Florida sales tax). (Facts ¶ 1.)

[4] Porsche's franchised dealers must "have a Porsche approved electronic Dealership Management System compatible with Porsche interfaces." (*Id.*) "Porsche remains in close contact with the major North American Dealer Management System providers," primarily CDK Global and Reynolds & Reynolds. (*Id.*).

trade-in vehicle (his 2015 Hyundai Genesis) with no outstanding "monthly payments" and "no lienholder" and thus a clear title. (*Id*.) And, "if there's no lienholder, there can't be negative equity."[5] When a consumer has positive trade-in equity in their deal, "[t]he correct amount of credit for [the consumer's] trade-in must be indicated in the lease." (*Id*.)

That same day, Porsche Financial reviewed and approved Mr. Cox's application for credit to lease a Porsche vehicle. (*Id*.) The Porsche dealer then arranged the paperwork for signature, and mailed Mr. Cox's "funding package" to Porsche Financial, which included his form PORSCHE® Lease, PORSCHE® Credit Application, and PORSCHE® Dealer Worksheet. (*Id*.)

> **2.      On March 12, Porsche Financial reviewed, approved, and agreed to finance Mr. Cox's Lease as written.**

On March 12, upon receipt of the funding package, Porsche Financial processed Mr. Cox's Lease and reviewed it for Truth-in-Lending Act (TILA) compliance, which is called "discounting the deal." (*Id*.) According to Porsche Financial's corporate representative:

> [D]iscounting a contract is **ensuring that the lease or retail installment contract is compliant with the truth-in-lending disclosures**. Also they [funders] input the numbers into the loan origination system. That helps ensure **truth-in-lending disclosures compliance**. Also they review the documents.

(*Id*., emphasis added.) Those documents include the Lease and the Dealer Worksheet, which are "[d]ocuments required for the dealership . . . to get paid by Porsche Financial." (*Id*.) (referring to the "funding checklist" in Porsche Financial's Lease Commitment Letter). The Dealer Worksheet tells Porsche Financial "how much to pay to the dealer." (*Id*.)

"When the lease . . . comes in for funding," Porsche Financial uses "review rules" and a "contract processing handbook" to "ensure that it is compliant" with TILA before acquisition:

---

[5] The parties agree that trade-in "equity" means the value "allowed" for the trade-in vehicle, less the amount of any lien on the trade-in (which results in the "net" trade-in allowance). Like a homeowner, a consumer may have "positive" or "negative" equity in their trade-in. (ECF No. 109-1 at 18, n.2; ECF No. 125 at 18, n.3)

4

> In our loan origination system we have what they call review rules, and those ensure that the money or the amount financed and all that, the APR, the rent charges, the interest charges are all within a tolerance.
>
> Also, I have a contract processing handbook that explains, you know, what to look for in a contract; if there's something missing, what the credit services rep needs to do if there is a blank space on a contract, and they follow that contract processing handbook as well.

(*Id.*) After accepting Mr. Cox's Lease as written, Porsche Financial disbursed funds to the dealer to buy "the ownership in the [leased] vehicle" and "the lease contract." (*Id.*) Therefore, on March 12, Porsche Financial became the lessor when it entered into the Lease with Mr. Cox by satisfying the Lease's financing contingency and acquiring both the leased vehicle and the Lease.

**B.      Porsche Financial offers leases to consumers.**

Porsche Financial is also the "lessor" because it offers Porsche® Leases to consumers on its website (www.porsche.com), and through the nationwide network of 189 franchised Porsche dealers. (Facts ¶16.) Porsche Financial advertises online that it "provide[s] [consumers] with competitive leasing and financing options," and that it "has prepared these attractive lease offers to get you the full Porsche experience at a highly competitive lease payment." (*Id.*) Porsche Financial also admits that it "offer[s] leasing options through the dealer(s)." (*Id.*) And its dealers agree: Q. "Essentially, after the transaction at the dealership, Porsche Financial Services becomes the lessor?" A. "Correct." (*Id.*) Porsche Financial even concedes in its own official handbook that it is the "**vehicle lessor/owner**." (*Id.*, emphasis added).

**C.      As the lessor, Porsche Financial controls the scheme.**

As the lessor, Porsche Financial concedes it is responsible for ensuring its Porsche® Leases are compliant with TILA, including the Consumer Leasing Act and Regulation M, and Florida tax and consumer protection laws. (*Id.* ¶16.) It purports to do so through "discounting the deal," *supra*, and controlling the terms and conditions of the Leases it offers to consumers. (*Id.*

¶¶ 16, 20, 33.) The standard, form, non-negotiable "Porsche Financial Services – Dealer Agreement" grants Porsche Financial "sole discretion" to "establish the form and provisions of Contracts" with its customers like Mr. Cox. (*Id.* ¶20.) Porsche Financial provides its dealers with boilerplate origination forms that include form PORSCHE® Credit Applications, Leases, Dealer Worksheets, and "other type[s] of forms that we need for funding." (*Id.*)

Through the Dealer Agreement, Porsche Financial requires its dealers to cause and convey title to the leased vehicle and the Lease to Porsche Financial or its designated assignee, Porsche Leasing. (*Id.* ¶21.) In its form PORSCHE® Leases, including Mr. Cox's Lease, Porsche Financial requires its dealers to "assign[] all right, title and interest in this Lease, the Vehicle and the Guaranty, if any, to the Assignee, according to the terms and conditions of the Porsche Financial Services, Inc. Dealer Agreement." (*Id.* ¶24.)

The Dealer Agreement also grants Porsche Financial the "sole discretion" to determine the extent and the terms and conditions upon which it will acquire PORSCHE® Leases from its dealers. (*Id.* ¶¶ 20, 33.) The Agreement requires dealers to abide by the policies and guidelines set by Porsche Financial, which are incorporated therein. (*Id.* ¶21.) "If we [dealers] want money from [Porsche Financial], we will follow their guidelines . . . if we want to get paid." (*Id.* ¶20.) Porsche Financial also requires its dealers to abide by the "PFS Fair Lending Policy," which tells dealers "[t]hat we're within all rights of what PFS tells us we can do." (*Id.* ¶21.)

In the Dealer Agreement, Porsche Financial warrants to its dealers that its form PORSCHE® Lease—*if filled out accurately*—complies with both Federal and Florida law. (*Id.* ¶20.) Yet Porsche Financial does not provide any instruction about how to fill out its form PORSCHE® Leases. (*Id.*) Nor does Porsche Financial provide any tools, policies, or procedures to assist dealers in accurately filling out PORSCHE® Leases. (*Id.*) Instead, dealers "fill in the

paperwork, we send it to Porsche, they send me a check." (*Id.*) Porsche Financial even grants its dealers discretion on whether to disclose a consumer's trade-in allowance on the face of their Lease: Q. "Does Porsche Financial Services allow a dealer to determine whether or not to disclose the net trade-in allowance on the face of the lease?" A. "I got paid." Q. "So, is that a yes?" A. "Yes." (*Id.*)

Porsche Financial provides no guidance to its dealers on how to properly compute Florida sales tax on a PORSCHE® Lease involving a trade-in with positive equity. (*Id.*) It does, however, undertake the duty to ensure that taxes are calculated accurately in its Leases: "Upon funding, PFS applies [the] procedures developed by the PCNA Tax Department to determine that the correct rate has been applied and that the calculations on the [PORSCHE®] lease are accurate." (*Id.*) But those procedures *do not* consider Florida law, because Porsche Financial claims to be ignorant of whether in Florida a trade-in reduces the taxable base of the leased vehicle.[6] (*Id.*)

For other states, Porsche Financial's loan origination system is designed to capture when a leased vehicle's taxable base should be reduced by a trade-in allowance. (*Id.*) Porsche Financial purportedly cross-trains its "funders" in its Credit Services Department to comply with each state's tax law—"like if the sales tax is up front as opposed to monthly." (*Id.*) Porsche Financial does so because each state may require different documentation and have different tax laws. (*Id.*) And Porsche Financial admits in its own official handbook that "as vehicle lessor (owner) [Porsche Financial] is required to pay all state imposed sales or sales use tax." (*Id.*)

**D.   Porsche Financial's revised form PORSCHE® Lease further demonstrates its control of the scheme.**

Since the filing of this lawsuit, Porsche Financial has materially changed the trade-in

---

[6] However, Porsche Cars' Tax Department—which provides "shared services to all of the legal entities in North America for Porsche"—concedes that Florida law does provide a tax credit for trade-in allowances. (*Id.* ¶¶16, 25.)

disclosures on its form PORSCHE® Lease from this:

| B. TRADE-IN VEHICLE. | Year | Make | Model |
|---|---|---|---|

To this:

| B. Trade-in vehicle. | |
|---|---|
| The following vehicle is being traded-in by the Lessee:<br><br>Year          Make          Model | **Gross Trade-in Allowance**<br>(Gross agreed-upon value of the trade-in)............$_____<br><br>**Less: Balance Owing on Trade-in**<br>(To Be Paid by Dealer/Lessor)..................................$_____<br><br>**Net Trade-in Allowance**<br>(If less than 0, then enter 0).......................................$_____ |

(Facts ¶ 2.) The reason for the change, according to Porsche Financial's corporate representative:
"**it was recommended by the lawyers . . . to be compliant**." (*Id*.) The change "was added for
the consumer and lessee for disclosure purposes," so "they can see exactly their trade vehicle."
(*Id*.) Q. "So now there's a section in the lease agreement that would require the dealer to disclose
whether the trade-in has positive or negative equity, is that true?" A. "Yes." (*Id*.) The new form
PORSCHE® Lease *now* "**has full disclosure to the consumer on the contract**"; it becomes
effective March 31, 2018. (*Id*.)

**II.**     **Porsche's scheme caused Mr. Cox to pay inflated rent charges and sales tax.**

  **A.**     **Mr. Cox's net trade-in allowance was $25,000—*not* "N/A" as disclosed on the
        face of the form PORSCHE® Lease.**

Both Porsche Financial's corporate representative and its former Director of Credit
Services each admit that Mr. Cox's trade-in allowance "should have been disclosed in Section
7B(1)" as $25,000 instead of "N/A." (Fact ¶12) (former Director testifying: Q. "And as Director
at Porsche Financial Services, would you agree that that term [net trade-in allowance] should be
accurately disclosed on the face of the lease agreement?"  A. "Yes."); (*see also id*. ¶6.)

It is likewise undisputed that Section 7B(3) on Mr. Cox's Lease inaccurately disclosed
the "Amount to be Paid in Cash" as $36,539.30; Mr. Cox paid for the Lease with a check for
$11,539.30 plus his $25,000 net trade-in allowance, not all <u>cash</u>.  (*Id*. ¶6.)

8

| 7. | A. | **Amount Due at Lease Signing or Delivery:** | | ***ITEMIZATION OF AMOUNT DUE AT LEASE SIGNING OR DELIVERY.*** | B. | **How the Amount Due at Lease Signing or Delivery will be Paid:** | |
|---|---|---|---|---|---|---|---|
| | (1) | Capitalized Cost Reduction | $ | N/A | | | |
| | (2) | First Monthly Payment | | N/A | | | |
| | (3) | Single Payment | | 36254.88 | (1) | Net Trade-in Allowance | $ N/A |
| | (4) | Title Fees | | N/A | | | |
| | (5) | Registration Fees | | N/A | (2) | Rebates and Noncash Credits | N/A |
| | (6) | License Fees | | 272.69 | | | |
| | (7) | Sales or Use Tax | | 11.73 | (3) | Amount to be Paid in Cash | 36539.30 |
| | (8) | N/A | | N/A | | | |
| | (9) | N/A | | N/A | | | |
| | (10) | Total | $ | 36539.30 | (4) | Total | $ 36539.30 |

Mr. Cox didn't knowingly agree to this inaccurate disclosure or understand how it result in inflated lease payments. (*Id*. ¶¶ 7-8.) Nowhere on the Lease did Porsche Financial disclose that his trade-in allowance would *neither* be applied as a cap cost reduction *nor* "excluded (deducted) from the gross sales price" to derive the correct taxable base. (*Id*. ¶8.) Therefore, when Mr. Cox signed the Lease, he was "convinced that the terms were right, that [his] trade-in was applied, and that the gross price was right. So [he] assumed the math was correct, and [he] accepted the lease." (*Id*. ¶8.)

### B. Porsche Financial's failure to reduce the Lease's capitalized cost by his $25,000 trade in allowance inflated his rent charge and sales tax; it also increased Porsche Financial's profit.

According to the Florida Attorney General, the "Capitalized Cost or 'Cap Cost' . . . is the amount of money that serves as the basis for calculating the amount of the payments under the lease agreement." (Ex. L.) "The lower the cap cost, the lower your monthly payment." (*Id*.) Importantly, "[t]he cap cost is reduced by the amount of cash or *vehicle trade-in equity* that you put into the deal[.]" (*Id*.) This is called the cap cost reduction, which the form Porsche® Lease defines as "[t]he amount of any Net Trade-in Allowance . . . . you pay that *reduces* the Gross Capitalized Cost." (*Id*.)

9

The "net" or "adjusted" cap cost is the "gross" cap cost less the cap cost reduction:



| 8. | YOUR MONTHLY PAYMENT OR SINGLE PAYMENT IS DETERMINED AS SHOWN BELOW: | | |
|---|---|---|---|
| A. **Gross Capitalized Cost.** The agreed upon value of the Vehicle ($ 63390.00) and any items you pay over the Lease Term (such as service contracts, insurance, and any outstanding prior credit or lease balance) .......... $ | **64935.00** | E. **Depreciation and any Amortized Amounts.** The amount charged for the Vehicle's decline in value through normal use and for other items paid over the Lease Term ...... = | 24365.40 |
| If you want an itemization of this amount, please check this box. □ | | F. **Rent Charge.** The amount charged in addition to the Depreciation and any Amortized Amounts ........... + | 9837.48 |
| B. **Capitalized Cost Reduction.** The amount of any Net Trade-in Allowance, rebate, noncash credit, or cash you pay that reduces the Gross Capitalized Cost ....... – | N/A | G. **Total of Base Monthly Payments or Single Payment.** The Depreciation and any Amortized Amounts plus the Rent Charge ......................... = | 34202.88 |
| C. **Adjusted Capitalized Cost.** The amount used in calculating your Base Monthly Payment or Base Single Payment .... = | **64935.00** | H. **Lease Payments.** The number of payments in your Lease ÷ | |
| | | I. Base Monthly Payment or Base Single Payment .... = | 34202.88 |
| | | J. Administrative Charge ...................... + | N/A |
| D. **Residual Value.** The value of the Vehicle at the end of the Lease used in calculating your Base Monthly Payment or Base Single Payment ........ – | 40569.60 | K. Monthly or Total Sales/Use Tax ................... + | 2052.00 |
| | | L. ......................................... + | N/A |
| | | M. **Total Monthly Payment ("Monthly Payment")** or **Total Single Payment ("Single Payment")** .......... = $ | 36254.88 |

*Id.* (8A-8B=8C). The adjusted cap cost is the key factor in computing the "rent charge" (interest) and sales tax charged on any given PORSCHE® Lease. (*Id.*) The higher the adjusted cap cost, the higher the rent charge. *Id*. The higher the rent charge, the higher the base payment. (*Id.*; *see also id*. ¶19) (explaining that Porsche Financial shared the rent charge—the profit—with the dealer)). The higher the lease payment, the higher the sales tax charge. (*Id.*) Conversely, a cap cost reduction reduces the rent charge and the base payment and thus the tax burden. (*Id.*)

According to the Porsche dealer, Mr. Cox was only entitled to a cap cost reduction *if* he was savvy enough to *know* to ask for one: "[i]f a customer asks for a capitalized reduction, yes, you can give it to them[.]" (*Id*. ¶14.) It is undisputed that the failure to apply a net trade-in allowance as a cap cost reduction will always result in the overpayment (or double taxation) of Florida sales tax, *infra*. As explained by a franchised Porsche dealer in Miami: if the "trade-in is a purchased vehicle," then the consumer has already "paid sales tax when they purchased that vehicle." (*Id*. ¶8.) He explained, for example, that if a consumer leases "a new car for $80,000, trade-in vehicle allowance is $40,000, they would pay sales tax on the difference, on $40,000[,]" because "they paid sales tax already on the vehicle that they traded." (*Id*.) Put another way, Mr. Cox's dealer testified: Q. "So if you don't use the net trade-in value that has positive equity as a

capitalized cost reduction, the consumer doesn't get a tax credit on that trade-in.  Is that a true statement?" A. "Yes." (*Id.*)

Porsche Financial, for its part, subsequently advised the dealer that Mr. Cox's form PORSCHE® Lease had been "done properly," because cap cost reductions "did not have to be applied for taxes." (*Id.* ¶8.) The Florida Department of Revenue disagrees. (Ex. Q, Letter of Technical Advice from Fla. Dep't of Revenue opining that Mr. Cox's $25,000 trade-in should have been deducted to calculate the correct taxable base of the Lease).

### C.    Mr. Cox discovers the scheme, but only after a fortuitous encounter with his neighbor, months of research, and a consultation with his former attorney.

Mr. Cox is a retired UPS driver and senior citizen; he is not an auto financing expert.  (*Id.* ¶8.) Since retirement, he has developed software for grade schools, worked for the Naples Chamber of Commerce, and moonlighted at the Apple Store. (*Id.*) He was unaware that his trade-in was not being applied to reduce the leased vehicle's cap cost and, correspondingly, his "rent" (interest) and sales tax charges.  (*Id.*) As the Florida Attorney General has recognized, "the technical and complex language [of a lease agreement] can cause car leasing to be an option that is fraught with pitfalls for the average consumer," like Mr. Cox. (*Id.*) And, the form PORSCHE® Lease did nothing to warn Mr. Cox about those pitfalls, *supra*.

It was not until weeks later—when Mr. Cox's neighbor, *a former car dealer* saw his Lease—that Mr. Cox first became aware that his $9,837.48 interest charge was high. (*Id.*) Mr. Cox then noticed that the $2,052 sales tax charge also seemed high. (*Id.*) After researching the issue, Mr. Cox consulted his former attorney and learned that the interest and sales tax charges were inflated, because his trade-in had not been applied as a cap cost reduction. (*Id.*)

**ARGUMENT**

I.    <u>Summary judgment should be denied because Porsche Financial is liable to Plaintiff under the Consumer Leasing Act.</u>

Plaintiff Cox has sued Porsche Financial because he was damaged by its failure to fairly and accurately disclose the financial terms of his PORSCHE® Lease as required by the Consumer Leasing Act (CLA), 15 U.S.C. §§ 1667 *et al*. "Automobile leasing ranks as one of the most complex financial transactions consumers can enter." (Ex. L.) It is therefore unsurprising that Congress found the "recent trend toward leasing automobiles" has resulted in leases "offered without adequate cost disclosures." 15 U.S.C. § 1601.

Congress sought to remedy the confusion and potential for fraud in consumer leasing through the CLA, which is a chapter of the Truth in Lending Act (TILA).  The CLA's directive is "to assure a meaningful disclosure" of lease terms so consumers, "who are viewed as not being on an equal footing with lenders," may compare alternatives in the market. *Taylor*, 51 F. Supp. 2d at 1216; 15 U.S.C. § 1601(b). The CLA thus "extended the TILA's disclosure requirements to consumer leases," and "incorporates some of the TILA's provisions dealing with civil remedies." *Carmichael v. Nissan Motor Acceptance Corp.*, 291 F.3d 1278, 1280 (11th Cir. 2002) (citing 15 U.S.C. § 1667d(a)). "Like the TILA, the CLA is a consumer protection statute which 'is remedial in nature and therefore must be construed liberally in order to best serve Congress' intent.'" *Id.* (citations omitted).

The CLA also grants broad authority to the Federal Reserve Board (now the Consumer Financial Protection Bureau)[7] to implement the CLA, *see* 15 U.S.C. §§ 1604, 1667f (a)(1), which it has exercised by promulgating Regulation M, 12 C.F.R. § 213 *et seq.*, "to fill in the statutory

---

[7] Title X of the Dodd-Frank Act transferred the Board's rulemaking authority to the Consumer Financial Protection Bureau, effective July 21, 2011. 15 U.S.C. § 1604(a).

gaps," *Myers*, 54 F. Supp. 2d at 754. The Board has also issued Official Staff Commentary. 12 C.F.R. § 213, Supp. I. "[T]he Supreme Court [has] instructed that the Board's interpretation of the TILA and Regulation M should be accepted so long as they are 'not irrational.'" *Miller v. Nissan Motor Acceptance Corp.*, 362 F.3d 209, 216 (3d Cir. 2004) (citing *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 568 (1980)).

Together, the CLA, Regulation M, and the Official Staff Commentary define the scope of a lessor's obligations when making disclosures in consumer leases like Mr. Cox's PORSCHE® Lease. Summary Judgment should be denied because Porsche Financial is a lessor that failed to make the disclosures required by the CLA and is therefore liable under the Act.

### A.    Porsche Financial is a "lessor" that must comply with the CLA.

The CLA provides for statutory damages against "any lessor" who fails to comply with its disclosure requirements. 15 U.S.C. §§ 1667d, 1640(a)(2). A "lessor" is defined as "a person who is regularly engaged in leasing, offering to lease, or arranging to lease under a consumer lease." 15 U.S.C. § 1667. Regulation M further clarifies that a "lessor" means a "person who has *leased*, *offered*, or arranged to lease personal property *more than five times* in the preceding calendar year." 12 C.F.R. § 213.2(h) (emphasis added).

### 1.    Porsche Financial concedes it is a "lessor" under the CLA.

There is no credible dispute that Porsche Financial is generally a "lessor" under the CLA, because it regularly offers and engages in consumer leasing. Between 2012 and 2016, Porsche Financial acquired approximately 8,000 PORSCHE® Leases from Florida Porsche dealers. (ECF No. 43 1 ¶¶ 7-8.) Porsche Financial offers PORSCHE® Leases to consumers on its website, www.porsche.com, and through the nationwide network of 189 franchised Porsche dealers. (Facts ¶8.) Porsche Financial advertises that it "provide[s] [consumers] with competitive leasing and financing options," and that it "has prepared these attractive lease offers to get you the full

Porsche experience at a highly competitive lease payment." (*Id.* ¶8.)

In fact, Porsche Financial admits in its official handbook that it is the leased vehicle's **"lessor**/owner." (*Id.* ¶8.) Porsche Financial also admits its "lease products are covered by Regulation M." (*Id.*) As the admitted "lessor" of its PORSCHE® Leases, Porsche Financial must comply with the CLA's disclosure requirements governing those transactions. *See, e.g.*, *Candelaria v. Nissan Motor Acceptance Corp.*, 740 F. Supp. 806, 807 (D.N.M. 1990) (Nissan's captive motor vehicle finance company "is a lessor as defined by Regulation M"); *Volkswagen "Clean Diesel" Mktg., Sales Practices, & Products Liab. Litig.*, MDL 2672 CRB (JSC), 2017 WL 2212783, at *3 (N.D. Cal. May 17, 2017) (Porsche Financial is the "lessor" of its leases); *Rand v. Porsche Fin. Services*, 167 P.3d 111, 114 (Ariz. Ct. App. 2007) (Porsche Financial was "lessor" of plaintiff's lease).

> **2.    Porsche Financial is likewise liable *as a lessor* because it is an assignee that had "substantial involvement" in the lease transaction.**

Under the Official Staff Commentary to Regulation M, which has the force of law, *Milhollin*, 444 U.S. at 560, "an assignee may be a lessor for purposes of the regulation in circumstances where the assignee has *substantial involvement* in the lease transaction." 12 C.F.R. § 213, Supp. I ¶ (2)(h)3 (emphasis added). While "substantial involvement" is undefined, the commentary cites *Ford Motor Credit v. Cenance*, 452 U.S. 155 (1981), where the Supreme Court held that a captive finance company claiming to be an "assignee" of its form motor vehicle financing contracts was actually the original TILA "creditor" because of its substantial involvement[8] in the credit transaction.

---

[8] Porsche Financial's micro-management of the terms, operation, and assignment of its leases with consumers like Plaintiff is far more involved than in cases where other courts have found an assignee's "substantial involvement" in the underlying transaction lacking. *See, e.g.*, *Bescos v. Bank of Am.*, 105 Cal. App. 4th 378, 388–91 (Cal. App. Ct. 2003) ("Some greater involvement in

*Cenance* involved certiorari review of *Cenance v. Bohn Ford, Inc.*, 621 F.2d 130 (5th Cir. 1980). There, the Fifth Circuit rejected Ford Motor Credit's argument that it was merely a subsequent "assignee" of its form retail installment contracts, and not the original TILA "creditor,"[9] because:

> [e]ach of the dealers had a similar standing agreement with Ford: as a prerequisite for the extension of credit, purchasers were required to submit a credit application to Ford on a form printed by Ford. If the application met with Ford's approval, Ford would purchase the credit instrument after execution by the dealer and purchasers without further participation or risk on the part of the dealer.

*Id.* at 133. Accordingly, the Fifth Circuit held that "it would be elevating form over substance to hold that [Ford Motor Credit] was anything but an original creditor within the meaning of the Act and Regulation Z." *Id.*

The Supreme Court agreed and affirmed the holding that Ford Motor Credit was a TILA "creditor," because "the sales were contingent upon [Ford Motor Credit]'s approval of the credit worthiness of the buyer," "[t]he acceptance of the contract and the assignment became operational simultaneously," and "the assignment divested the dealer of any risk in the transaction." *Cenance*, 452 U.S. at 157-58. These facts showed that while the dealers had "*arranged* for the extension of credit," they never "anticipated financing any of these transactions." *Id.* Only Ford Motor Credit "actually *extended* the credit." *Id.* The Supreme Court thus "agree[d] with the Court of Appeals that it would be elevating form over substance" to conclude that Ford Motor Credit was not a TILA "creditor"—notwithstanding the "shell game" of automatically-assigned form contracts.

---

the negotiations of the lease itself, rather than simply approving the credit worthiness of the lessee, is required to constitute 'substantial involvement.'").

[9] Similar to the definitions of "lessor" at issue here, the definitions of "creditor" at issue in *Cenance* included someone "who regularly extend[ed], or arrange[d] for the extension of, credit," or "who in the ordinary course of business regularly extends or arranges for the extension of consumer credit[.]" *Id.* at 157-58 (citations omitted).

Virtually identical facts compel the conclusion that Porsche Financial is the true "lessor" of Plaintiff's PORSCHE® Lease. Like in *Cenance*, Porsche Financial and the dealer had a standing Dealer Agreement that "prearranged for the assignment of the finance instrument." *Cenance*, 621 F.2d at 133. (Facts ¶21.) Pursuant to that Agreement, the dealer agreed to assign all its PORSCHE® Leases to Porsche Financial. (*Id.* ¶20.) But Porsche Financial retained the sole discretion to: determine each consumer's creditworthiness; establish the forms and provisions of the contracts it would acquire; and determine the terms and conditions on which it will acquire contracts from dealers. (*Id.* ¶20.) Porsche Financial also provided the dealer with boilerplate PORSCHE® origination forms, including form Credit Applications, Leases, and Dealer Worksheets. (*Id.* ¶20.)

As a prerequisite for funding Plaintiff's deal, Porsche Financial required Plaintiff to submit a form PORSCHE® Credit Application through the dealer. (*Id.* ¶33.) Once Porsche Financial approved his credit application, the dealer arranged the PORSCHE® Lease for signature, which remained contingent upon financing approval by Porsche Financial. (*Id.* ¶20.) The dealer then submitted Plaintiff's "funding package" to Porsche Financial to accept or reject. (*Id.*) It was only when Porsche Financial ultimately "accepted" Plaintiff's deal that the PORSCHE® Lease became valid—at the same moment it was automatically assigned to Porsche Financial for funding. (*Id.* ¶20.) As in *Cenance*, Porsche Financial's "acceptance of the contract and the assignment became operational simultaneously," and the automatic assignment "divested the dealer of any risk in the transaction." *Cenance*, 452 U.S. at 158.

Furthermore, even if Porsche had rejected Plaintiff's deal, the dealer would have had no obligation to finance the Plaintiff's PORSCHE® Lease—the risk of nonpayment was always going to transfer to Porsche Financial through the form Lease. Without Porsche Financial's approval

16

and acceptance of the terms of Plaintiff's Lease, there would be no contract at all. Accordingly, this Court should decline Porsche's invitation to "elevat[e] form over substance to hold that [Porsche Financial] was anything but an original [lessor] within the meaning of the Act and Regulation [M]." *Cenance*, 452 U.S. at 156–57.

### 3.   Porsche Financial is liable to Plaintiff as a "lessor" under Section 1640—not as an "assignee" under Section 1641.

Porsche Financial is liable to Plaintiff as a "lessor" under Section 1640—not as an "assignee" under Section 1641. Porsche argues that, as an assignee of Plaintiff's Lease, it is liable only for violations apparent on the face of Plaintiff's Lease under Section 1641. (ECF No. 109-1, pp. 17-19.) Porsche seeks shelter from its obligations under the CLA through Section 1641 of TILA, which creates liability for a lessor's subsequent assignees *in addition to* a lessor's liability under Section 1640. *See* 15 U.S.C. § 1641(a). For example, had Porsche Financial—as the lessor—assigned Plaintiff's lease to another lender, that lender could be responsible for violations apparent on the face of Plaintiff's Lease under Section 1641. But, Porsche's attempt to use Section 1641 to erase its liability as a lessor under Section 1640 is premised on errors of statutory construction and has been properly rejected by other courts that recognized the same.[10]

The CLA incorporates Sections 1640 (lessor liability) and 1641 (assignee liability) of TILA to define the consequences for inadequate disclosures by lessors and their subsequent

---

[10] Other Courts have correctly recognized that "15 U.S.C. § 1641(a) is part of the TILA statute, not the CLA," and that "Regulation M imposes a broader scope of liability on assignees than does 15 U.S.C. § 1641(a)." *Jordon v. Schaumburg Toyota*, 1999 WL 116224, at *8 (N.D. Ill. Feb. 26, 1999), *aff'd sub nom. Jordan v. Toyota Motor Credit Corp.*, 236 F.3d 866 (7th Cir. 2001); *see also Jenkins v. Mercantile Mortg. Co.*, 231 F. Supp. 2d 737, 749 (N.D. Ill. 2002) ("TILA's coverage regarding assignees is not as extensive as the Consumer Lending [*sic*] Act's Regulation M"). "Specifically, under the Official Staff Commentary to Regulation M, … 'an assignee may be a lessor for purposes of the regulation in circumstances where the assignee has substantial involvement in the lease transaction.' In contrast, the TILA allows suits against assignees 'only if the violation for which such action or proceeding is brought is apparent on the face of the disclosure statement . . . .' 15 U.S.C. § 1641(a)." *Jordan*, 1999 WL 116224, at *8.

assignees. *See* 15 U.S.C. § 1667d(b). But nothing in Section 1641 (assignee liability) *limits* a lessor's liability under Section 1640 (lessor liability) just because the lessor is *also* an "assignee." The CLA specifically instructs the opposite: "*Any lessor* who fails to comply with any requirement . . . is liable to such person as provided in section 1640." 15 U.S.C. § 1667d(a). As discussed above, Porsche Financial is the "lessor."

Porsche's interpretation of Section 1641 as a "limit" on liability is contrary to its text. When creating *additional* liability for downstream assignees, Section 1641 states that its limits on an assignee's liability are conditional: "[e]xcept as otherwise specifically provided in this subchapter[.]" 15 U.S.C. § 1641(a). The status of "lessors" and their liability under the CLA, and the availability of damages in Section 1640, are all sections "otherwise specifically provided" in Subchapter I ("Consumer Credit Cost Disclosure"), 15 U.S.C. §§ 1601 through 1667f. 15 U.S.C. § 1641(a). Section 1641 of TILA cannot and explicitly does not operate to invalidate the express creation of liability for lessors under the CLA.

**4.    Porsche Financial cannot rely on the *Kennedy* opinion to erase its liability as a "lessor" under Section 1640.**

Porsche relies on *Kennedy v. BMW Financial Services, N.A.*, 363 F. Supp. 2d 110 (D. Conn. 2005), a non-binding opinion that failed to consider the above issues of statutory construction regarding the CLA and assignee liability under TILA. In *Kennedy*, the district court began by recognizing that BMW Financial Services was "substantially involved" in the lease transactions at issue, which is one way an assignee is also a "lessor" under the CLA. *Id.* at 115. But the *Kennedy* court held that a lessee cannot "avail himself of the remedies provided by TILA through § 1640 but ignore the restrictions of § 1641(a)." *Id.* at 116. *Kennedy*'s characterization of Section 1641 as "restrictions" on liability for a lessor is contrary to its express language: "*Except as otherwise specifically provided in this subchapter.*" 15 U.S.C. §

1641(a) (emphasis added). "[O]therwise specifically provided" would include liability under Section 1640 (lessor liability), as well as the CLA's own definition of a "lessor." 15 U.S.C. § 1641(a). Without addressing this contradiction, the *Kennedy* court moved on to the "better question" of "whether BMW should be classified as an assignee or a lessor for purposes of the alleged violations," but failed to consider whether BMW could be classified as <u>both</u>. *Kennedy*, 363 F. Supp. 2d at 117.

Nothing in the CLA or Sections 1640 and 1641 of TILA suggest that "lessor" versus "assignee" is an "either/or" proposition for liability. In fact, the official commentary to Regulation M commands *exactly* the opposite result: "an assignee may be a lessor" where it has "substantial involvement" in the lease transaction like Porsche Financial does here. 12 C.F.R. § 213, Supp. I. This Court should follow the express language of the intersecting statutes when construing the statute—not the incomplete analysis of the *Kennedy* court—to fulfill its objectives consistent with the binding commentary of its enforcing authority. Because Porsche Financial meets the definition of "lessor" under the CLA, whether or not it meets Section 1641's criteria for *assignee* liability is irrelevant. Porsche Financial is responsible for the disclosures made to Plaintiff regardless.

**B.** **Porsche Financial failed to accurately disclose the financial terms of Plaintiff's Porsche® Lease as required by the CLA.**

The CLA "reflects a transition in congressional policy from a philosophy of 'Let the buyer beware' to one of 'Let the seller disclose,'" "erecting a barrier between the [lessor] and the prospective [lessee] in the form of hard facts." *Mourning v. Family Publications Serv., Inc.*, 411 U.S. 356, 377 (1973); *see also Clement v. Am. Honda Fin. Corp.*, 145 F. Supp. 2d 206, 210 (D. Conn. 2001) (TILA and its regulations' "required disclosures are intended to provide, especially to the inexperienced and uninformed consumer, a way to avoid 'the possibility of deception,

19

misinformation, or at least an obliviousness to the true costs' of a credit transaction.").

Specifically, the CLA requires a lessor—like Porsche Financial—to "set[ ] out **accurately** and in a clear and conspicuous manner . . . [t]he **amount of any payment** by the lessee required at the inception of the lease." 15 U.S.C. § 1667a(2) (emphasis added). Filling in "the statutory gaps," *Myers*, 54 F. Supp. 2d at 754, Regulation M mandates that the lessor "shall disclose . . . [the] 'amount due at lease signing or delivery'" and "itemize each component by type and amount, including any . . . capitalized cost reduction; and in motor-vehicle leases, **shall itemize how the amount due will be paid, by type and amount, including any net trade-in allowance**[.]" 12 C.F.R. § 213.4(b) (emphasis added).

Plaintiff claims Porsche Financial did not accurately itemize on the face of his PORSCHE® Lease how the amount due would be paid "by type and amount" in two ways: *first*, by disclosing his $25,000 trade-in allowance as "N/A" in Section 7B(1); *second*, by disclosing that he paid $36,539.30 in <u>cash</u> in Section 7B(3):

| 7. | *ITEMIZATION OF AMOUNT DUE AT LEASE SIGNING OR DELIVERY. | | | | |
|---|---|---|---|---|---|
| **A. Amount Due at Lease Signing or Delivery:** | | | **B. How the Amount Due at Lease Signing or Delivery will be Paid:** | | |
| (1) Capitalized Cost Reduction | $ | N/A | | | |
| (2) First Monthly Payment | | N/A | | | |
| (3) Single Payment | | 36254.88 | (1) Net Trade-in Allowance | $ | N/A |
| (4) Title Fees | | N/A | | | |
| (5) Registration Fees | | N/A | (2) Rebates and Noncash Credits | | N/A |
| (6) License Fees | | 272.69 | | | |
| (7) Sales or Use Tax | | 11.73 | (3) Amount to be Paid in Cash | | 36539.30 |
| (8) N/A | | N/A | | | |
| (9) N/A | | N/A | | | |
| (10) Total | $ | 36539.30 | (4) Total | $ | 36539.30 |

(Facts ¶6.) Porsche Financial concedes that Plaintiff's $25,000 trade-in allowance "should have been disclosed in Section 7B(1)." (*Id.* ¶12); *see Myers*, 54 F. Supp. 2d at 755 ("the use of the abbreviation 'N.A.' to disclose the net trade-in value . . . is a clear violation of the [CLA], particularly [Regulation M]"). Porsche Financial likewise concedes that Plaintiff did *not* pay $36,539.30 in <u>cash</u>. (*Id.* ¶12.)

It is therefore undisputed that Porsche Financial inaccurately disclosed the financial terms

of Plaintiff's PORSCHE® Lease in violation of the CLA. *See, e.g.*, *Myers*, 54 F. Supp. 2d at 749-57 (rendering judgment for plaintiffs under the CLA, because their $7,000 trade-in allowance was disclosed as "N/A"); *Taylor*, 51 F. Supp. 2d at 1215 (granting summary judgment for plaintiff on CLA claim, because her $4,000 trade-in allowance was disclosed as "N/A"); *Jordon*, 1999 WL 116224 at *7 (plaintiff stated legally sufficient CLA claim by alleging that Toyota Motor Credit disclosed her "Net Trade In Allowance" as $0 despite positive trade-in equity); *Cummings v. Warren Henry Motors, Inc.*, 648 So. 2d 1230, 1232 (Fla. 4th DCA 1995) (plaintiff stated legally sufficient CLA claim by alleging that Volvo Finance North America "did not disclose the trade-in allowance" for his trade-in); *cf. Gross*, 1998 WL 2027611 at *3-6 (enjoining Buick's unfair and deceptive practice of "[f]ailing to list the value of a consumer's trade-in vehicle in a contract" and awarding damages); *see also* (Ex. CC, National Association of Attorneys General Report) (the "use of 'n/a' for . . . disclosures, where a number should have been placed," deprives consumers of the "means of ascertaining the true cost of the lease").

Even though Porsche's corporate representatives conceded Plaintiff's disclosures were unlawful and inaccurate, Porsche Financial makes the novel argument it is immune from liability because Regulation M supposedly exceeds its Congressional authorization. Citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), Porsche Financial claims that Regulation M's specific disclosure requirements "impermissibly expand[ ] the statute" because the CLA purportedly only required an accurate disclosure of the "amount of any payment" by Plaintiff at lease inception. (ECF No. 109-1, p. 14.) However, Porsche presents no analysis under *Chevron*, where the Supreme Court explained that "'[t]he power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.'" *Chevron*, 467

U.S. at 843 (citation omitted).

> If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are *arbitrary, capricious, or manifestly contrary* to the statute.

*Id.* (emphasis added).

Here, Congress expressly delegated broad authority by explicitly providing: "[t]he Bureau **shall prescribe regulations t**o **update and clarify the requirements and definitions applicable to lease disclosures** and contracts, and any other issues specifically related to consumer leasing . . . ." 15 U.S.C. § 1667f (a)(1) (emphasis added); *see also* 15 U.S.C. § 1604.[11] Consistent with this broad delegation, Congress also explicitly required the Bureau to "establish and publish model disclosure forms to facilitate compliance with the [CLA's] disclosure requirements . . . and to aid the consumer in understanding the transaction[.]" 15 U.S.C. § 1667f (b)(1). These same "model disclosure forms" require the specific itemizations that Porsche Financial failed to disclose.[12] 15 U.S.C. § 1667f (b)(1).

Regulation M's requirement that lessors itemize the method and amount of payment due at lease signing—including an accounting of any net trade-in allowance and cash used in the deal—is consistent with the text and purpose of the statute. The CLA requires that lessors set out "accurately and in a clear and conspicuous manner . . . the amount of any payment by the lessee at the inception of the lease" as well as "the amount of other charges payable . . . not included in the periodic payments." 15 U.S.C. § 1667a(2), (4). Regulation M's specific requirements

---

[11] "The Bureau shall prescribe regulations to carry out the purposes of this subchapter. . . . [S]uch regulations may contain such additional requirements . . . as in the judgment of the Bureau are necessary or proper to effectuate the purposes of this subchapter, to prevent circumvention or evasion thereof, or to facilitate compliance therewith."

[12] The model disclosure forms are Appendix A to Regulation M, and available online at: https://www.law.cornell.edu/cfr/text/12/appendix-A_to_part_213 (last visited Mar. 20, 2018)

regarding *how* these amounts should be itemized advance the "accurate," "clear," and "conspicuous" disclosures of the financial terms of terms of Plaintiff's lease. Porsche has advanced no argument that these regulations are somehow "arbitrary, capricious, or manifestly contrary to the statute"—nor could it.[13] *Chevron*, 467 U.S. at 843.

Further undermining Porsche's novel position is that the Supreme Court has explicitly found that TILA's analogous Regulation Z has the force of law. "[C]aution requires attentiveness to the views of the administrative entity appointed to apply and enforce a statute. And deference is especially appropriate in the process of interpreting the Truth in Lending Act and Regulation Z." *Milhollin*, 444 U.S. at 565. "Congress delegated broad administrative lawmaking power to the Federal Reserve Board when it framed TILA. The Act is best construed by those who gave it substance in promulgating regulations thereunder." *Id.*; *see also Bragg v. Bill Heard Chevrolet, Inc.*, 374 F.3d 1060, 1065 (11th Cir. 2004) ("Courts must defer to the regulations of the Federal Reserve Board when interpreting TILA."). The same force of law applies here.

## C.   Plaintiff was harmed "in fact" by Porsche Financial's inaccurate disclosures.

Porsche argues that its disclosure violations did not harm Plaintiff, and therefore he has no Article III standing to bring a claim for "bare procedural violations." *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) ("To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'") (citation omitted).

Porsche's interpretation of *Spokeo*'s Article III "injury-in-fact" analysis has already been

---

[13] Even assuming *arguendo* that Regulation M did impermissibly expand the CLA, Porsche Financial would still be liable because Plaintiff's Lease did not accurately disclose in a clear and conspicuous manner "[t]he amount of any payment" required at lease inception. 15 U.S.C. § 1667a(2). Rather, the Lease inaccurately disclosed that the "Amount to be Paid in Cash" was $36,539.30 when, in fact, the "amount" of Plaintiff's cash payment was $11,539.30, after deducting his $25,000 trade-in "allowance." (Facts ¶ 6).

rejected by the Eleventh Circuit: "An injury-in-fact, as required by Article III, 'may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing . . . ." *Church v. Accretive Health, Inc*., 654 F. App'x 990, 993 (11th Cir. 2016) (citations omitted). "A proven violation of [the CLA's] disclosure requirements is presumed to injure the borrower by frustrating the purpose of permitting consumers to compare various available credit terms." *Taylor*, 51 F. Supp. 2d at 1215 (quoting *Herrera v. First Northern Sav. and Loan Ass'n*, 805 F.2d 896, 901 (10th Cir.1986)). Indeed, "[i]f a lease does not properly disclose its terms, then consumers that rely on those untruthful or incomplete terms when deciding whether to enter into the lease necessarily make an uninformed decision." *Jordon*, 1999 WL 116224 at *4.

"Therefore, the harm to the consumer for a CLA disclosure violation occurs when the consumer relies on the inaccurate disclosure and executes a lease without full and truthful information." *Id.* "Because the misinformed consumer suffers an injury simply by entering the lease agreement, that consumer has standing to assert a CLA failure to disclose violation regardless of what acts the consumer or the lessor took after the parties executed the lease." *Id.* Porsche's practices prevent consumers like Plaintiff from understanding the true financial terms of their PORSCHE® Leases—including whether they are agreeing to pay to rent and be taxed on their own trade-in equity. Here, Porsche caused Plaintiff "injury to [his] statutorily-created right to information pursuant to the [CLA]," giving Plaintiff standing to enforce his rights under Article III. *Church*, 654 F. App'x at 994.

## II.    Summary judgment should be denied because Porsche Financial is liable to Plaintiff under the Florida Deceptive and Unfair Trade Practices Act.

Porsche Financial is liable to Plaintiff for its own unfair and deceptive acts. Porsche Financial drafted, reviewed, accepted, enforced, and unfairly profited from a form PORSCHE® Lease with Plaintiff that failed to properly apply his undisclosed $25,000 trade-in equity to

reduce the "capitalized cost" of his leased vehicle. Porsche Financial owed Plaintiff a fair and lawful deal, but the deal he got was unfair, deceptive, and unlawful. As a result, Porsche Financial damaged Plaintiff by overcharging him for both (1) the "rent charge" and (2) Florida sales tax.

Porsche Financial's failure to apply Plaintiff's trade-in as a down payment means Plaintiff first paid to borrow his own equity in his trade-in, and then unlawfully paid taxes on that equity. This unfair and deceptive formulation of Plaintiff's Lease was predicated by Porsche Financial's inaccurate disclosures in violation of the CLA, discussed *supra*. Porsche Financial's actions, policies, and inaccurate disclosures all worked to violate the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), which broadly declares unlawful any unfair or deceptive acts or practices committed in the conduct of any trade or commerce. Fla. Stat. § 501.204. Porsche violated FDUTPA to cause Plaintiff economic loss; it is liable for actual damages, civil penalties,[14] and injunctive relief. Fla. Stat. § 501.211(1)-(2), 501.2077(2).

Plaintiff's "claim 'for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages.'" *Bowe v. Pub. Storage*, 318 F.R.D. 160,

---

[14] Porsche's contention that only an "enforcing authority" may seek civil penalties for violations against senior citizens is belied by the case law and the plain meaning of FDUTPA. (ECF No. 109 at 29 n.3.) Section 501.2075 provides a civil penalty of up to $10,000 for *general* violations in actions by "the enforcing authority"—"*[e]xcept as provided in s. 501.2077.*" Section 501.2077 provides a heightened civil penalty of up to $15,000 for *specific* violations against senior citizens and omits any requirement that such penalties be sought by an enforcing authority. Fla. Stat. § 501.2077(2). Courts have presumed this omission to be intentional, and therefore allowed consumers to claim civil penalties under Section 501.2077. *See, e.g.*, *In re Miller*, 418 B.R. 406, 412 (Bankr. N.D. Fla. 2009); *Makaeff v. Trump Univ., LLC*, 145 F. Supp. 3d 962, 983-84 (S.D. Cal. 2015) (denying summary judgment on senior citizens' claim for civil penalties under § 501.2077(2) because there were "triable dispute[s]"); *Makaeff v. Trump Univ., LLC*, 2014 WL 688164, at *21 (S.D. Cal. Feb. 21, 2014) (certifying a class of senior citizens to seek civil penalties under § 501.2077(2)); *cf.* Fla. Stat. § 521.006(2) (permitting consumers to recover "civil penalties up to $1,000 per lease transaction" in actions against dealerships for unlawful disclosures).

181 (S.D. Fla. 2015) (citation omitted). Courts "must liberally construe [FDUTPA]." *Lombardo v. Johnson & Johnson Consumer Comp., Inc.*, 124 F. Supp. 3d 1283, 1287 (S.D. Fla. 2015). "Courts have regarded FDUTPA as 'extremely broad' and the statute is designed to protect the consuming public from those who engage in deceptive or unfair trade practices[.]" *Pincus v. Speedpay, Inc*., 161 F. Supp. 3d 1150, 1157 (S.D. Fla. 2015). An "unfair" practice is "one that 'offends established public policy' and one that is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003) (citations omitted). A "deceptive" practice is one that would "'likely [ ] deceive a consumer acting reasonably in the same circumstances,'" which is an "objective test." *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 983-84 (11th Cir. 2016) (citation omitted). "Reliance is not required for causation under FDUTPA: 'When addressing a deceptive or unfair trade practice claim, the issue is not whether the plaintiff actually relied on the alleged practice, but whether the practice was likely to deceive a consumer acting reasonably in the same circumstances.'" *Cabrera v. Haims Motors, Inc.*, --- F. Supp. 3d. ---, 2017 WL 6947924, at *5 (S.D. Fla. Dec. 28, 2017) (quoting *Gold Coast Racing, Inc. v. The Home Depot U.S.A., Inc*., 2006 WL 4579688, at *2 (S.D. Fla. Feb. 6, 2006)).

Porsche Financial's acts were both unfair and deceptive because they are (1) injurious to consumers and (2) objectively deceptive to reasonable consumers that do not know how to decode the cryptic financing terminology of an automobile lease. Porsche does not disclose its method of calculating the inflated "rent charges" that appeared on its form lease agreements to consumers like Plaintiff. By not disclosing Plaintiff's net trade-in allowance or how it should be applied, Porsche's form lease agreement concealed the unfair inflation of the "rent charge" and unlawful inflation of sales taxes charges. And regardless of whether Plaintiff subjectively relied

on any representation, he was unambiguously harmed by the practices—which is all that is required to support a claim under the pro-consumer principles of FDUTPA.

### A.  Porsche Financial's is liable for its *own* acts under FDUTPA, not "vicariously liable" for the acts of its franchised dealers.

It is not surprising that Porsche Financial goes to great lengths to control all aspects of its leases with consumers like Plaintiff: Porsche holds the risk created by financing the lease transaction, and Porsche receives the benefit of lease payments from its lessees. Porsche Financial—not salespersons or franchised dealerships—sets the permissible terms of a lease agreement, including acceptable profit margins (floors and ceilings) on financing terms like the "rent charge." As the admitted lessor under state and federal law, Porsche Financial also controls the disclosures made to consumers through its form PORSCHE® Leases.

Ultimately, it was Porsche Financial that reviewed Plaintiff's lease agreement for legal compliance, and then adopted and accepted the lease agreement between Plaintiff and itself. Without Porsche Financial's literal review, approval, and acceptance of Plaintiff's deceptive and unfair lease agreement, there would have never been a contract formed at all. If Porsche Financial had properly *rejected* the unlawful lease after reviewing it, Plaintiff would have lost no money, and there would have been no claim under FDUTPA. Instead, Porsche Financial chose to enter into the lease agreement with Plaintiff and profit from its unfair and deceptive terms.

Porsche's motion spends considerable time injecting irrelevant issues of "vicarious liability" into Plaintiff's claims. For example, Porsche contends that Plaintiff has failed to show Porsche Financial's "'direct' involvement in the offending act or practice." (ECF 109-1, p. 24.) Porsche cites *Aboujaoude v. Poinciana Dev. Co. II*, 509 F. Supp. 2d 1266 (S.D. Fla. 2007), which held that "in order to proceed against *an individual* for a violation of FDUTPA, a plaintiff must allege that the individual was a 'direct participant' in the dealings." *Id.* at 1277. But

Plaintiff is not trying to hold Porsche "vicariously liable" under FDUTPA—Plaintiff has sued Porsche Financial directly for its own unfair trade practices. Porsche has turned the "direct participant" analysis on its head in its bid to blame its dealers for Porsche's own unfair and deceptive lease agreement with Plaintiff.

Porsche cannot escape accountability under FDUTPA by cherry-picking alternative allegations in Plaintiff's complaint to misconstrue his direct claims against Porsche as derivative of its dealers.[15] Porsche Financial is the master of its form PORSCHE® Leases with consumers, including all terms and disclosures. Porsche Financial made the conscious decision to review, accept, and enter into an unfair and deceptive lease with Plaintiff. Porsche is thus directly liable under FDUTPA.

**B.   Porsche Financial's CLA disclosure violations are _per se_ violations of FDUTPA.**

Porsche Financial's violations of the Consumer Leasing Act's disclosure requirements result in _per se_ violations of FDUTPA. "A _per se_ violation of the FDUPTA [_sic_] occurs when the transgression stems from '[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition or unfair, deceptive, or unconscionable acts or practices.'" _Williams v. Delray Auto Mall, Inc._, 916 F. Supp. 2d 1294, 1300 (S.D. Fla. 2013) (citations omitted). _See_ Fla. Stat. § 501.203(3)(c). "Violations of federal consumer protection statutes can constitute FDUTPA violations," like the violations of the Consumer Leasing Act at issue here. _Virani v. Homefield Fin., Inc._, 2010 WL 11507411, at *6 (M.D. Fla. May 10, 2010).[16]

---

[15] Plaintiff's complaint alleges in the alternative that Porsche is directly and/or indirectly liable for the claims at issue, as permitted under Fed. R. Civ. P. 8(d). (_Compare, e.g._, ECF No. 1 ¶¶ 128, 132-37) (direct liability) _with id._ ¶¶ 18-19, 129 (indirect liability).)

[16] _See, e.g._, _Jones v. TT of Longwood, Inc._, No. 2006 WL 2789140, at *6 (M.D. Fla. Sept. 26, 2006) ("the alleged violations of the TILA, MVRSFA, FCRA, FCCPA and the other alleged misrepresentations by the Defendant clearly amount to an unfair or deceptive trade practice

Other courts have already declared virtually identical practices to be unlawful under both the Consumer Leasing Act and state consumer protection statutes analogous to FDUTPA. In *Taylor v. United Management, Inc.*, 51 F. Supp. 2d 1212 (D.N.M. 1999), the court granted summary judgment *for plaintiff* on claims brought under the CLA and the New Mexico Unfair Trade Practices Act (UPA). In *Taylor*, as here, the lease agreement "showed that a net trade-in allowance was 'N/A,' not applicable," despite a trade-in worth at least $4,000.00. *Id.* at 1214. The court found "that a distinction between a trade-in and sale is not material in this case," and that the documents were inaccurate regardless, because they either failed to show the trade-in allowance or they failed to accurately state how much cash was actually due at signing. *Id.* at 1215-16. The same is true here. And like Porsche Financial, "[a]lthough the Defendant credited the balance of the [trade-in] towards other items, that action served to reduce the principle owed by the least amount possible. This, of course, kept the monthly payment as high as possible." *Id.* at 1216. As a result, the *Taylor* court granted summary judgment for Plaintiff both "with respect to the CLA claim that the trade-in disclosure was not accurate" and "on the issue of violation of the unfair or deceptive trade practices provision." *Id.* at 1216-17.

In *Myers v. Hexagon Co., LLC*, 54 F. Supp. 2d 742, 757 (E.D. Tenn. 1998), the court entered judgment for the plaintiff after a bench trial under both the CLA and the Tennessee Consumer Protection Act. As here, the *Myers* plaintiffs "contend[ed] that the defendant's use of the terms 'NA' on the lease documents with regard to the plaintiff's trade-in, defendant's failure to explain its intentions with regard to the trade-in in response to questions about the terms 'NA,'

---

under the FDUTPA"). *See, e.g.*, *Taylor v. Homecomings Fin., LLC*, 738 F. Supp. 2d 1257, 1264 (N.D. Fla. 2010) ("a FDUTPA violation thus may be based upon the federal Truth in Lending Act, a rule adopted under that act by the Board of Governors of the Federal Reserve System, or a published interpretation of that act by the Federal Reserve System's Division of Consumer and Community Affairs").

and the defendant's omission of any reference to the treatment of the equity in the lease documents deceived them into consummating a lease that was unconscionable and unfair and was intended to take advantage of them[.]" *Id.* at 749. The court held that "the use of the abbreviation 'N.A.' to disclose the net trade-in value in this case is a clear violation of the Consumer Leasing Act, particularly 12 C.F.R. §§ 213.4(a)(1) and (g)." *Id.* The court also held "that use of the abbreviation 'N.A.' in block 16 of the lease agreement is misleading" under the state consumer statute when the plaintiff actually had a trade-in with equity. *Id.* at 753. The court thus rendered judgment for Plaintiff and awarded damages under the CLA and the state consumer protection statute. *Id.* at 755-57.

Plaintiff Cox is likewise entitled to summary judgment, and will move for summary judgment on behalf of the class after resolution of his pending motion for class certification.

### C.  <u>Porsche Financial violated FDUTPA by overcharging Plaintiff for his lease</u>.

Porsche Financial specifically formulated Plaintiff's lease to overcharge him interest ("Rent Charge") and sales tax. While the CLA admittedly governs required disclosures, not the substantive methods for calculating leases, Porsche Financial's disclosure violations were the predicate for a substantively unfair and unlawful formulation of Plaintiff's lease agreement. FDUTPA provides the remedy when disclosure violations result in a materially unfair lease calculation that costs Plaintiff money. "While there is no definition of an 'unfair or deceptive act,' the Legislature mandated that the FDUTPA be liberally construed to protect the consumer and that great weight should be given to federal cases interpreting the federal counterpart of this Act." *Baez v. Potamkin Hyundai, Inc.*, 2010 WL 11553183, at *9 (S.D. Fla. July 3, 2010) (citations omitted).

Plaintiff's Lease failed to reduce the capitalized cost "by the amount of cash or *vehicle*

30

*trade-in equity* that [Plaintiff] put into the deal[.]" (Ex. L.) This reduction, in turn, would have resulted in a correctly-calculated rent charge and Florida sales tax, as well as an accurate disclosure of the amount *actually* due at signing. This is also the lawful and fair formulation of Plaintiff's lease according to Florida's Attorney General. In an online memorandum titled "How to Protect Yourself: Car Leasing," the Office of the Attorney General explains that the capitalized cost "is reduced by the amount of cash or vehicle trade-in equity that you put into the deal," and cautions that "[t]he correct amount of credit for your trade-in **must** be indicated in the lease agreement." (Ex. L, emphasis added). "The lower the cap cost, the lower your monthly payment." (*Id.*) But here, Porsche Financial accepted, approved, enforced, and profited from a lease agreement that failed to make the required disclosures and, in turn, failed to properly calculate the amount to be paid by Plaintiff.

Porsche's formulation of Plaintiff's lease was "unfair" because it "'offends established public policy,'" including the purposes of the CLA and FDUTPA, and is "'unscrupulous or substantially injurious to consumers.'" *PNR, Inc.*, 842 So. 2d at 777. Likewise, it was "deceptive" because it is "objectively" "'likely [to] deceive a consumer acting reasonably in the same circumstances[.]'" *Carriuolo*, 823 F.3d at 983-84 (citations omitted). Other federal courts have already found that the practices at issue here resulted in miscalculation of lease payments, and that plaintiffs were entitled to damages and judgment under their state consumer protection laws. *See, e.g.*, *Taylor* and *Myers*, *supra*.

### 1.     Porsche Financial overcharged Plaintiff for his "rent charge."

The Official Staff Commentary to Regulation M, which is granted the force of law under *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565-66 (1980), explains that "[a] capitalized cost reduction is a payment in the nature of a down-payment on the leased property that reduces

the amount to be capitalized over the term of the lease." 12 C.F.R. § 213, Supp. I (Official Staff Commentary). Plaintiff Cox did not receive the benefit of his trade-in equity as a down-payment or "capitalized cost reduction," which resulted in Porsche Financial overcharging him for the vehicle he rented for 36 months.

Porsche applied its "rent charge" (the equivalent of interest charges) to the entire value of the leased vehicle unreduced by the trade-in, which inflated the total "rent charge" owed by Plaintiff. In other words, Plaintiff paid a % charge to rent the equity in his own trade-in. Had his undisclosed $25,000 trade-in equity been used to reduce the capitalized cost of his lease, the rent charge—derived as a factor of the "adjusted capitalized cost" after any applied trade-in reduction—would have been $2,331.23 lighter. (*See* Yerkes Dec., ECF No. 105-10.) Essentially, Plaintiff paid $2,331.23 to borrow $25,000.00 that he already placed in the deal. That is unfair "'unethical, oppressive, unscrupulous [and] substantially injurious to consumers.'" *PNR, Inc.*, 842 So. 2d at 777 (citations omitted). *See, e.g.*, *Taylor* and *Myers*, *supra*. It would not have happened if Plaintiff's $25,000.00 trade-in equity was properly disclosed, and then used to reduce the capitalized cost of Plaintiff's lease (like a down-payment).

### 2. Porsche Financial overcharged Plaintiff for Florida sales taxes.

The second consequence of Porsche Financial's exploitation of Plaintiff's trade-in equity is that Plaintiff's lease agreement inflated the charge of Florida sales tax. The failure to apply Plaintiff's trade-in as a capitalized cost reduction resulted in an "adjusted capitalized cost" that remained as high as possible—it was *unadjusted*. The higher the adjusted capitalized cost, the higher the rent charge. (Facts ¶ 8.) The higher the rent charge, the higher the lease payment. (*Id.*) And the higher the lease payment, the higher the sales tax charge. (*Id.*) Here, Porsche overcharged Plaintiff by $1,639.70 in Florida taxes by failing to reduce his taxable base by his

$25,000.00 of trade-in equity. (*See* Yerkes Dec., ECF No. 105-10.)

The practical effect of Porsche Financial's scheme is that Plaintiff paid sales and use tax on his own trade-in—a result contrary to Florida law. In Florida, tax is imposed on the "sales price" of any item sold, unless specifically exempt. Fla. Stat. § 212.05. However, the term "sales price" specifically *excludes* Plaintiff's $25,000.00 trade-in: "Trade-ins or discounts allowed and taken at the time of sale shall not be included within the purview of this subsection." Fla. Stat. § 212.02(16) (definition of "Sales Price"). *See also* Fla. Admin. Code, Rule 12A-1.007(1)(b)1 ("[a]ny trade-in allowance . . .shall be excluded" from sales tax calculation). The Florida Department of Revenue has also issued a non-binding Letter of Technical Advice confirming the same. (Ex. Q, Department of Revenue's Letter of Technical Advice.)

Porsche speciously argues that it's not unfair and deceptive to formulate a lease that overcharges Plaintiff for taxes *if* it renders those taxes to the State. (ECF No. 109-1, p. 31.) But Porsche ignores that the overcharges for taxes are a mere byproduct of its unfair inflation of Plaintiff's lease payment and "Rent Charge"—the profit that Porsche Financial enjoyed when it chose to adopt, approve, and enter into an unfair lease transaction with Plaintiff. That Porsche claims it only managed to profit from *half* of its fraudulent overcharges is irrelevant. Porsche Financial is responsible for all economic damage suffered by Plaintiff as a result of its unfair and deceptive practices, as discussed *infra*.

Nor can Porsche Financial rely on an "affirmative defense" based on Section Fla. Stat. § 213.756(2) to upend the precedent that "[a] taxing statute should always be construed in the light most favorable to the taxpayer." *Mikos v. Ringling Bros. Barnum & Bailey Combined Shows, Inc.*, 497 So. 2d 630, 632 (Fla. 1986). Porsche claims that it is immune for the miscalculation of state taxes because it "remitted the amount collected from the purchaser to the appropriate taxing

authority." Fla. Stat. § 213.756(2)(a)(3.). But by its very terms, this affirmative defense applies *only* "[i]n any action … against a retailer, dealer, or vendor … to … recover taxes … collected by the retailer, dealer, or vendor from the purchaser." Fla. Stat. § 213.756(2)(a). But it was not Porsche Financial or its dealer that remitted the taxes to the State of Florida, it was Porsche Leasing. (Facts ¶ 17.) Porsche Financial is not a *retailer, dealer, or vendor* protected by the statute, nor did Porsche Financial *collect* the taxes from the *purchaser*. And, Porsche *insists* the dealership is not its agent.

Porsche offers no legal support for its position that some subset of the statutory damages provided by FDUTPA are prescribed or narrowed by Section 213.756. The Court should construe the statute in the light most favorable to Plaintiff—the taxpayer—and find Porsche Financial liable for *all the harm* it caused.

### D.   **Porsche Financial cannot blame Plaintiff for being defrauded by injecting irrelevant issues of his subjective reliance.**

Throughout its brief, Porsche insinuates that it cannot be held liable for consumer fraud when there is a written contract signed by a consumer. Porsche's primary excuse for its policy of adopting and enforcing unlawful and unfair lease payment calculations is that this Plaintiff agreed to it. (*See, e.g.*, ECF No. 109-1, p. 1) ("What he claims … is entitlement to different disclosures that would accompany a reimagined, rewritten, *different deal*."); (*Id.* at p. 14) ("Mr. Cox knew that he received a $25,000 credit … and paid $11,539.30 by check, … [and] therefore suffered no 'actual' and 'concrete' harm"); (*id.* at p. 15) ("that was not the deal he negotiated"). According to Porsche's logic, sufficiently defrauding a consumer into handing over unfairly inflated lease payments is just "*a deal*"—even when induced and concealed by an unlawful failure to make accurate disclosures. That logic is " totally *fanciful*."

Porsche's perspective, of course, is against the full weight of the public policy objectives

of the statute. "In creating the FDUTPA, the Florida legislature intended to create a simplified statutory cause of action which bestows additional substantive remedies on Florida citizens to recover economic damages related to a product or service purchased in a consumer transaction involving unfair or deceptive trade practices or acts." *Jones v. TT of Longwood, Inc.*, 2007 WL 2298020, at \*6 (M.D. Fla. Aug. 7, 2007). *See Zlotnick*, 480 F.3d at 1284 ("deception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment") (citations omitted). "[H]ad the legislature intended to provide that contract principles would govern exclusively the resolution and recovery of economic damage claims brought under the FDUTPA, it could easily have said so." *Delgado v. J.W. Courtesy Pontiac GMC-Truck, Inc*., 693 So. 2d 602, 611 (Fla. Dist. Ct. App. 1997) (declining to apply the "economic loss" rule to limit consumer claims to contract, rather than tort, principles).

Porsche's spin on Plaintiff's case rests upon a fundamental mischaracterization of the elements of a claim for consumer fraud under FDUTPA. "A deceptive or unfair trade practice constitutes a somewhat unique tortious act because, although it is similar to a claim of fraud, it is different in that, unlike fraud, a party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue." *Bookworld Trade, Inc. v. Daughters of St. Paul, Inc*., 532 F. Supp. 2d 1350, 1364 (M.D. Fla. 2007) (quoting *State, Office of Att'y Gen., Dept. of Legal Affairs v. Wyndham Int'l, Inc.*, 869 So.2d 592, 598 (Fla. 1st DCA 2004)). As a result, "[r]eliance is not required for causation under FDUTPA: 'When addressing a deceptive or unfair trade practice claim, the issue is not whether the plaintiff actually relied on the alleged practice, but whether the practice was likely to deceive a consumer acting reasonably in the same circumstances.'" *Cabrera v. Haims Motors, Inc.*, 2017 WL 6947924, at \*5 (S.D. Fla.

35

Dec. 28, 2017) (quoting *Gold Coast Racing, Inc. v. The Home Depot U.S.A., Inc.*, 2006 WL 4579688, at *2 (S.D. Fla. Feb. 6, 2006)).

Porsche's repeated insistence that Plaintiff "got the deal he bargained for" is an attempt to amend FDUTPA and add a non-existent element to Plaintiff's claim. For this reason, Plaintiff's subjective mindset when being economically injured has no place in the Court's analysis. FDUTPA was specifically designed to prevent Porsche from profiting by consummating a consumer fraud through its contracts. Instead, Porsche Financial is liable to Plaintiff—like the class he seeks to represent—because Porsche Financial engaged in (1) a deceptive act or unfair practice (2) that caused Plaintiff (3) actual damages." *See Bowe*, 318 F.R.D. at 181.

E.   **Porsche Financial's "voluntary payment" defense does not apply to FDUTPA claims, and it fails regardless.**

Porsche claims that Plaintiff's state law claims, including FDUTPA, are barred by the "voluntary payment" defense—doubling down on its position that Porsche Financial is not accountable for deceptive trade practices as long as consumers agree to their injuries. Not only is this idea contrary to the public policy advanced by FDUTPA, but Porsche seeks to create new law by applying the common law "voluntary payment" defense to a claim created by a consumer protection statute. Porsche cannot provide a single decision holding that the "voluntary payment" doctrine could bar a FDUTPA claim. *See, e.g.*, *Chrzanowski v. S.D.S. Autos, Inc.*, 16-2005-CA-005434, 2006 WL 6235026 (Fla. Cir. Ct. 2006) ("Lexus concedes that there is not a single Florida case holding that the common law voluntary payment defense applies to statutory FDUTPA claims."). This makes because "a party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue." *Bookworld Trade, Inc.*, 532 F. Supp. 2d at 1364. State supreme courts that have considered the issue have explicitly held that the common law voluntary payment doctrine is not a defense to claims brought under consumer

36

protection statutes.[17]

Porsche's affirmative defense also fails as a matter of disputed fact because Plaintiff Cox did not make a payment with "knowledge of the factual circumstances" material to Porsche Financial's fraud. *Hassen v. Mediaone of Greater Fla., Inc*., 751 So. 2d 1289, 1290 (Fla. Dist. Ct. App. 2000). Porsche suggests that Plaintiff knew how much he was paying on top of his trade-in, but Porsche omits the fact that Plaintiff had no understanding that he was paying financing charges and taxes on the value of his own trade-in as a result of Porsche's failure to use his trade-in like a downpayment. (Statement of Disputed Facts ¶¶ 6-8.)

Plaintiff paid to rent his own trade-in equity, and then be taxed on it, precisely because he was defrauded—not because he understood the consequences of his lease terms. The evidence demonstrates that Plaintiff began to pursue his remedies as soon as he began to understand the unfair and deceptive trade practices used to inflate his lease payment. (*Id.*) Regardless, both the voluntary payment doctrine and Plaintiff's subjective understanding of his lease terms are irrelevant to Plaintiff's FDUTPA claim.

### F.    Porsche Financial owes Plaintiff actual damages under FDUTPA.

Porsche Financial's unfair and deceptive practices caused Plaintiff actual harm. Porsche made more money, and Plaintiff lost more money, than would have occurred under fair and lawful lease terms. FDUTPA measures these damages according to the loss suffered by the consumer. "In any action brought by a person who has suffered a loss as a result of a violation of

---

[17] *See, e.g. Huch v. Charter Commc'ns, Inc*., 290 S.W.3d 721, 727 (Mo. 2009) ("the voluntary payment doctrine is not available as a defense to a violation of the act"); *Indoor Billboard/Washington, Inc. v. Integra Telecom of Washington, Inc.*, 162 Wash. 2d 59, 86, (Was. 2007); *Sobel v. Hertz Corp*., 698 F.Supp.2d 1218 (D. Nev. 2010); *MBS-Certified Pub. Accountants, LLC v. Wisconsin Bell, Inc.*, 338 Wis. 2d 647, 678 (Wis. 2012). Like these other consumer protection laws, FDUTPA must be interpreted liberally in favor of its policy objective—protecting consumers. *Lombardo*, 124 F. Supp. 3d at 1287; Fla. Stat. § 501.202.

this part, such person may recover **actual damages** … ." Fla. Stat. Ann. § 501.211 (emphasis

added). These are the same damages recoverable at common law. *See Rollins, Inc. v. Heller*, 454

So. 2d 580, 585 (Fla. Dist. Ct. App. 1984). At common law, "Florida follows the 'flexibility

theory' in fraud actions, which permits a trial court to instruct the jury under either the out-of-

pocket rule or the benefit of the bargain rule, whichever will more fully compensate the

defrauded party." *Gregg v. U.S. Indus., Inc.*, 887 F.2d 1462, 1466 (11th Cir. 1989) (collecting

cases at common law). *See, e.g.*, *DuPuis v. 79th St. Hotel*, 231 So.2d 532, 536 (Fla. 3rd DCA

1970) (explaining the different measures for "actual damages" in a fraud case to do "justice as

the circumstances may demand").

Here, the measure of Plaintiff's actual damages is the difference between what a lawful

lease should have cost Plaintiff and the amount Plaintiff actually paid, with all other negotiable

terms being equal. In other words, his damages are the cost of his total lease obligations actually

formulated minus the cost of the lease had it been calculated fairly and lawfully. This measure of

damages is typical for consumer claims, including the same practices at issue here. *See, e.g.*,

*Myers*, 54 F. Supp. 2d at 755 ("I find that the plaintiff's actual damages for the defendant's

deceptive practices is the difference in the monthly payment they have been assessed and the

monthly payment they should have been assessed if they had been credited with their equity.");

*Gen. Motors Acceptance Corp. v. Laesser*, 718 So. 2d 276 (Fla. Dist. Ct. App. 1998) (in *dicta,*

the measure of actual damages would have been the cost of Plaintiff's deal, less the cost of the

deal Plaintiff claimed was legally required).

III.   **Summary judgment should be denied because Porsche Cars is liable to Plaintiff for
its negligent sales tax policies and procedures.**

Plaintiff has brought a FDUTPA claim and a claim of "negligence" against Porsche Cars

for its unlawful and negligent sales tax policies and procedures. Porsche Cars acted contrary to

Florida law, and breached its duty to exercise reasonable care, when setting the tax collection procedures that overcharged Plaintiff for his Florida sales tax.

Porsche's sworn discovery responses make clear that Porsche Financial "applies [the] procedures developed by the PCNA Tax Department to determine that the correct rate has been applied and that the calculations on the [PORSCHE®] lease are accurate." (Ex. K.) But the undisputed evidence is that Porsche Cars' procedure fails to account for reductions of the taxable base of a trade-in, and therefore fails to properly compute sales tax in the State of Florida where the deal involves a trade with positive equity. (*Id.*)

### A.      Porsche Cars is liable to Plaintiff under FDUTPA.

Porsche Cars is liable to Plaintiff under FDUTPA because Porsche Cars' conduct was unlawful and caused Plaintiff to be overcharged. As discussed in Section II.C.2, *supra*, the collection of Florida taxes on a taxable base unreduced by Plaintiff's own trade-in equity was unambiguously contrary to Florida law. Plaintiff has a justiciable FDUTPA claim against Porsche Cars because (1) its unfair trade practice (2) caused Plaintiff (3) actual damages. *See Bowe*, 318 F.R.D. at 181. Similarly, Porsche Cars cannot rely on an affirmative defense based on Fla. Stat. Section 213.756 because it is not a "retailer, dealer or vendor" that "collected" Plaintiff's tax payments. Fla. Stat. § 213.756(2)(a). Nor can Porsche Cars rely on the voluntary payment doctrine to rebut a FDUTPA claim, as discussed *supra*. *See* Section II.E.

### B.      Porsche Cars is liable to Plaintiff for negligence.

Porsche Cars is negligently liable to Plaintiff for its breach of an assumed duty to set the tax procedure that injured him. "Whenever one undertakes to provide a service to others, whether one does so gratuitously or by contract, the individual who undertakes to provide the service— i.e., the 'undertaker'—thereby assumes a duty to act carefully and to not put others at an undue

risk of harm." *Clay Elec. Co-op., Inc. v. Johnson*, 873 So. 2d 1182, 1186 (Fla. 2003). Whether by contract or "from the general facts of the case," it is clear that Porsche Cars undertook the provision of a sales tax procedure on behalf of Defendants. *Id.* at 1185. The failure to set a p that accurately accounted for Florida law breached Porsche Cars "duty to act carefully" and not harm others, giving rise to a claim of negligence. *Id.* at 1186.

While Porsche argues that it is not vicariously liable for the acts of a dealer, Porsche Cars cannot escape negligence liability for its own acts. Porsche Cars' duty under the "undertaker's doctrine" "applies not just to parties in privity with one another," "but also to third parties" like Plaintiff. *Id.* at 1186. Plaintiff's claim arises because his "harm is suffered because of reliance of the other [Porsche Financial] or the third person [Plaintiff] upon the undertaking" of Porsche Cars—satisfying the causation element of Plaintiff's negligence claim. *Id.* (quoting Restatement (Second) of Torts § 324A). *See, e.g.*, *Schojan v. Papa Johns Int'l, Inc.*, 303 F.R.D. 659, 668 (M.D. Fla. 2014) (certifying a class of consumers claiming "Defendants breached a duty of reasonable care and were negligent … in charging sales tax on delivery fees"); *Bugliaro v. BJ's Wholesale Club, Inc.*, 2015-006256-CA-01, p.1 (Fla. 11th Cir. Ct. May 25, 2017) (certifying an injunctive class of consumers against retailer who were overcharged for Florida sales tax).

Furthermore, Porsche Cars cannot rely on the "voluntary payment" doctrine because Plaintiff Cox did not make a payment with "knowledge of the factual circumstances" material to Porsche Financial's fraud. *Hassen*, 751 So. 2d at 1290. Plaintiff paid to rent his own trade-in equity, and then be taxed on it, precisely because he failed to understand the consequences of his lease terms. *See* Section II.E, *supra.* Summary judgment for Porsche Cars is due to be denied.

**IV.     Plaintiff will amend his Complaint to narrow the claims at issue.**

Plaintiff will move to amend his complaint and conform his theories and allegations to

the facts uncovered in discovery. As a result, Plaintiff intends to drop Count 5 (Breach of Contract), Count 6 (Breach of Covenant of Good Faith and Fair Dealing), Count 7 (Negligent Training and Supervision), and Count 8 (Unjust Enrichment).

## CONCLUSION

Porsche is the lessor of Plaintiff's lease, but failed to make fair and accurate disclosures required by federal and Florida law. The nondisclosures were a predicate to overcharging Plaintiff for his PORSCHE® Lease to increase Porsche's profit—a violation of FDUTPA. Summary judgment should be denied.

Respectfully submitted,

By: *s/ Mark A. Schweikert*
Mark A. Schweikert (FBN 70555)
Ronald P. Weil (FBN 169966)
**WEIL SNYDER SCHWEIKERT & RAVINDRAN, P.A.**
201 South Biscayne Boulevard, Suite 720
Miami, Florida 33131
T: (305) 372-5352
F: (305) 372-5355
mschweikert@weilquaranta.net
rweil@weilquaranta.net

Hirlye R. Lutz, III (*Pro Hac Vice*)
F. Jerome Tapley (FBN 22066)
Adam W. Pittman (*Pro Hac Vice*)
**CORY WATSON, P.C.**
2131 Magnolia Avenue
Birmingham, Alabama 35205
T: (205) 328-2200
F: (205) 324-7896
rultz@corywatson.com
jtapley@corywatson.com
apittman@corywatson.com

*Attorneys for Plaintiff*

41

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on March 22, 2018, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF filing system. I further certify that the foregoing document was served on all counsel of record via transmission of the Notice of Electronic Filing generated by the Court's CM/ECF system.

<i>s/ Mark A. Schweikert</i>
Mark A. Schweikert